23 So.2d 409

AMERICAN GUARANTY CO. v. SUNSET REALTY & PLANTING CO., Inc., et al.

Nos. 37350, 37351.

Nov. 6, 1944.

On Rehearing May 2, 1945.

Second Rehearing Denied June 29, 1945.

Ellis, Barranger & Suthon, of New Orleans, Frank B. Ellis, of Baton Rouge, Frank H. Langridge, of Gretna, and Charles D. Lancaster, of New Orleans, for plaintiff-appellant.

Milling, Godchaux, Saal & Milling, Chas. H. Blish, Roberts C. Milling, and M. Truman Woodward, Jr., all of New Orleans, Herold, Cousin & Herold and Sumter P. Cousin, all of Shreveport, and Dufour, St. Paul & Levy, John St. Paul, Jr., and Montgomery, Montgomery & Fenner, all of New Orleans, for defendant-appellee.

PONDER, Justice.

The plaintiff, the American Guaranty Company, brought two suits to set aside two quitclaim deeds on the grounds that they had been obtained through fraud. The two suits were consolidated in the lower court for trial, and separate judgments were rendered by the trial judge, rejecting the plaintiff's demands. The plaintiff has appealed. The cases were consolidated for hearing on the appeal with the understanding that separate judgments would be rendered.

The two consolidated suits involved herein bear Nos. 37,350 and 37,351 of the docket of this Court, and we shall hereafter refer to these suits as Suit No. 37,350 and Suit No. 37,351 for brevity.

Suit No. 37,350 was brought against C. B. Small, Sunset Realty & Planting Company, Inc., the Texas Company and Hibernia Bank & Trust Company, in Liquidation, to set aside a quitclaim deed executed on November 15, 1939, by the plaintiff in favor of C. B. Small, covering Lot 53 and Lots 104 to 119, inclusive, of Sub-District No. 1 of the Sunset Drainage District in St. Charles Parish. The consideration recited in the quitclaim deed was $5,000 cash and $47,000 to be paid the plaintiff out of one-forty-eighth of the first oil, gas or other production from the property.

Suit No. 37,351 was brought against the same defendants and others, who had acquired rights from these defendants, to set aside a quitclaim deed executed on November 15, 1939, by the plaintiff in favor of C. B. Small, covering Lots 34 to 52, inclusive, and Lots 530 to 533, inclusive, in the Sunset Drainage District No. 1. This deed contains a general or omnibus clause whereby the plaintiff released and quitclaimed all of its rights, title and claims to all the property acquired by the plaintiff from C. J. Sorrells in a certain deed of August 8, 1921. The consideration recited in this quitclaim deed was $2,000 cash and the payment of a royalty to the plaintiff equal to one-two-hundredths ($\frac{1}{200}$ths) of the whole of the oil, gas or other minerals produced from Lots 34 to 52, inclusive, and Lots 530 to 533, inclusive. For the sake of brevity and certainty, we shall hereafter refer to the general or omnibus clause contained in this quitclaim deed as the omnibus clause.

The plaintiff contends that C. B. Small, acting for himself and the other defendants, fraudulently obtained the quitclaim deeds by misrepresentation and suppression of the true facts in that:

1. Defendant C. B. Small advised plaintiff that the well known as LL&E#1 in the Paradis area was a gas well producing some condensate or distillate, when in truth and in fact said well was an oil well, and represented further that the properties covered by the quitclaim deed were capable of producing only gas when defendants knew said properties were bound to produce great quantities of oil.

2. Defendant C. B. Small represented to plaintiff that Sunset Realty & Planting Company, Inc., had a good and paramount title to the property described above, whereas in truth and in fact said Sunset Realty & Planting Company, Inc., had no title whatever to part of said property and a doubtful claim on the remainder.

3. On the day following the execution of the quitclaim deeds, the defendant C. B. Small substituted a redrafted copy in place of one of the original quitclaim deeds, wherein the omnibus clause was surreptitiously inserted without the knowledge of the plaintiff.

The defendants take the position that the well was in fact a gas well producing some condensate and distillate, and that at the time the representations were made, the defendants nor anyone else knew that the area covered by the quitclaim deed would produce oil in paying quantities. The defendants admit that Small represented to the plaintiff that the Sunset Realty & Planting Company, Inc., had a paramount title to some of the properties described in the quitclaim deeds and assert that the representation is true. The defendants also admit that Small requested the officials of the plaintiff company to sign another quitclaim deed on November 16, 1939, similar in verbiage and import to the quitclaim deed of November 15, 1939, in order to correct the spelling of Small's name and change the attestation of the secretary of the company, but assert that in all other respects the instrument was neither changed nor altered.

On October 6, 1938, the Sunset Realty & Planting Company, Inc., hereinafter referred to as Sunset, granted to the Texas Company a mineral lease on a large tract of land which it owned in St. Charles Parish. A part of this leased property is involved in these suits. At the time the mineral lease was granted, the Texas Company held mineral leases on adjoining lands, particularly those of the Louisiana Land & Exploration Company, lying across the Southern Pacific Railway right-of-way from the Sunset acreage. The Texas Company began drilling operations in November, 1938, on the lands of the Louisiana Land & Exploration Company near the Southern Pacific right-of-way and some eight hundred feet from the Sunset property. The well was completed in the month of June, 1939, as a gas distillate well or, in other words, as a well producing gas and distillate. This well will hereinafter be referred to as LL&E#1.

Prior to the completion of this well, C. B. Small contacted the officers of Sunset, who were also the officials of the State Banking Department engaged in liquidating the Hibernia Bank & Trust Company, which owned an interest in Sunset as well as a large mortgage indebtedness against it, with the view of purchasing royalty interests. In examining Sunset's title to the property, Small's attorney discovered in the records of St. Charles Parish a deed dated August 8, 1921, whereby C. J. Sorrells had conveyed the lands to the American Guaranty Company. The attorney informed Small that this deed had the effect of casting a cloud upon Sunset's title to these lands. Small purchased the royalty interest from Sunset with the understanding that a slander of title suit would be brought against the plaintiff company, the American Guaranty Company, for the purpose of removing the cloud. Pursuant to this agreement or understanding, deeds were executed by Sunset conveying the royalty interest to Small and placed in escrow pending the determination of the slander of title suit. Sunset brought the suit against the plaintiff in conformity with the agreement. While this suit was pending, Small endeavored to locate the plaintiff company. On being informed that the plaintiff was a Delaware corporation, Small found, after investigation, that the company had been inactive for approximately sixteen years, and its last known president was Mr. C. I. Link of Denver, Colorado. He also found that the plaintiff was in arrears in the payment of its franchise tax, and it would be necessary to have the company reinstated before it would have any authority to act. He immediately contacted Mr. C. I. Link with the view of acquiring a quitclaim deed from the plaintiff on lots 53 and 104 to 119, inclusive. After negotiations with Link, an agreement was entered into whereby Small was to pay all the expenses for having the plaintiff corporation reinstated with the understanding that the plaintiff for a recited consideration would execute a quitclaim deed to Small covering these lots. The negotiations between Link and Small continued for some three months and finally terminated in the execution of the two quitclaim deeds involved in these suits.

While the negotiations were in progress and prior to the execution of the quitclaim deeds, the Texas Company began drilling operations of another well on the lands of the Louisiana Land and Exploration Company, more than one and one-fourth miles from the Sunset acreage. In the latter part of October, 1939, the well was cored and showed an oil sand. The well was brought in as a producing oil well on November 26, 1939, after the execution of the quitclaim deeds.

A short time after the execution of the quitclaim deeds, Tom L. Sessions and other parties contacted the plaintiff with the view of setting aside the quitclaim deeds and acquiring a mineral lease and royalty interests. The plaintiff and these parties entered into an agreement whereby Link was paid $10,000; a mineral lease was executed to Sessions; and certain mineral rights were transferred. In this agreement, Sessions was to pay the expenses of all litigation necessary to cancel the quitclaim deeds, and the attorneys selected by him were to receive certain interests in the property and the royalties for their services. It is specifically provided in the agreement and the other instruments executed in furtherance thereof that the plaintiff does not warrant the title to the land.

Thereafter, these suits were brought. At the time these suits were filed, the property had become a part of a proven oil field.

The plaintiff contends that it was misled in executing the quitclaim deeds by Small's fraudulent misrepresentations and suppression of facts in the negotiations leading up to the execution of the quitclaim deeds.

The pertinent correspondence leading up to the execution of the quitclaim deeds is as follows:

"Shreveport, La.
"August 22, 1939

"Mr. Chas. I. Link
"Interstate Trust Bld.
"Denver, Colorado

"Dear Mr. Link:

"Since returning to Shreveport, I have been doing some work on the title to property which we discussed on two different occasions and will have some information which I will forward to you within the next few days.

"I hope that you have taken advantage of the time that has elapsed since our conversation and have gotten some information both as to the value and title to the property we discussed.

"I, also, want to thank you for your time and consideration given me while in Denver.

"Very truly yours,

"C. B. Small"

"C. I. Link

"Suite 612–614 Interstate Trust Building
"Denver, Colorado

"August 24, 1939·

"My dear Mr. Small:

"Yours of the 22nd. received this A.M. and note you are putting some time on arranging the matter you discussed with me on your recent trip here.

"As I stated to you, I hope to be able to cooperate with you in attaining your purpose.

"The Westcoats are on a cruise, my daughter had a letter from them this week dated Halifax, N. S.

"For your information I have before me a statement showing the Am. Guaranty Company spent $23,471.51 on the Paradis property from July 1st, 1921, to Dec. 31st, 1921.

"My plans now are to go to Illinois on business about September 15th.

"Very truly yours,

"(Signed) C. I. Link"

"Shreveport, Louisiana
"August 31, 1939

"Mr. Charles I. Link
"Interstate Trust Building
"Denver, Colorado

"Dear Mr. Link:

"Following my letter to you of August 22nd, I wish to say that I am now in a position to suggest to you the basis upon which I would be willing to acquire whatever claims the American Guaranty Company might have to Lot 53 and Lots 104 to 119, both inclusive, (totaling approximately 180 acres) of the Sunset Drainage District near Paradis in St. Charles Parish, Louisiana, about which you and I had considerable discussion when I was in Denver on the 12th and 14th of August last.

"As you told me you had found your file covering the acquisition by the American Guaranty Company of these and other lots in St. Charles Parish, I take it that you are familiar with the nature of the claim of the American Guaranty Company to these lots, and for that reason will not dis-

cuss this phase of the matter. Besides, I take it further that if you do not have complete information as to the source of your claim of title, that you will prefer to make an independent investigation thereof.

"As stated to you, The Texas Company has drilled a well for oil or gas on the Louisiana Land & Exploration Company property lying to the west of the Southern Pacific Railroad. This well is west and opposite Section 39, and is approximately 6,000 feet from Lot 104 which, together with Lots 104 to 119, inclusive, lie to the southeast thereof, and is approximately the same distance from Lot 53, which lies to the northeast thereof. It is our information that this well was drilled to a depth of over 11,000 feet and was plugged back and completed as a gas well producing some condensate or distillate.

"I think that a trade could be worked out between you and me by which I would purchase all of the rights of the American Guaranty Company to the lots above mentioned for a cash consideration, say $2,000.-00, and I would further agree to pay as a portion of the price therefor $47,000.00, payable out of, and only in such wise, a proportionate part of all of the oil produced from the said lots, say 1/48th of all of such production. This purchase, of course, would not be with warranty of title. In other words, if the property produces and either American Guaranty Company or Sunset Realty And Planting Company, Inc., has good title, I would be obligated to pay you, irrespective of whether your title is good, the sum of $47,000.00 payable out of 1/48th of the production.

"If, after considering both the nature of your title and the value of the property involved, you should think that we could work out a trade somewhat along the suggestions contained above, I would be glad to meet with you further to see if such can be done. Of course, I would prefer to have the meeting here, and the advantage to you would be that you could more thoroughly have at hand any information you might desire.

"I hope you had a nice visit to Illinois, and that all is well with you.

"Very truly yours,

"C. B. Small"

"C. I. Link

"Suite 612–614 Interstate Trust Building

"Denver, Colorado

"September 2nd, 1939

"My dear Mr. Small:

"Will co-operate with you on terms of your letter of August 31st, 1939, with one exception; namely; the cash consideration to be $5,000.00.

"Upon receipt of $1,000.00, to be wired, and to apply on cash account and to be used to defray legal and preliminary expenses will meet you in Cherryvale, Kansas or Tulsa to be decided after conference with Attorney Brady.

"Will give the matter my immediate attention upon hearing from you.

"I am

"Respectfully yours,

"(Signed) C. I. Link"

"Sept. 25, 1939

"Mr. C. B. Small

"Shreveport, Louisiana

"Dear Mr. Small:

"This letter is written to confirm the oral understanding reached between us today which is as follows to-wit:

"It is your desire to purchase all of the right, title or interest of the American Guaranty Company in and to the following described property:

"All those certain lots hereinafter designated by number shown on the map of the Sunset Drainage District, formerly the St. Charles Municipal Drainage District, being a subdivision of Sections (or portions thereof) 10, 15, 21, 22, 23, 26, 27, 28, 29, 31, 32, 34, 35, 38, 39, 41, 43, 45, 46, 47, Township 14, South, Range 20 East, and Sections (or portions thereof) 3, 4, 5, 6, 9, 10, Township 15, South, Range 20 East as prepared by James S. Webb, Civil Engineer, and duly filed in the conveyance records in book 'N. N.' of St. Charles Parish, Louisiana;

"Following property situated in the Parish of St. Charles, State of Louisiana to-wit: All those certain lots hereinafter designated by number shown on the map of the Sunset Drainage District, formerly the St. Charles Municipal Drainage District.

"Lots 104 to 119 incl. and Lot 53, comprising 180 acres more or less.

"The consideration which you propose to pay to the American Guaranty Company for such interest is $5,000.00 cash with the further agreement that the American Guaranty Company shall receive $47,000.00 payable out of 1/48 of the whole of the oil, gas or other minerals if and when pro-

duced, saved and marketed from the above described property, provided that either the title transferred by the American Guaranty Company or the title of the Sunset Realty and Planting Company to the said property is good. This mineral payment shall be a covenant running with the lands and binding upon any future owner of said property. It is agreed that the sale from the American Guaranty Company to you is to be without warranty of title, even as to the return of the purchase price. The $5,000.00 is to be paid the American Guaranty Company upon the producing deed from the American Guaranty Company to yourself valid as to form, accompanied by satisfactory proof of the authority of the officer who might execute the deed on behalf of the American Guaranty Company to act in the premises.

"As president of the American Guaranty Company I favor the proposition that you have made and agree to cooperate to the extent of my ability in having the corporate privileges of the said company restored and in taking such steps it might be necessary to elect a board of directors for the said corporation and to present your proposition to such board of directors to the end of said board authorize me or some other officer of the corporation to make the conveyances to you as above outlined.

"It is my understanding that you will pay the sum of $402.50 to the State of Delaware in order to have the privileges of the American Guaranty Company restored under the laws of that state and you have today paid to myself the sum of $100.00 to cover actual expenses incurred by me in the furtherance of the interests of the American Guaranty Company in the instant trade; you have also paid today the sum of $100.00 to Mr. James A. Brady for legal services rendered by him in furtherance of the interest of the American Guaranty Company. It is agreed by me for and on behalf of the American Guaranty Company that the sum set forth in this paragraph which have been or are to be paid by you shall be deducted from the cash portion of the purchase price of $5,000.00 upon the consummation of the trade.

"This transaction shall be consummated by the delivery of the deed from the American Guaranty Company to yourself accompanied by satisfactory proof of corporate authority of the officer acting for such company to some bank in Shreveport, Louisiana, accompanied by a sight draft in the amount of $4,397.50 upon the honoring of such draft deed shall be delivered to you.

"Yours truly,
"(Signed) C. I. Link"

The testimony shows that Small first contacted Mr. C. I. Link in July, 1939, with the view of acquiring a quitclaim deed to Lot 53 and Lots 104 to 119, inclusive. From that date until the execution of the quitclaims, Small and Link had several conferences. Link and Small were both represented by able counsel at most of these meetings. In pursuance to these conferences, the corporation was reinstated at Small's expense. The titles to these lots and others were discussed at these conferences. From the testimony, it appears that at these conferences Small made substantial-

ly the same representation as to the nature and character of LL&E#1 as he made in his letter of August 31, 1939, viz., "that the well was a gas well producing some condensate or distillate." Small admits that he told Link Sunset had a paramount title to some of the lots listed in the quitclaim deeds, but there is conflict in the testimony as to whether Small informed Link that Sunset had a paramount title to the other lots. For the purpose of this decision, we may assume that Small told Link that Sunset had a paramount title to all the lots described in the quitclaim deeds. As a result of these conferences and the aforementioned correspondence, two quitclaim deeds were finally executed on November 15, 1939. On November 16, 1939, Small presented Link with a quitclaim deed purporting to change some errors made in one of the deeds. This quitclaim deed was signed by the parties and substituted for the original.

The plaintiff contends that Small misrepresented the nature and character of LL&E#1 in that he fraudulently represented it to be a gas well when he, in truth and in fact, knew that it was an oil well.

This well was classified by the Conservation Commission as a gas well and operated by the Texas Company as such. The six expert witnesses who testified in behalf of the defendants classified the well as a gas well, making some condensate or distillate, or as a gas distillate well, which they stated conveyed the same idea. Only one expert witness testified on behalf of the plaintiff on this point. He classified the well as an oil well. However, he admitted that it would be correct to say that the well produced distillate. The trial judge viewed the well during the process of the trial and had it opened in the presence of all counsel and a large number of witnesses. The trial judge states, in his written reasons for judgment, that the well when opened began roaring and blew into the air a substance that looked like a stream of steam or white misty vapor which dampened the foliage underneath as though it had been wet by water. He further states therein that the foliage thereabouts was not discolored, and that he placed a handkerchief in the vapor which became damp, quickly dried out and showed no discoloration whatsoever. There is a pint bottle containing some of the fluid taken from the well in the record. This fluid is transparent and looks like distillate or an inferior grade of gasoline. In view of the preponderance of the testimony, the experiment made by the trial judge in the presence of the parties at interest and our observation of the fluid contained in the bottle, the conclusion is inescapable that this well produces gas and distillate. Whether it should be characterized as an oil well or a gas well is of no particular moment so long as the actual production from the well was properly represented.

The plaintiff contends that Small and his principals deceived it when they withheld their knowledge that LL&E#2 was certain to be a highly successful oil well.

The plaintiff is under the impression that Small should have divulged all of the technical information respecting LL&E#2 in his or the Texas Company's possession. It

is contended that even though Small was not in possession of this information the knowledge of the Texas Company is imputed to him for the reason that Small acted as agent of the Texas Company or as a joint adventurer or as a partner, and that the failure to transmit this information to the plaintiff constitutes fraud. It is argued that when Small transmitted some of the facts concerning the property and its prospects for producing minerals, it was his solemn duty to divulge all of the facts that would tend to show the land was situated in a proven oil field.

At the time Small began negotiating with Link with the view of obtaining a quitclaim, drilling operations were in progress on LL&E#2. This well is approximately one and one-fourth miles from the Sunset acreage. The well was cored after these negotiations had been going on sometime but prior to the execution of the quitclaims. Small testified that he was not in possession of any information tending to show the well would, when completed, be a producing oil well at the time the quitclaims were executed. We find no evidence in the record to the contrary.

The plaintiff takes the position that we should infer that Small was in possession of this information from the fact that the Texas Company contributed some of the funds necessary to perfect Sunset's title to the lands involved herein which were under lease to the Texas Company from Sunset.

We see no necessity to go into this question for the reason that it is immaterial whether Small was in possession of the information or whether he was chargeable with the information in possession of the Texas Company. In either event, there was no obligation on Small's part to transmit this information to the plaintiff since they were dealing at arms' length. We are not presented with a case of an advantage being taken of an inexperienced person. The record shows that Link has had a wide business experience. He has been president of a number of corporations and is undoubtedly a shrewd business man. If Link did not know the value of the property and the status of the titles, it was his own fault. He had ample opportunity to investigate the titles and the value of the property. The negotiations between him and Small covered a period of approximately four months. Repeatedly, Small suggested to Link, especially in his correspondence, that he make an independent investigation. If he chose to act with his eyes closed, he was at liberty to do so, and there is no reason why he should now complain of a lack of information which he might have readily obtained by investigation.

"If, knowing, or being in a position to know, that the interest of the defendants might have been partially or wholly devested by an attachment or an execution against Buck, the bank chose to act with its eyes closed, it was at liberty to do so, but there is no reason why it should now complain of a lack of information which it might readily have obtained if it had kept its eyes open." Exchange Bank v. E. B. Williams & Co., 120 La. 901, 45 So. 935, 942.

It is suggested that Small knew at the time he requested Link to investigate the value of and title to the property that such request was an idle gesture for the reason that Small had knowledge that Link, who had been involved in some litigation in Louisiana, had been advised by his attorney never to return to this State. We are *not* impressed with the suggestion for the reason that when the case was tried, Link attended the trial and testified in the case. Moreover, Link had the advice of able counsel during the negotiations and there was nothing to prevent him from having some other person investigate the titles and value of the property.

The evidence does not show that Small made any false assertions as to the value of the property included in these suits. Even if he had made false assertions regarding the value of the property, they would not be such an artifice as to invalidate the quitclaim deeds when Link could have, under ordinary attention, detected the falsehoods. In such case, he is supposed to have been influenced more by his own judgment than by the false assertions. Article 1847, Revised Civil Code.

"As to the alleged fraud on the part of the bank and its agents in reference to the value and worth of the land, and the uses to which it had been and might be put, these are not such misrepresentations as to cause the contract of sale to be set aside. All of these matters could have been verified by an inspection of the land, which was accessible to the plaintiff at all times." Pike v. Kentwood Bank, 146 La. 704, 83 So. 904, 905.

"It is quite immaterial whether the verbal, written, and pictorial representations first made to plaintiffs were true or false. They were from the start invited to visit and investigate the lands for themselves, and were definitely told that no land would be sold to any one who had not visited and inspected it for himself and at his own expense. This was distinct warning to plaintiffs that they must rely upon their own judgment alone in any purchase which they might make; * * *" Davitt v. Long-Bell Farm Land Corporation at al., 162 La. 59, 110 So. 88, 89.

"* * * as we have pointed out, the property which was the object of the contract which is now attacked was of such a nature and in such a situation that Ralph Fichet, 'with ordinary attention',—as the 3rd rule in article 1847 of the Civil Code puts it,—might have known as much about the value of the property as John Grivaud knew." Succession of Grivaud, 192 La. 181, 187 So. 284, 288.

"It is declared in the third paragraph of article 1847 of the Civil Code that a false statement made by a party to a contract of sale, as to the value of the object of the sale, is not such a fraud, 'such an artifice', as will give to the other party the right to annul the sale, if the object was of such a nature and in such a situation that he who was induced by the false statement to enter into the contract 'might with ordinary attention have detected the falsehood.' Therefore, if the statement in the circular letter which induced the plaintiff to sell her shares of stock for $50 per share, that the listing of the stock would be reduced to $38

on the nineteenth day after the date of the circular letter, should be regarded as a false statement, it was not a false statement of which the plaintiff may complain, because 'with ordinary attention' she could have learned all that any one else could know about the value of her shares of stock." Wessel v. Union Savings & Loan Ass'n, 198 La. 219, 3 So.2d 594, 598.

The record shows that during the negotiations between Link and Small, up to the date of the execution of the quitclaims, there was no operation on or production of minerals from the lands in these suits. The fact that there was a gas and distillate well on an adjacent tract of land and another well being drilled some distance from the land involved herein, showing prospects of being a successful oil well, would not show with any degree of certainty that the lands involved in these suits would produce oil if drilled. It was at that time uncertain and speculative as to whether or not oil could be produced from the lands involved in these suits. Even though the technical information regarding LL&E #2 might have indicated that there was oil under these lands, there would have been no absolute certainty that these lands would produce oil until drilled. The values of the lands involved herein, as well as the probability of their producing oil, would be a matter of opinion based on information, technical or otherwise.

"The uniform jurisprudence of this court is that error as to the value of land, which is the object of the contract, is not error of fact, but error of judgment, for which the law furnishes no relief, since the value

of the land could have been verified by inspection. Davitt v. Long-Bell Farm Land Corp. et al., 162 La. 59, 110 So. 88; Citizens' Bank of Louisiana v. James, 26 La. Ann. 264; Kirkland v. Edenborn, 140 La. 669, 73 So. 719." Davis v. Lacaze, 181 La. 75, 158 So. 626, 627.

"Error is said to be the greatest defect that can occur in a contract, but the error must be in respect to the object of the agreement, the identity or quality of the subject. Pothier, p. 10. 'That is called error of fact which proceeds either from ignorance of that which really exists, or from a mistaken belief in the existence of that which has none.' C. C. 1821. Now the defendant was not in error as to the existence of the thing which was the subject of his agreement with the bank, or its identity or quality. His error as to the value of the property which he agreed to buy was not error of fact, but, if it existed, error of judgment. This is an error for which the law furnishes no relief." Citizens' Bank of Louisiana v. James, 26 La.Ann. 264.

"The law does not hold one responsible for the extravagant notions he may entertain of the value of property, dependent upon its future successful exploitation, or the result of future enterprises; nor for expressing them to one acquainted with its general character and condition. How could an overestimate in such a case be shown? Other estimates would be equally conjectural. The law does not fasten responsibility upon one for expressions of opinion as to matters in their nature contingent and uncertain. Such opinions will

probably be as variant as the individuals who give them utterance. A statement of an opinion assigning a certain value to property like a mine or a quarry not yet opened is not to be pronounced fraudulent because the property upon subsequent development may prove to be worthless; nor is it to be pronounced honest because the property may turn out of much higher value." Gordon v. Butler, 105 U.S. 553, 557, 26 L.Ed. 1166.

The U. S. Supreme Court in the case of Southern Development Company v. Silva, 125 U.S. 247, 8 S.Ct. 881, 883, 31 L.Ed. 678, quoted the following pertinent statement from Tuck v. Downing, 76 Ill. 71, 94:

"No man, however scientific he may be, could certainly state how a mine, with the most flattering outcrop or blow-out, will finally turn out. It is to be fully tested and worked by men of skill and judgment. Mines are not purchased and sold on a warranty, but on the prospect. 'The sight' determines the purchase. If very flattering, a party is willing to pay largely for the chance. There is no other sensible or known mode of selling this kind of property. It is, in the nature of the thing, utterly speculative and every one knows the business is of the most fluctuating and hazardous character. How many mines have not sustained the hopes created by their outcrop?" Also see: Shappirio v. Goldberg, 192 U.S. 232, 24 S.Ct. 259, 48 L.Ed. 419; Roosevelt v. Missouri State Life Ins. Co., 8 Cir., 78 F.2d 752; Phillips Petroleum Co. v. Rau Const. Co., 8 Cir., 130 F.2d 499; Rau Const. Co. v. Phillips Petroleum Co., 317 U.S. 685, 63 S.Ct. 260, 87 L.

Ed. 549; Id., 317 U.S. 713, 63 S.Ct. 434. 87 L.Ed. 567.

Moreover, the written instruments, the correspondence between the parties and the quitclaims show that the parties contemplated that oil might be produced from the property. In Small's letter to Link of August 31, 1939, written sometime before the execution of the quitclaims, he stated that he would be willing to pay as a portion of the price $47,000 out of a proportionate part of the oil produced from the property. It is to be noted that this payment was to be made out of oil not gas. The quitclaim executed in pursuance to this letter provided for this amount to be paid out of a proportionate part of the first oil, gas or other production that might be had from the property. In the other quitclaim, the plaintiff was to be paid a royalty equal to 1/200ths of the oil, gas or minerals produced from certain property. These declarations and actions on the part of the parties show, in our opinion, that the parties evidently contemplated that the property had a potential value for oil purposes. The fact that the plaintiff company had information that gas and distillate were being produced near the property was sufficient to put it on guard and prompt it to investigate, if it saw fit to do so, for the reason that gas and oil are usually found in close proximity. Phillips Pipe Line Company v. United States, 40 F.Supp. 981, 94 Ct.Cl. 462, certiorari refused, 316 U.S. 679, 62 S.Ct. 1104, 86 L.Ed. 1753.

In support of his contention the plaintiff relies on the cases of Hossier Realty Co. v. Caddo Cotton Oil Co., 136 La. 328, 67

So. 20; Roby Motors Co. v. Price, La. App., 173 So. 793; Markey v. Hibernia Homestead Ass'n, La.App., 186 So. 757; and Smith v. Richards, 13 Pet. 26, 10 L.Ed. 42. These cases are not applicable to the present controversies.

In the case of Hossier Realty Co. v. Caddo Cotton Oil Co., supra, the vendor sold a quantity of cotton seed out of a certain mass of seed contained in a house on a plantation. At the time the seed were sold, the vendor knew that 50% of the seed were rotten but concealed this fact from the purchaser and made statements which induced him to buy the seed for a sound price without previous inspection. It was held that the transaction was fraudulent. The court was of the opinion that the seed could not have been conveniently inspected because they were not segregated from the other seed in the house, and that the sale was of a thing indeterminate in itself.

The case of Roby Motors Co. v. Price, supra, involved a rehibitory vice in an automobile.

In the case of Markey v. Hibernia Homestead Ass'n, supra, there existed a quasi fiduciary relationship between the parties. No such relationship exists between the parties to this suit.

In the case of Smith v. Richards, supra, a person was induced to purchase a tract of land through the fraudulent representation that there was a gold mine located thereon, having a vein of unusual value, which made it one of the richest tracts in the United States. The seller actually presented fraudulent specimens of ore purporting to come from the mine. The fraudulent representations were representations of fact and not of opinion.

The Supreme Court of the United States stated in a more recent case, "the law does not fasten responsibility upon one for expressions of opinion as to matters in their nature contingent and uncertain." See, Gordon v. Butler, supra, and the quotation heretofore set out in this opinion.

From our appreciation of the evidence in this case, Small and Link were dealing on equal terms and at arms' length. Link had ample opportunity, if he had exercised ordinary attention, to have investigated the property and surrounding area in order to inform himself of the prospective value of the property from an oil standpoint. There was no obligation on Small's part to transmit the technical information concerning LL&E#2. The evidence does not show that Small misrepresented the nature and character of LL&E#1. There was no production on the lands involved in these suits, and any expression made by Small that might be construed to indicate that the lands involved in these suits were or were not valuable from an oil standpoint was merely an opinion. The expression of an opinion relative to the value of the lands is an error from which the law furnishes no relief.

The plaintiff contends that it was induced to execute the quitclaim deeds by Small's representation that Sunset had a good and paramount title to the property when in truth and in fact Sunset had no

title whatever to part of the property and a doubtful claim to the remainder.

From our examination of the record, we find that the titles to this property are considerably involved and will require a petitory action to determine whether or not Sunset had a superior title to the property prior to the execution of the quitclaim deeds. No purpose could be gained by a detailed discussion of the various muniments of title for the reason that the sole object of these suits is to set aside the quitclaim deeds. There is a petitory action now pending in the lower court between the parties to these suits.

The lower court in its written reasons for judgment in these cases went into a lengthy discussion of the various muniments of title and arrived at the conclusion that Sunset had a paramount title to the property prior to the execution of the quitclaim deeds. We do not believe that we would be warranted in passing on the titles in a suit of this nature. Such a question should be determined in a petitory action. It is only necessary for us to examine the various instruments introduced in evidence in order to ascertain whether or not Small procured the quitclaim deeds through fraudulent representations.

Mr. Charles I. Link testified that Small first approached him in Denver, Colorado, sometime during the latter part of July or the early part of August, 1939, with the view of acquiring a quitclaim on the 180 acres of land described in the first quitclaim deed. He stated that Small informed him that he was a royalty buyer interested in buying gas, oil and mineral rights and royalties; that he had contracted to buy a block of royalties from Sunset and that in this block of land was a piece of property which had formerly been in the name of the plaintiff; that in going over the records, he had found that the plaintiff had no claim on the property; that he examined the records carefully and found that no taxes had been paid; that there was a valid title issued to Sunset; that Small stated that his legal advisers in going over the abstracts had pointed out a defect in the tract of land covering 180 acres; that his, Small's, attorney advised Small to correct the error if possible; and that he visited Link for that purpose.

Mr. Link further stated that he was willing at that time to assist Small in any manner he could to clear the titles and offered to give him a quitclaim deed to the property. He testified that Small informed him that he would like to bring his attorney to see him.

Some two weeks thereafter, Small and his attorney contacted Link with reference to securing the quitclaim. From Link's testimony, it appears that no agreement was entered into at this meeting. Link stated that Small's attorney inquired as to whether Link had been informed with respect to a suit brought in Louisiana by Sunset against the plaintiff for the purpose of removing a cloud from the titles to lots 34 to 52, inclusive, and lots 530 to 533, inclusive. The record indicates that this was the first information Link had that such a suit was pending. Service had not been made on him at this time. Link stated

that he again offered to give Small a quitclaim at this meeting, and Small's attorney informed him that they expected to pay Link for any trouble he might undergo.

Link's testimony discloses that Small's attorney informed him that within a short time a proposition would be formulated and submitted to him and something might be worked out of the production of the land.

During the month of October, 1939, Small had a conference with Link in Chicago, Illinois to discuss matters pertaining to the quitclaim deed to the 180 acres of land. At this meeting, the details of reinstating the plaintiff corporation were discussed. Link stated that Small told him at that time he thought he could get him $1,500 on the 440 acres involved in the jactitation suit whereupon he informed Small he was not interested in the proposition.

Small's letters of August 22 and 31, 1939, to Mr. Link, heretofore set forth, written during the course of these negotiations, requested Link to make an independent investigation of the titles.

Our appreciation of Link's version of what transpired at these various conferences and the letters requesting Link to make an independent investigation of the titles leads us to the conclusion that the plaintiff and its officers were distinctly warned that they must rely on their own judgment as to the strength of American Guaranty Company's titles.

The facts that Small refused to accept a gratuitous quitclaim and subsequently, in his letter of August 31, 1939, offered to give a consideration of $2,000 and $47,000 out of 1/48th of the production are additional reasons why the plaintiff should have been on its guard.

While these negotiations were pending, Small took the necessary steps, at his own expense, to have the plaintiff company reinstated. Link actively aided him in this respect.

It would appear to us that Link should have been impressed that the plaintiff had a muniment of title that cast a serious cloud on Sunset's title when he observed all the trouble and expense incurred by Small in addition to his offering a valuable consideration for the quitclaim.

Link, in his testimony, stated that his first knowledge of the existence of C. B. Small was on the date of his first meeting with him during the latter part of July or the early part of August, 1939. In fact, prior to that time Small and Link had been complete strangers to each other. It does not seem reasonable that Link would have agreed to part with the property of the plaintiff because of representations made by Small, a complete stranger, respecting title to the property.

Under the circumstances in this case, the conclusion is inescapable that the plaintiff had sufficient warning to place it on guard and to cause it to make an investigation of the titles. It had the same opportunity as the defendants to examine the records or have them examined. It cannot be relieved of its carelessness and neglect in failing to do so.

Link was a man of wide business experience and was and had been president of nu-

merous corporations. The record shows that Link was attended by his attorney at some of the conferences held with Small with respect to securing the quitclaim. Consequently, we are not presented with a case of an ignorant or inexperienced man having an advantage taken of him.

Moreover, the representations complained of are nothing more than Small's expressions of an opinion which he had formed after examining the records.

As to whether or not the taxes had been paid prior to the tax sale, there is considerable evidence in the record going to show that they had not been paid. However, there had been an entry on the tax collector's books indicating a payment of the taxes which had been erased. There is a letter in the records from the sheriff and tax collector to the Supervisor of Public Accounts stating that the taxes were not paid. Without passing on this question, it is sufficient to say that there were reasonable grounds for Small to believe that the taxes had not been paid by the plaintiff.

There appears to have been no misrepresentation of any fact relied on to sustain the titles of either party. Where a matter of judgment may be exercised, neither party can claim to have been influenced by the other, and no deduction of fraud can be drawn. When a person has sufficient grounds to believe that a title is paramount, he certainly has a right to assert its superiority until the matter is determined by a court of competent jurisdiction.

From our investigation of the authorities of this State as well as those of other states, no deduction of fraud can be drawn from a representation of this nature based on reasonable grounds, provided there is no misrepresentation of the facts relied on to sustain the titles. See: Saltonstall and Wife v. Gordon, 33 Ala. 149; National Park Bank v. Louisville & N. R. Co., 199 Ala. 192, 74 So. 69; Robins v. Hope, 57 Cal. 493, overruled by Seeger v. Odell, 18 Cal.2d 409, 115 P.2d 977, 136 A.L.R. 1291; Rogers v. Warden, 20 Cal.2d 286, 125 P.2d 7; Grill v. Driad Const. Corporation, Sup., 34 N.Y. S.2d 593; Hawkins v. Wells, 17 Tex.Civ. App. 360, 43 S.W. 816; Hoyt v. First Nat. Bank of Chester, W.Va., Tex.Civ.App., 247 S.W. 637; Farrar v. Churchill, 135 U. S. 609, 10 S.Ct. 771, 34 L.Ed. 246; Silbernagel v. Harrell, 18 La.App. 536, 138 So. 713; Breaux-Renoudet Cypress-Lumber Co. v. Shadel, 52 La.Ann. 2094, 28 So. 292; Chachere v. Superior Oil Co., 192 La. 193, 187 So. 321; White v. Harrigan, 77 Okl. 123, 186 P. 224, 9 A.L.R. 1051; Seeger v. Odell, 18 Cal.2d 409, 115 P.2d 977, 136 A. L.R. 1291.

In Suit No. 37,351 it is contended that Small induced the president and secretary of the plaintiff corporation to sign a quitclaim deed on November 16, 1939, enlarging the contract between the parties by falsely representing that it was executed to correct minor errors appearing in the original contract, a quitclaim executed between the parties on November 15, 1939.

The plaintiff takes the position that the quitclaim deed executed on November 15, 1939, only conveyed to Small plaintiff's interest in Lots 34 to 52, inclusive, and Lots 530 to 533, inclusive, whereas the quitclaim

of November 16, 1939 conveyed to Small all the plaintiff's interest in these lots and contains a general omnibus clause transferring all plaintiff's interest in the property acquired by it from C. J. Sorrells under a certain deed dated August 8, 1921.

The controversy is leveled at the general omnibus clause.

The plaintiff points out that the lots described in the original quitclaim deed of November 15, 1939, have an area of 459.78 acres and contends that by Small's fraudulent insertion of the omnibus clause, he obtained a quitclaim to an additional 431.70 acres of land. The district court, in its opinion, states that only 231 acres are involved in the omnibus clause. The exact acreage contained in the omnibus clause is of no particular moment, for the reason that the sole question presented to us is whether or not the omnibus clause was fraudulently incorporated in the deed.

We gather from the record that Small had his attorneys in Louisiana prepare for him a quitclaim deed covering the lands involved in the jactitation suit pending in Louisiana, namely, lots 34 to 52, inclusive, and lots 530 to 533, inclusive, before he went to Denver, Colorado on November 10, 1939. A copy of this proposed quitclaim deed is in the record, and it does not contain the omnibus clause or make any reference to any of the property embodied in the omnibus clause.

Sunset, sometime prior thereto, had suggested to Small that he secure a quitclaim on the property involved in the suit and if possible a quitclaim to the remainder of the property owned by the plaintiff in St. Charles Parish.

Small arrived at Denver, Colorado on November 10, 1939 prior to the meetings of the stockholders and Board of Directors of the American Guaranty Company set for November 15, 1939. After all negotiations with respect to a quitclaim to lot 53 and lots 104 to 119, inclusive, which we refer to hereafter as the first quitclaim, had culminated, Small then took up with Link the adjustment of the jactitation suit pending in Louisiana. The parties arrived at an agreement on the night of November 14, 1939.

Charles I. Link, Gordon Link and Mr. Frank E. Weaver testified that the agreement was to the effect that for a consideration of $2,000 and a 1/200th royalty, the American Guaranty Company would transfer to Small the lots involved in the suit, but there was no agreement as to the remainder of the property which the American Guaranty Company had acquired from C. J. Sorrells. Mr. Small's testimony is to the effect that the agreement was to quitclaim the lots and the remainder of the property acquired from Sorrells.

Small testified that on the night of November 14th, he contacted Mr. R. C. Stewart of the Texas Company for the purpose of securing authority to pay an additional $500 and a royalty of 1/200ths in order to clear title to the acreage covered by the Sunset suit. He had previously been authorized to pay $1,500 to clear this title. On the morning of November 15, 1939, the

following telegram was received by Mr. Small:

"Western Union

"RXDA77 51 Ser-Shreveport, La., 15 915 A
 "1939 No. 15, AM 8 40

"C. B. Small Jr.
"Albany Hotel DVR

"Texas Company will pay five hundred dollars cash and royalty of one two-hundredths in order to clear title to acreage covered by Sunset suit. If this can be worked out suggest that contract be drawn so that Denver people quitclaim all interest they might have in any of Sunset acreage.

"The Texas Company, R. C. Stewart"

On the morning of November 15, 1939, Small telephoned his attorneys in Louisiana and requested them to wire him a purported draft of the quitclaim deed. The purported draft is in the record and does not contain the omnibus clause quitclaiming the remainder of the property acquired from Sorrells.

When the stockholders and Board of Directors of the American Guaranty Company met on the morning of November 15, 1939, the first quitclaim deed was taken up and discussed, and an agreement was reached with respect thereto. The board of directors authorized the president and secretary to sign this quitclaim. After this transaction had terminated, the second quitclaim was discussed. Small left the meeting and sometime thereafter returned to the meeting of the board of directors and presented a quitclaim deed and purported minutes of the board of directors. Small testified that when he left the board of directors' meeting, he had the attorney for the Texas Company prepare these instruments for him. After Small had presented the quitclaim and proposed minutes, there was some discussion regarding the quitclaim. Mr. Charles I. Link stated that he did not read the instrument. Mr. C. Gordon Link, son of Mr. Charles I. Link, employed by the Commodity Credit Corporation, Mr. Ernest Lee Williams, a member of the Colorado Bar and former law professor of the University of Colorado, Mr. H. L. Chase, secretary of the American Guaranty Company, and Mr. Frank E. Weaver, building inspector for the city of Hamilton, Ohio and brother-in-law of Mr. Charles I. Link, all present at the meeting of the board of directors of the American Guaranty Company, testified that the purported quitclaim was read, and it covered only the property involved in the suit pending in Louisiana, there being no clause in it conveying the remainder of the property acquired from C. J. Sorrells.

Mr. Ernest Lee Williams, a member of the board of directors, testified that he did not agree to grant the quitclaim deed, which is corroborated by the other testimony in the record, until some provision was made to dismiss the suit in Louisiana. Mr. Small agreed that he and Mr. Williams would draw up an instrument to cure this defect in the quitclaim deed. This instrument was duly prepared and reads as follows:

"Denver, Colorado
"November 15, 1939
"The American Guaranty Company,
 "C/O C. I. Link

"Gentlemen:

"In consideration of the execution of that certain quit claim deed to lots 34 to 52 and lots 530 to 533, inclusive, in the Sunset Drainage District No. 1, formerly the St. Charles Municipal Drainage District No. 1, at the Parish of St. Charles, State of Louisiana, It is hereby agreed that in consideration of said deed I will have that certain action or suit, wherein the Sunset Realty and Planting Company, Inc. is plaintiff, and American Guaranty Company is defendant and pending in the Twenty-fourth Judicial District Court for the Parish of St. Charles, Louisiana, dismissed as to said American Guaranty Company with prejudice and without cost to the defendant.

"C. B. Small
"Cavill B. Small"

Thereafter, the board of directors authorized the president and secretary to sign the quitclaim. The transaction was rushed because of the nearness of the bank's closing time and the necessity for notarizing the documents before one of the bank's notaries. The instruments were notarized, and Small gave Link two drafts which were deposited to the account of the American Guaranty Company. The following notation appeared on the check for $2,000:

"Payment quitclaim deed
"Lots 34 to 52, Incl.
"Lots 530 to 533, Incl.
"Other Property."

Shortly thereafter, Mr. Small boarded the train to return to Louisiana. He testified that immediately after he boarded the train he retired for the night and awoke at about two a. m. feeling that something was wrong. He examined the quitclaim deeds and discovered that in the second quitclaim deed his name was misspelled, Cavill instead of Cavil, and the word "attest" appeared over the signature of the secretary. He stated that he became alarmed and alighted from the train at Des Moines, New Mexico. He employed a garage attendant to drive him back to Denver, some 200 miles, arriving there at or near noon of November 16, 1939. He contacted Mr. Charles I. Link and requested him and Mr. Chase to meet him for the purpose of correcting the errors in the spelling of his name and deleting the word "attest" from the instrument. He testified that in the meantime he employed a stenographer to recopy the instrument and make the necessary corrections. The instruments were presented to Mr. Link and Mr. Chase who signed them. Mr. Small stated that Mr. Link and Mr. Chase read the documents before they signed them. Mr. Link said that Mr. Chase read the instruments, but that he did not read them. Mr. Chase stated that he did not read the instruments.

Mr. Chase had only recently become connected with the American Guaranty Company. He had been given five shares of stock to qualify him as a member of the board of directors.

Immediately after the substituted quitclaim deed had been signed, Mr. Small tore up the original quitclaim deed and

handed it to the secretary and president who threw it in the waste paper basket.

Mr. Link testified that he did not become aware of the omnibus clause in the quitclaim until sometime after it had been executed and that he had complained to his son, Mr. Williams and others.

The correspondence between Mr. Small and Mr. Charles I. Link thereafter shows that a friendly relationship existed between them, and Mr. Link urged the development of the property.

The omnibus clause complained of in the substituted quitclaim provides as follows:

"For the same Two Thousand Dollar ($2,000.00) consideration hereinabove recited as paid, the said American Guaranty Company releases and quitclaims to said C. B. Small all of its rights, title and claims and pretensions in and to all property acquired by American Guaranty Company from C. J. Sorrell by virtue of that certain deed dated August 8, 1921, in favor of American Guaranty Company executed by said Sorrell and recorded in the Deed records of St. Charles Parish, Louisiana, except the interests reserved by American Guaranty Company in a part of said land in this instrument and in that certain other instrument covering another part of said land bearing even date herewith and by and between the parties hereto. It is understood and agreed, however, that the obligation to pay the one two-hundredths (1/200ths) royalty herein reserved does not attach to and shall not apply to the land released and quitclaimed in this paragraph hereof, said obligation being in-

tended to cover and attach to only the land hereinabove first described."

The attorney for the Texas Company produced a carbon copy of the quitclaim deed and minutes of the board of directors which he drew on November 15, 1939.

The stenographer who retyped the quitclaim deed testified that the only corrections made were the correction of the spelling of Mr. Small's name and the elimination of the word "attest." Mr. Small testified that these were the only changes made.

The minutes of the board of directors in connection with the substituted quitclaim show an additional paragraph which is not contained in the carbon copy of the minutes drafted by the attorney for the Texas Company. The additional paragraph reads as follows:

"Resolved, That the President and the Secretary of this company be and they hereby are authorized and directed to make, execute and deliver to the said Mr. C. B. Small or his nominee, in the name of and in behalf of this company and under its corporate seal, a written instrument covering the transfer of all rights to said tract of land from the American Guaranty Company in and to the name of said Mr. C. B. Small or his nominee and to execute and file any and all other documents necessary to consummate the sale of all right to said tract of land."

The evidence shows, without dispute, that the original quitclaim deed executed on November 15, 1939, was destroyed and a quitclaim deed purporting to correct mi-

nor errors was substituted in its place on November 16, 1939. It is conceded that the board of directors did not meet and authorize the substitution. Consequently, the sole question presented is whether the substituted quitclaim complies with the authority granted by the board of directors. Since the quitclaim authorized by the board of directors has been destroyed, parol evidence is admissible to prove its contents. Art. 2279, R.C.C.; Succession of Granger, 155 La. 225, 99 So. 46.

Four members of the board of directors testified positively that the original quitclaim did not contain the omnibus clause and that no authority was given the president and secretary of the American Guaranty Company to execute a quitclaim on the balance of the property acquired from Sorrells. The only testimony to the contrary is that of Mr. Small. The preponderance of this testimony is to the effect that the original quitclaim did not contain the omnibus clause and no authority was given to execute a quitclaim on the property contained therein.

From our examination of the minutes of the board of directors, we find that the minutes show the nature and details of the transaction touching the first quitclaim deed independently of the copy of the deed embodied therein. There is nothing in the minutes of the board of directors with respect to the second quitclaim deed showing the nature and details of the transaction independently of the copy of the quitclaim deed therein embodied. In other words, the minutes with reference to this second quitclaim are so general that a sub-stitution could have been made and the minutes would have been applicable. The minutes would have been applicable to a quitclaim deed transferring rights to lots 34 to 52, inclusive and lots 530 to 533, inclusive, or equally applicable to a deed quitclaiming these lots and the remainder of the property.

Mr. Small testified that the original quitclaim deed and the minutes of the board of directors were prepared by the Texas Company's attorney. The Texas Company's attorney's testimony is to the effect that he prepared a purported quitclaim deed and purported minutes for Mr. Small on November 15, 1939. He presented a carbon copy of these instruments. However, he was not present at the meeting of the board of directors and was in no position to and did not testify that Mr. Small presented these instruments to the board of directors.

Mr. Small as well as the stenographer, who retyped the instruments on November 16, 1939, testified that no changes were made in the instruments except the spelling of Small's name and the deletion of the word "attest." If that be true, the minutes presented to the board of directors on November 15, 1939, by Mr. Small could not have been the ones prepared by the Texas Company's attorney for the reason that they are not identical and contain a complete paragraph which is not reflected in the copy of the proposed minutes presented by the Texas Company's attorney. We have been given no reasonable explanation of this discrepancy.

The draft of the proposed quitclaim which Small had his attorneys draw for him before he went to Denver, Colorado, on November 10, 1939, does not contain the omnibus clause. The telegram of November 15, 1939, from Mr. R. C. Stewart indicates that the deal was to cover only the lots involved in the litigation. However, he did suggest that Small endeavor to secure a quitclaim on the balance of the property. The proposed draft wired Small by his attorneys on November 15, 1939, in answer to his telephone message of that date shows that the transaction did not cover the property embodied in the omnibus clause.

The instrument drawn by Mr. Small and Mr. Williams on November 15, 1939, which Mr. Williams demanded before he would authorize the execution of the quitclaim, shows that there was no quitclaim to the property set out in the omnibus clause. This instrument is signed by Mr. Small.

The testimony relative to the conferences between Small and Link on the night of November 14, 1939, prior to the execution of the quitclaims shows that Link insisted on a 1/100ths royalty but finally agreed on a 1/200ths royalty. It is passingly strange that Link would agree to release all royalties on a large tract of land and at the same time insist on a greater royalty interest only on the property in litigation.

The notation on the draft given in payment of the quitclaim indicates that other property was quitclaimed, and the two telegrams sent by Small on the night of November 15, 1939, indicate that the omnibus clause was in the original quitclaim deed.

The preponderance of the testimony as to what transpired at the meeting of the board of directors as well as all the other facts and circumstances surrounding this case leads us to the conclusion that the original quitclaim deed did not contain the omnibus clause. Under such circumstances, we are compelled to eliminate the omnibus clause from the quitclaim deed.

Mr. Small had the plaintiff corporation reinstated. He dealt with it as a corporation. The president and secretary had only such authority to execute a quitclaim as authorized by the board of directors. Authority was given by the board of directors to quitclaim lots 34 to 52, inclusive, and lots 530 to 533, inclusive, but no authority was given to quitclaim the balance of the property acquired from Sorrells as set out in the omnibus clause. The quitclaim is valid insofar as it was authorized. However, the omnibus clause will have to be eliminated because there was no authority given by the board of directors to quitclaim the property described therein. Munn v. Hoyt, 150 La. 729, 91 So. 169.

We are not unaware of the fact that a party who signs an instrument is supposed to know its contents. However, we are not presented with a case of an individual selling his own property. In this case, the president and secretary were quitclaiming the property of the corporation. The party acquiring the quitclaim was cognizant of the authority granted the president and secretary by the board of directors. The meeting of the board of directors was held at his instance, and he was present during the meeting.

The appellant complains of the overruling of its motion for a new trial by the lower court.

The motion for a new trial is predicated on the discovery of evidence touching muniments of title and the discovery of evidence tending to show that the defendants knew the property was of great value at the time the quitclaims were being negotiated.

The appellant has consistently contended throughout the trial of this case that the titles were not at issue. If the lower court had not passed on the titles, in all probability the appellant would not have raised this issue. Be that as it may, we have refrained from passing on the muniments of titles for the reason that such should be determined in a petitory action. Consequently the evidence in this respect could serve no purpose. In view of our conclusions that the parties were dealing at arm's length, the defendants' knowledge of the value of the property and any technical knowledge that they might have in their possession would be of no aid.

For the reasons assigned, the judgment of the trial court in Suit #37,350, entitled, "American Guaranty Company v. Sunset Realty and Planting Company, Inc. Et Als," bearing #2779 of the docket of the lower court, is affirmed at appellant's cost.

It is ordered, adjudged and decreed that the judgment in Suit #37,351, entitled, "American Guaranty Company v. Sunset Realty and Planting Company, Inc. Et Als," bearing #2780 of the lower court, is amended so as to decree the quitclaim deed valid insofar as it transfers the plaintiff's

rights in lots 34 to 52, inclusive, and lots 530 to 533, inclusive, to the defendant Small and annulled insofar as it seeks to transfer the plaintiff's right in other properties acquired from C. J. Sorrells as set forth in the omnibus clause. As thus amended, the judgment is affirmed. Costs of the appeal to be borne by the appellee. All other costs to be paid by the plaintiff appellant.

O'NIELL, C. J., recused.

HAMITER, J., concurs in part and dissents in part.

On Rehearing.

HIGGINS, Justice.

The American Guaranty Company, a Delaware corporation with its principal office in Denver, Colorado, instituted two separate actions against Cavil B. Small (a resident of Shreveport, La., its transferee), the Sunset Realty & Planting Company, Inc., (a Louisiana corporation domiciled in the City of New Orleans, Small's transferee or assignee and alleged subsidiary of the Hibernia Bank & Trust Company, in Liquidation), the Texas Company (a Delaware corporation domiciled at Shreveport, La., the mineral lessee of the Sunset Company and also beneficiary of the transfer or assignment by Small to the Sunset Company), the Hibernia Bank & Trust Company, in Liquidation, under the State Bank Commissioner of Louisiana, (the mortgage creditor of the Sunset Company, which also pledged its royalty rights and rents under the mineral lease with The Texas Company

as security for the indebtedness), the defendants, in the suit No. 2779 of the docket of the district court and No. 37,350 of the docket of this Court, and, in addition to them, in the suit No. 2780 of the docket of the district court and No. 37,351 of the docket of this Court, plaintiff also named as defendants, Nemours Corporation (a Delaware corporation having its place of business in Shreveport, La.), Fred Hall Ryan, William C. Spooner, J. W. Koonce, C. W. Sharp, R. J. O'Brien, P. F. O'Brien, H. A. O'Brien and J. C. O'Brien (residents of Shreveport, La., all assignees or transferees of defendant Small of a part of his alleged mineral interest), to have rescinded and annulled two quitclaim deeds granted by itself to Small covering the lands in controversy, executed on November 15 and 16, 1939, respectively, at Denver, Colorado, as well as the subsequent assignments or transfers by Small to his alleged principals and co-defendants, and to have them cancelled from the public records on the grounds that they were obtained through fraud. The specific charges are:

That the plaintiff's officers and directors were uninformed as to the value of the property and were entirely ignorant of the geological and geophysical conditions existing in the area where the lands were located; that Small informed them, verbally and in writing, prior to November 15 and 16, 1939, the date of the execution of the deeds in controversy, that the only well in the area had been drilled about 6,000 feet from its property to a depth of 11,000 feet and "plugged back and completed as a gas well producing some condensate or distil-

late"; that there was no ready market for the gas produced in that area and no facilities to take it to the market; that, although he knew that this well designated as L.L. &E. No. 1 had produced 120 barrels of distillate or condensate per day through a quarter inch choke, by ordinary production methods, and was capable of producing in excess of 245 barrels per day through a larger choke, he suppressed these facts; that this same information was repeatedly given by Small to the plaintiff's officers up until the execution of the deeds for the deliberate purpose of inducing its representatives to believe that the property described in the sales was located near a field capable of producing gas only in doubtful quantities without any market therefor, so as to cause its officers and directors to conclude that the property was of relatively little value; that during all the time that Small was making these misrepresentations and concealing the true facts from the plaintiff, the Texas Company had a geophysical map of the area which showed that the property embraced in the purported quitclaims was located in an oil producing field of enormous value; that from other geophysical information in the possession of the Texas Company and specifically the knowledge which it gained from its discovery well L.L.&E. No. 1, completed on June 25, 1939, on the adjacent property of the Louisiana Land & Exploration Company, the Texas Company's representatives knew that the lands described in the quitclaims would produce pipe line oil of great value and were worth many times the amount which Small, an experienced dealer in oil lands,

led its officers and directors to believe by his deceptive and false statements, which were relied upon by them in entering into the purported sales; that the information possessed by the Texas Company was well-known to Small and the other defendants whom he represented but was unknown to the plaintiff and the public, and the plaintiff had no means of obtaining the information; and that Small knew that the plaintiff's officers and directors must of necessity rely upon the information he furnished them as to the lands he sought to acquire.

It is further charged that on September 4, 1939, the Texas Company had started to drill its second well, L.L.&E. No. 2, one and one-fourth miles to the north of the L.L.&E. No. 1 well, also located on the land of the Louisiana Land & Exploration Company in the Paradis Field, St. Charles Parish, and had, on October 15, 1939, cored sand sections therefrom which conclusively established that the land which Small was endeavoring to obtain from the plaintiff was located in the heart of an oil field of tremendous value; and that although Small and his principals and co-defendants possessed this information, he artfully withheld and suppressed it, in order to induce the plaintiff to part with its property for an insignificant consideration which he knew would not have been accepted had he revealed the true facts to the plaintiff's officers and directors.

It is also charged that Small, who had had extensive experience in abstracting titles, had examined the title to the lots in question and had secured the written opinions of his attorney to the effect that he disapproved the asserted title of the Sunset Company to Lots 104 to 119, inclusive, and Lot 53 covered by the first quitclaim deed, because the plaintiff was the last record owner thereof; that he also knew that his attorney had refused to approve the Sunset Company's alleged title to Lots 34 to 52, inclusive, and Lots 530 to 533, inclusive, embraced in the second quitclaim deed, recommending that a slander of title or jactitation action be instituted by the Sunset Company against the plaintiff as to these lots, and, notwithstanding this information, he verbally assured the plaintiff's officers and directors that the Sunset Company had a good and valid title to the property described in the deeds, whereas Small and his principals knew that the Sunset Company had no title whatsoever to the lots covered in the first quitclaim deed and a very doubtful claim as to the lots described in the second quitclaim deed.

It is further charged that Small, at all times, was acting as the duly authorized and appointed agent of the other defendants in these suits, and that he had been specifically authorized by his principals to negotiate with the plaintiff and acquire the property for their "joint account"; that Small artfully concealed the fact that he was the agent for The Texas and the Sunset Companies and the Hibernia Bank & Trust Company, knowing if this fact were revealed, it would have tended to place the plaintiff on its guard and thereby prevent the execution of the sales; and that the plaintiff's officers executed the deeds because of material and serious errors of

fact resulting from Small's misrepresentations and concealment of the truth.

The above charges are common to both quitclaim deeds, but in the suit No. 2780 of the docket of the district court and No. 37,351 of the docket of this Court, involving the alleged second quitclaim deed, dated November 16, 1939, which embraces Lots 34 to 52, inclusive, and Lots 530 to 533, inclusive, the additional charge was made that after this quitclaim deed had been approved by the Board of Directors of the plaintiff on November 15, 1939, in Denver, Colorado, and had been signed in its behalf by its president and secretary for a consideration of $2,000 and a 1/200th royalty interest, Small left Denver that night about 8 o'clock by train en route to his home in Shreveport, Louisiana, but returned to Denver the next day about noon and induced the president and the secretary of the plaintiff to execute an entirely new quitclaim deed without any authority whatsoever from the directors, Small representing to them that he desired to have his name correctly spelled "Cavil" instead of "Cavill" as it appeared in the second quitclaim deed, and to have the word "Attest," appearing above the secretary's signature, removed as it might tend to indicate he had signed merely as a witness and not as an officer of the corporation and that these corrections would not in anyway change the meaning of the authorized and executed deed; and that Small thereby and through haste had the plaintiff's president and secretary sign the redrafted or new deed on November 16, 1939, without informing them nor their discovering that he

had surreptitiously added an omnibus clause in the rewritten deed, which not only embraced Lots 34 through 52 and Lots 530 to 533, both inclusive (the sale of which had been authorized by the Board of Directors), but also additionally included 431.70 acres, which the Board of Directors of the plaintiff had not authorized and which its two officers did not intend to convey, there being no consideration paid for the 431.70 acres whatsoever, said lands being generally described as follows: "* * * all property acquired by American Guaranty Company from C. J. Sorrell by virtue of that certain deed dated August 8, 1921, in favor of American Guaranty Company executed by Sorrell and recorded in the Deed records of St. Charles Parish, Louisiana, * * *."

It is alleged in both suits that on December 19, 1939, Small transferred the title to all of the property embraced in the first quitclaim deed of 180 acres consisting of Lots 104 to 119, inclusive, and Lot 53 to the Sunset Company and acknowledged the oil, gas, and mineral lease previously granted by the Sunset Company to the Texas Company, but retained in his own name one-half interest in the one-eighth royalty in this tract of land under the Sunset and the Texas Companies' lease, as the consideration, under contract of employment, for his services rendered in obtaining this quitclaim deed.

It is further alleged, as to the second quitclaim deed, dated November 16, 1939, embracing Lots 34 to 52 and Lots 530 to 533, both inclusive, containing 459.78 acres, and the lands covered by the omnibus

clause containing 431.70 acres, that Small transferred the title he had acquired from the plaintiff to the Sunset Company and recognized the Sunset and the Texas Companies' mineral lease; that the Sunset Company then transferred to Small an undivided one-half interest in the one-eighth royalty under the lease on Lots 34 to 52, inclusive, and Lots 530 to 533, inclusive, which Small had contracted to purchase in an agreement of April 6, 1939, with the Sunset Company and this agreement, with the cash consideration, was escrowed pending the successful clearing of the title; and that on February 3, 1940, Small executed an instrument in which he declared and fixed the interest of each of the other named defendants from Shreveport, who were royalty buyers in the lands embraced in the second quitclaim deed.

This explains why Small, the Hibernia Bank & Trust Company, in Liquidation, the State Bank Commissioner, the Sunset and the Texas Companies were the only defendants in the first suit and the other parties from Shreveport were additional defendants in the second suit. The Hibernia Bank & Trust Company, in Liquidation, and the State Bank Commissioner are made defendants in each suit because the Sunset Company is an alleged subsidiary of the bank which had loaned it in excess of $100,000 secured by a mortgage on its property and by a pledge of all of the royalty rights and rents, owned by it under the provisions of the mineral lease with the Texas Company.

The defendants deny all of the charges of alleged misrepresentation and deception and aver that the statements made by Small were true and that he did not deceive or mislead the plaintiff's officers or directors. They also deny that the plaintiff's representatives relied upon any statements made or information given to them by Small, and aver that the parties were dealing at arm's length, relying upon their respective opinions and judgments. With reference to the property included in the second quitclaim deed, the defendants admitted that Small stated to the officers and the Board of Directors of the plaintiff that the Sunset had a paramount title thereto and averred that this statement was true, but denied that he made this statement with reference to the title to the property included in the first quitclaim deed, averring that he informed the American's representatives that it had "a serious title" thereto. They also admitted that the second quitclaim deed and the minutes of the Board of Directors of the plaintiff attached thereto were rewritten by Small, but aver that this was done only for the purpose of correcting the spelling of his first name and eliminating the word "Attest."

The respondents, the Sunset and the Texas Companies and the Hibernia Bank and the Bank Commissioner, denied that Small was their agent and averred that he was an independent contractor from whom they acquired their rights in the property through the plaintiff as bona fide purchasers for value on the faith of the public records. These defendants also pleaded ratification of the transaction by the plaintiff after its officers are said to have been apprised of the alleged impositions.

The Texas Company also pleaded estoppel on the ground that the plaintiff delayed from November 16, 1939, until April 18, 1940, before instituting the suits and, in the meantime, failed to notify it that Small had deceived the plaintiff's officers in obtaining the quitclaim deeds with the result that, relying upon the legality of these deeds, it had bound itself to a contract under which it had undertaken to drill a well on Lot 74, included in the omnibus clause, and had expended therefor $130,000 to prove the mineral value of the land. The Texas Company, in the alternative, only in the event the Court concluded that the quitclaim deed should be annulled, claimed reimbursement for the sum of $130,000 said to have been expended in drilling the well designated as Sunset No. 1 on Lot 74 of the property included in the omnibus clause, and further, in the alternative, prayed that the Court reserve its right to claim reimbursement in another proceeding.

The suits were filed on April 18, 1940.

The trial of the cases, which were consolidated, commenced on March 31, 1941, and ended on April 3, 1942. The record consists of 45 volumes of pleadings and testimony, and exhibits which fill three trunks.

In two written opinions, our learned brother below concluded that the plaintiff had failed to establish any of the alleged grounds of fraud or that its officers and directors had relied upon the information given to them by Small, verbally and in writing, in arriving at their decision to sell the

property to him; and, if he were in error in these views, that Small had not defrauded the plaintiff out of anything because he was of the opinion that the Sunset Company and not the plaintiff had title to the property in controversy, although it was conceded by counsel representing the respective parties that the question of title was not involved in either of these two suits, but was pending in the district court in petitory actions filed for the purpose of having that issue determined.

The plaintiff applied for a new trial on the grounds of newly discovered evidence which it stated would further prove that the defendants were aware of the tremendous value of the property involved before November 15, 1939, and also that the Sunset Company was merely an interposed party of the Hibernia Bank, which was the real party in interest in the land. The motion was overruled. The plaintiff appealed from both judgments to this Court where the cases were consolidated for the purpose of argument and decision.

We allotted counsel an entire day to present their respective oral arguments before us. Voluminous briefs were filed and the case was taken under advisement. In due course, we handed down an opinion in which it was pointed out that the question of title was not involved in the litigation before us but in petitory actions pending in the district court; that as six expert witnesses for the defendants technically classified the well, L. L. & E. No. 1, as a gas well making some condensate or distillate, or a gas distillate well, and only one expert for the plaintiff testified that it was

an oil well, Small's representations were not incorrect; that insofar as his representations as to the value of the lands were concerned, the evidence tended to show that at the time the trade was effected, the defendants did not know positively or definitely that the property involved would produce oil and, therefore, its value was speculative; that Small's statement that the Sunset Company had a paramount title was merely an expression of opinion and not a fact; and that the parties with reference to title and value had dealt at arms' length and, therefore, the transfer of the lots in the first quitclaim deed and the lots specifically described in the second quitclaim deed were not obtained through fraud. With reference to the omnibus clause in the second quitclaim deed, by a divided court, it was held that Small had surreptitiously inserted the provision of the additional acreage in the rewritten deed of November 16, 1939, without consideration, and had fraudulently obtained the signatures of the president and the secretary of the plaintiff to this unauthorized instrument. The omnibus clause was annulled and set aside and the judgment of the trial court, as thus amended, was affirmed, the appellees were assessed with the costs of the appeals and the appellant was cast for all other costs.

The plaintiff and the defendants, respectively, filed lengthy applications for rehearings, alleging that our opinion was correct insofar as it was favorable to them but erroneous in the respects that it was unfavorable to them, assigning their reasons and citing authorities in support of their contentions, and specifically complaining

that, because of the tremendous record and voluminous briefs filed in these proceedings, this Court had overlooked and did not pass upon all of the issues which had been raised by the parties litigant. Both sides filed additional extensive briefs in support of their respective positions and after a full consideration of the matter, our original decree was set aside and an unrestricted rehearing, in favor of all parties, was granted. An entire day was granted to counsel to present their arguments and additional briefs were filed, making a total of fifteen briefs in all to be considered, some of which contain nearly 500 pages. The entire proceedings are now again before us.

■ Was plaintiff required by law to tender or return the purchase price received before instituting annullment proceedings? It appears that the plaintiff did not tender or return the price received from Small for the lands and there has been production on Lot 74 by the Texas Company requiring an accounting, in the event the plaintiff is successful in this suit and the petitory actions. The Texas Company, in this case, has also prayed, in the event the quitclaim deeds are set aside, that it be reimbursed the amount of the expenses incurred in drilling the well on the land covered by the second quitclaim deed, citing Martel et al. v. Hunt et al., 195 La. 701, 197 So. 402.

In State v. Hackley, Hume & Joyce, 124 La. 854, 50 So. 772, 774, where the plaintiff sued to rescind the sale of lands on the ground of fraud but failed to tender or return the purchase price and the defendant

pleaded a lack of tender, the court, on re-hearing, said:

"The exception of want of tender was properly overruled. Previous tender is not required in a suit to set aside a sale on the ground of fraud. Germaine v. Mallerich, 31 La.Ann. 371; Heirs of Burney v. Ludeling, 41 La.Ann. 627, 6 So. 248; Killelea v. Barrett, 37 La.Ann. 865; Self v. Taylor, 33 La.Ann. 769; Heirs of Wood v. Nicholls, 33 La.Ann. 744; Aronstein v. Irvine, 48 La.Ann. 301, 19 So. 131. Especially where an accounting is alleged to be due. 28 Ency. Pl. & Pr. 834."

In the case of Consolidated-Progressive Oil Corp. v. Standard Oil Co. of Louisiana, 158 La. 982, 105 So. 36, 38, an action was filed to set aside an assignment of a mineral lease for alleged fraud. There had been production on the property which would require an accounting, if the plaintiff prevailed. The defendant under its exception of no cause of action alleged that the plaintiff had failed to tender or return the price received as consideration. In disposing of this issue, the Court stated:

"The defendant, the Palmer Trust, urges under the exception of no cause of action that, as plaintiffs have failed to allege payment or tender of the price received, as a condition precedent to the maintenance of their action for the rescission of the assignment and the recovery of the oil produced, the petition in this case fails to set forth a cause of action.

"This contention is not sound, as previous tender is not required in a suit to set aside a sale on the ground of fraud, as in the present case. [Citing the above referred to authority.]" (Brackets ours.)

With reference to the extent of the burden of proof on a plaintiff in this type of case, it is well settled that fraud is not presumed. The proof must be exceptionally strong. Metcalf v. Monsour, 195 La. 570, 574, 197 So. 235; Strauss v. Insurance Co. of North America, 157 La. 661, 102 So. 861; Valesi v. Mutual Life Ins. Co. of New York, 151 La. 405, 91 So. 818; Winzey v. Louisiana Industrial Life Ins. Co., La.App., 195 So. 67; and Klumpp v. Fontenot, 11 La.App. 27, 122 So. 503.

In Belcher v. Booth et al., 164 La. 514, 114 So. 116, this Court, without citing any authority, stated that the party alleging fraud must prove it beyond any reasonable doubt, as in a criminal case.

The jurisprudence is well established that where issues of fact are involved, the appellate court will not disturb the finding of the trial judge unless the record shows that his holding is manifestly erroneous. Ratcliff v. Levin, 175 La. 49, 143 So. 1; Pisciotte v. Indemnity Co., 164 La. 260, 113 So. 840.

We shall now give a general statement of the facts, in chronological order:

During the summer of 1910, Julius Funk came to Louisiana and undertook the reclamation and farm development of 24,000 acres of lands in the Third Ward of St. Charles Parish, Paradis, Louisiana, in the locality designated as the St. Charles Municipal Drainage District. He met with reverses and his brother-in-law, M. J. McCullough of Illinois, and his father-in-law,

C. J. Sorrells of New York, came to his financial assistance. As security each of these parties acquired some of the lands from Funk and his companies and also by purchase at tax sales. All of the property described in the two instruments, the validity of which is attacked in this litigation, belonged to McCullough and was assessed in his name. When he failed to pay the taxes for the year 1917, the lands, with others, were adjudicated to C. J. Sorrells at several tax sales in 1918. Sorrells acquired title to Lot 54 at a tax sale under an assessment in the name of John Morrison. He was also the adjudicatee of Lot 53 at a tax sale on July 20, 1918, the property being assessed in the name of A. V. Smith, who, on November 7, 1918, quitclaimed his rights to Sorrells. During the period from 1910 to 1921, Funk, McCullough and Sorrells, from their earnings and inheritances, expended about $750,000 for the development of the 24,000 acre tract, but were unable to continue further. In 1922, Funk moved to Connecticut and then to New York. The American had leased a piece of property in Terrebonne Parish from M. C. Baker for a hog farm and had some misunderstanding with him resulting in litigation. In about 1920, it secured permission from Funk to occupy a part of the Sorrells' property involved in this suit to raise thoroughbred hogs which were sold to the public on a "unit basis" with a guarantee of certain profits. On August 8, 1921, Sorrells executed in favor of the American an instrument purporting to convey to it all of the lands he had acquired from McCullough at tax sale, except the

south 15 acres of Lot 31, Lot 32 and Lots 94 to 98, inclusive. Lot 53 was included in the sale but Lot 54 was not. In consideration of the conveyance, the American executed its $35,000 note due five years after date, bearing 6% interest, and agreed to spend $25,000 on the property and to pay the taxes of 1920 then due thereon. The document was not registered in the conveyance office until February 12, 1923. Before its recordation, Sorrells conveyed to Mrs. Julius Funk, his daughter, Lot 53 and this sale was registered prior to February 12, 1923. The taxes assumed by the American appeared on the St. Charles Parish tax rolls for the year 1920, the assessment being in the name of W. J. McCullough instead of C. J. Sorrells and purported to embrace a tract of land containing 1041.35 acres. The 1920 State and Parish tax assessment rolls did not describe Lots 104 to 119, inclusive, but these lots were apparently described on the St. Charles Municipal Drainage Tax rolls. The description was of Lots 32–34 to 52, inclusive, instead of Lots 32 and Lots 34 to 52, inclusive. At the time of the execution of the sale by Sorrells to the American on August 8, 1921, the lands were being advertised for sale for the 1920 State and Parish taxes, on August 27, 1921, but the sale was not made on that date. On the 1920 State and Parish tax assessment rolls under the heading "Paid" there was in pencil the figures "8/27/21." Three witnesses testified that these taxes were paid by Julius Funk. An attempt, apparently, had been made to erase these figures but they appeared clearly thereon. Thereafter, the lands had been

readvertised for sale and the American claiming ownership had the sale enjoined on the ground that the assessment and advertisement were illegally made, but the injunction subsequently was dissolved in December, 1921. The lands as described on the State and Parish assessment rolls in the name of W. J. McCullough were again advertised for sale for the 1920 State and Parish taxes and on February 25, 1922, the property was adjudicated to A. V. Smith, it being recited that the American was the owner thereof. Lots 104 to 119, inclusive, were not described in the advertisement and tax deed and the description covered "Lots 32 to 34 to 52, inclusive, and Lots 530 and 533, inc.," instead of Lots 32 and 34 to 52, inclusive, and Lots 530 to 533, inclusive. Smith paid the State, Parish, and drainage taxes and receipts were issued to him. The receipt covering the State and Parish taxes was not the one usually issued and there is testimony tending to show that Smith had rejected the regular receipt because there was a notation on it that the State and Parish taxes had been paid. Subsequently, Smith was placed in possession of a part of the lands by the sheriff under a writ of possession, which described the lots as they were designated in the tax deed and on the State and Parish tax assessment rolls. Julius Funk, the son-in-law of Sorrells, who, as previously stated, had resided for a number of years at Paradis in the St. Charles Municipal Drainage District and was a Vice-President of the American, had negotiated an agreement between Smith and Sorrells on December 19, 1922, whereby Sorrells conveyed to Smith the $35,000 note executed by the American and in which Sorrells declared that he did not consider the property sufficiently valuable to redeem it and would not exercise his right of redemption, and transferred to Smith his (Sorrells') interest in all of the lands which Smith had acquired at tax sale on February 25, 1922, as well as other lands owned by Sorrells in the St. Charles Municipal Drainage District other than Lots 59, 60 and 61, and certain lots in the Town of Paradis. Smith agreed to convey to Sorrells title to Lots 39, 40, 41 and 42, which he had acquired at tax sale. This instrument was recorded on February 12, 1923, on the same date as the instrument of conveyance from Sorrells to the American of August 8, 1921, the latter recordation appearing in the registration book before the agreement of December 19, 1922.

Smith instituted suit against the American on March 28, 1923, to quiet his tax title. The American had left the State of Louisiana because of financial involvement, resulting in serious litigation against it. Smith obtained a judgment against the American through a curator ad hoc, quieting the tax title. This judgment described "Lots 32 to 34, inclusive" instead of "Lots 32 and 34 to 52, inclusive." Lots 530 to 533, inclusive, were also described therein. The validity of this judgment is attacked by the American in its petitory action on the grounds that the curator ad hoc, without its authority, waived certain delays and rights which it was entitled to under the law and consented to the judgment, and that, therefore, it is null.

On March 28, 1923, Smith also instituted a suit against the American on the $35,000 mortgage note, alleging that the American was the owner of Lots 34 through 52, inclusive, and Lots 530 through 533, inclusive. He secured a judgment and, through a writ of execution, seized and caused these lots to be advertised for sale as the property of the American. Evidently, the sale did not take place because no proces verbal thereof was found of record, although a diligent and thorough search was made therefor. On October 8, 1924, Smith executed the conveyance of the lands in question to the Sunset, including Lots 59, 60, 61 and Lots 39, 40, 41 and 42.

On January 3, 1925, Messrs. Sorrells and Smith entered into another agreement to which the Sunset was a party, whereby Sorrells conveyed to Smith his interest in Lots 39, 40, 41 and 42 and also Lots 59, 60 and 61, and Smith transferred to Sorrells certain lots in the Town of Paradis standing in the name of Mrs. Funk that Smith had acquired at tax sale. The plaintiff contends that this agreement had the effect of cancelling the instrument of December 19, 1922, between Sorrells and Smith and the defendants deny that such a cancellation was intended and effected. In the meantime, Smith, through tenant farmers, had possessed certain parts of the lands and this type of possession was continued by the Sunset when it became the owner in 1924. Later, the Sunset became financially involved and failed to pay the taxes for the year 1932 and the property was adjudicated to the State for the unpaid taxes on January 15, 1934. Mrs. Smith, the

widow of A. V. Smith (who died in the meantime), leased the surface rights of the lands from the State and continued the tenant farm operations on a part thereof. In 1936, the Legislature passed Act No. 310, which provided that distressed taxpayers had the right to redeem their property upon the payment of one year's taxes. In 1937, it appears that oil was reported to have been discovered at Black Prince Island in St. Charles Parish, La. On August 1, 1938, the Sunset redeemed the property from the State and Mrs. Smith continued in possession, under the Sunset. On October 6, 1938, the Sunset granted the Texas Company a mineral lease covering 8432.05 acres in the Sunset Drainage District, formerly the St. Charles Municipal Drainage District. The lease was corrected by an instrument dated November 12, 1938. On April 5, 1939, the Texas made its selection of lands and released the other portion of the property. The Texas had also acquired mineral leases on adjoining lands, particularly those of the Louisiana Land & Exploration Company lying across the Southern Pacific Railway right-of-way from the Sunset acreage. In November 1938, the Texas began drilling operations on the lands of the Louisiana Land & Exploration Company near the Southern Pacific Railway's right-of-way and about 400 to 600 feet from the Sunset's property. This well was known as L.L.&E. No. 1, and was successfully completed on June 25, 1939, producing 120 barrels per day of distillate or condensate through a quarter inch choke and was capable of producing, through ordinary production

methods, in excess of 245 barrels of distillate or condensate, simply by giving it a larger choke. The well was originally classified by the Conservation Department as an "oil well" and granted an allowable of 50 barrels a day, but subsequently it was classified by the Conservation Commissioner as a "gas well" on the theory that the distillate or condensate, that is, a colorless fluid also referred to as "white oil," was in vapor form in the natural reservoir. Before the completion of the above well, Small, a resident of Shreveport, experienced in abstracting titles and purchasing mineral and royalty rights in lands in Louisiana, Mississippi, Arkansas and other States, for himself and also representing Nemours & Company and the other defendants, herein, contacted the Sunset and on March 29, 1939, entered into an agreement with it whereby he was to select 1200 acres from the Sunset's acreage and acquire one-half of the Sunset's one-eighth mineral rights in the royalty created by the lease with the Texas Company for the sum of $60,000. He visited the lands and found the tenants of the Sunset in possession of a part of the property, and had his attorney examine the titles to the bulk of the 1200 acres selected by him. The map of the Drainage District, which consisted of five Sub-drainage Districts, showed that the Sub-districts had been divided into lots numbered consecutively from 1 upwards, each containing 10 to 20 acres. As a result of his examination, Small's attorney, in two written reports to him and the Sunset, on April 11 and 28, 1939, declined to approve the title to Lots 53 and 104 to 119, inclusive, in the Sunset, because they were not described on the State and Parish tax rolls for the year 1920 nor in the advertisement and the tax deed to Smith, calling attention to the fact that the last record owner of the lots was the American. He also pointed out the faulty and uncertain description in the 1920 State and Parish tax rolls and in the tax deed to Smith of lots "32–34 to 52 inclusive" and "lots 530 and 533, inclusive," and recommended that a jactitation or slander of title action be filed by the Sunset against the American to clear the title to these lots, resulting from the above defect and also from the fact that Smith in his foreclosure proceedings against the American on the $35,000 note had alleged that the American was the owner of these lots and that they were not included in the tax sale. He suggested that, as to these lots, the price to be paid by Small for one-half of the Sunset's one-eighth mineral interest therein be escrowed until the title thereto was cleared. In June 1939, the Sunset instituted the suggested suit against the American in the district court for the Parish of St. Charles (No. 2678 of the docket) and Leon Vial, Jr., Attorney, a resident of Hahnville, St. Charles Parish, La., was appointed as curator to represent the American, the defendant absentee. Sunset furnished the information that the American could be reached at Denver, Colorado, but Vial's letter to the absentee without a street address was returned to him and a copy of the petition was not delivered to the American until November 14, 1939, or the day before the quitclaim

deeds were authorized and signed on November 15, 1939. On August 9, 1939, the Sunset and Small entered into an agreement under which Small was to acquire from the American a quitclaim to lots 53 and 104 to 119, inclusive, and agreed to transfer the "fee simple title" he thus acquired to the Sunset and in consideration of this service he was to receive an undivided one-half of the Sunset's one-eighth mineral interest in these lots. Small then entered an agreement with the Texas whereby it, as Sunset's mineral lessee, agreed to assist in acquiring the American's title to the lots for the benefit of itself and its lessor. Small was to be reimbursed three-fourths of his expenses upon the Texas Company approving the undertaking. Small made the preparations and later the Texas Company's formal approval was received. Small ascertained that the headquarters of the American were in Denver, Colorado, and visited that city in August 1939. From the old corporate reports of the American, he found that the company was inactive, without funds, and had lost its franchise for nonpayment of the franchise taxes to the State of Delaware in 1923. Before leaving Louisiana, he had been informed that the President of the American, Charles I. Link, had been prosecuted in the Federal Court in Denver for violating the Mail Fraud Statute in connection with the Colorado and Louisiana hog farm projects, having failed to make good the guaranteed profit to its patrons. The records showed that he had been convicted but that the judgment of conviction had been set aside by the United States

Circuit Court of Appeal in 1929, Link v. United States, 8 Cir., 30 F.2d 342, because of erroneous instructions to the jury. Apparently he was never retried. From this proceeding, Small also gathered information as to the American and its affairs. On August 12, 1939, Small contacted Link and, in an interview in the latter's office, Small informed him that he was interested in purchasing royalties in certain Louisiana lands from the Sunset, the owner of the valid title, but due to some slight irregularity, his attorney failed to approve the title and, therefore, to clear the defect he wished to purchase the American's claim to Lots 53 and 104 to 119, inclusive, stating that the land had a speculative value for the production of gas but there was a doubtful market therefor. Link informed Small that he would give him a quitclaim deed to the property and Small then stated that his attorney would be in Denver in a few days. On August 14, 1939, Small and his attorney called on Link at his office with reference to the purchase of the American's claim to Lots 53 and 104 to 119, inclusive, and Link reiterated the statement that he would give the quitclaim deed to the land, but Small's attorney stated that they would not accept any gratuity and that some satisfactory proposition could be worked out. Small's attorney then inquired if his client had told Link about the suit that had been filed by the Sunset against the American in St. Charles Parish. Small replied that he had not done so. The conference was closed with the understanding that Small would submit an offer to the

American at a later date. On August 22, 1939, Small wrote Link from Shreveport that he was working on the title and hoped that Link had gotten some information both as to the value of and title to the property. Link, on August 24, 1939, answered Small, stating that he hoped to cooperate and had found a 1921 statement of the American showing that it had expended $23,471.51 on the Paradis property from July 1, 1921, to December 31, 1921, as required by its act of purchase. On August 31, 1939, Small wrote Link that he was willing to acquire the American's interest in the lots and, as Link had found his file, he assumed that he was familiar with the nature of the claim to the property and if Link did not have complete information as to the source of his claim of title, he presumed Link would prefer to make his own independent investigation thereof. He informed Link in the letter that the Texas Company had drilled a well for oil and gas on the Louisiana Land & Exploration Company's property west of the Southern Pacific Railway's right-of-way and approximately 6,000 feet from lot 104, together with the other lots lying southeast of the well, and that it was approximately the same distance from Lot 53, which was to the northeast of the well. He also stated: " * * * It is our information that this well was drilled to a depth of over 11,000 feet and was plugged back and completed as a gas well producing some condensate or distillate." He offered to purchase the American's claim for $2,000 cash and $47,000 out of a ⅛sth part of the oil produced. This consideration was to be paid regardless of whether the American or the Sunset held the title, which was not to be warranted. He suggested that after considering the nature of the title and the value of the property, if Link thought a trade might be made, the parties could meet at Shreveport where Link might obtain any information he desired. Link did not go to Shreveport, Louisiana. On September 2, 1939, Link wrote Small, stating that he would cooperate, but that the cash consideration had to be $5,000, and he needed $1,000 to defray the legal and preliminary expenses. The $1,000 was never advanced by Small although the Texas had authorized him to do so. On September 25, 1939, Small and his attorney met Link and his attorney, Brady, in the latter's office in Cherryvale, Kansas, where Small and Link executed an agreement in the form of a letter dated the same day, wherein it was agreed that Small would purchase the American's rights in Lots 53 and 104 to 119, inclusive, for $5,000 cash and $47,000 payable out of ⅛sth royalty of the oil, gas and other minerals produced—whether title was vested in the American or the Sunset, payment to be made on delivery of a valid deed with proof of the authority of the officers of the American to sign. Link stated that he would cooperate in taking the necessary steps to have the American's franchise reinstated and to elect a Board of Directors and make the conveyance, in accordance with the understanding, Small to bear the expenses in connection therewith. The American's franchise was reinstated under Small's direction and at his expense and the directors of the corporation were named through the joint efforts

of Small and Link. On September 4, 1939, the Texas Company began drilling a second well on lands belonging to the Louisiana Land & Exploration Company, a mile and a quarter north of L.L.&E. No. 1 well. On October 15, 1939, the Texas cored a thick, or 200 foot, oil sand, which showed the officials that they had encountered a very rich oil field. In October, 1939, Small met Link in Wilmington, Delaware, and consulted G. Sellers Smith of the Delaware Registration Company, and thereafter, at Small's expense, the parties visited in different cities in other States, some of the original directors of the American and secured their signatures to waivers of the meeting of the former Board. During October, 1939, Small also met Link in Chicago and suggested that he might be able to obtain $1500 for the American's claim to Lots 34 through 52, inclusive, and Lots 530 to 533, inclusive, but Link never responded and the matter was dropped there. Small and his attorney required meetings of the stockholders and the directors of the American to authorize the acceptance of his offer as to Lot 53 and Lots 104 to 119, inclusive, and a meeting was called for November 15, 1939, in Link's office at Denver, Colorado. Small returned to Louisiana and after conferring with the Sunset, the Hibernia Bank, the Texas Company, and the other defendants, had his attorney prepare a quitclaim deed to Lots 34 through 52 and Lots 530 through 533, both inclusive, and the minutes showing the authorization of same and placed them and the prepared quitclaim deed and minutes covering Lots 53 and 104 to 119, inclusive, with the abstract of the titles to the

property, and the written opinions of his attorney dated April 11 and 28, 1939, in his brief case and left for Denver, arriving there on November 10, 1939. He made some further research as to the condition of the American. On November 14, 1939, he contacted Link, who assured him of his continued cooperation. That evening about 8:30 p. m., he telephoned Link at his home and suggested that he would like to see him to discuss a trade with reference to Lots 34 through 52, inclusive, and 530 through 533, inclusive. Link informed him that due to his age (69 years), he retired early. Small hastened to Link's residence and offered to purchase the American's claim to these lots for $1500. There was a lot of discussion. Link stated that he would recommend the sale for $2,000 and a 1/100th royalty interest in the land. Small countered by saying that he thought he could get $2,000 and a 1/200th royalty but not a 1/100th, and Link then verbally agreed. Small left Link and then longdistanced the Texas Company to get its approval to the $500 increase in the cash and the 1/200th overriding royalty and the Texas' approval was confirmed by wire received the following morning. Small also telephoned his Louisiana attorney and asked him to wire a quitclaim deed to the lots included in the second trade and he received this deed by wire the next morning. Small states that the parties had also agreed in the second trade to the omnibus clause covering the balance of the American's holdings in the Drainage District and that his attorney, inadvertently, had omitted that provision in the quitclaim deed which he had brought to Denver with

him and also in the one he wired him. On November 15, 1939, he delivered the prepared quitclaim deed and minutes authorizing its execution to the stockholders' and directors' meetings covering Lots 53 and 104 through 119, inclusive, and then rushed out to have Yates Land, General Counsel for the Texas Company in Denver, on his lunch hour, draw a second quitclaim deed and the directors' minutes in connection therewith. Small returned to the American's office about 1 o'clock in the afternoon. He was in such a hurry he never read these papers. The stockholders and directors approved the sale of the property contained in the first quitclaim deed, in accordance with the agreement of September 25, 1939, and authorized the President, Link, and the Secretary, Chase, to sign the necessary instrument of conveyance. When the second quitclaim deed covering Lots 34 to 52, inclusive, and Lots 530 to 533, inclusive, was presented, together with the minutes, E. L. Williams, a member of the Board of Directors and an attorney in Denver, insisted that the stockholders also authorize the sale of these lots as they had done in connection with the first quitclaim deed, but Small immediately waived that requirement. Williams also insisted that since the lots described in the second quitclaim deed were the same as those involved in the slander of title action in St. Charles Parish, some disposition should be made of the suit. Williams and Small repaired to the office of a patent attorney in the same building and had his young lady secretary type a letter stating that the suit would be dismissed, with prejudice, as to

these described lots and also as to the consideration therefor. There is no mention in this letter, quoted in full in our original opinion, about the lands embraced in the omnibus clause. The quitclaim deed and the minutes of the Board of Directors' meeting with reference thereto presented by Small to the Board were read, and approved, and Link, as President, and Chase, as Secretary, were authorized to sign the deed. Due to the fact that the document had to be notarized and the bank was about to close, the parties hurried over to the bank where the signatures were acknowledged before the notary. At the same time and place Small gave Link three drafts drawn on Fred H. Ryan in care of the First National Bank of Shreveport, the first one to cover the cash consideration for Lots 53 and 104 to 119, inclusive, less expenses, and the second draft for $2,000 covering the purchase price recited in the second quitclaim deed, both drafts were payable to the American Guaranty Company and endorsed by Link and Chase and deposited to its account. The third draft was for $250, expenses, and Small cashed this draft, Link signing as an accommodation endorser. At 8 o'clock p.m. that night (November 15, 1939) Link and some of his associates went to the train with Small, who was returning to Shreveport. Small states that he did not have an opportunity to read the papers prepared by Yates Land, the attorney, and that he signed them without doing so. Before leaving Denver, he wired Sunset and Texas that he had secured a quitclaim to the remainder of the American's properties in the Drainage Dis-

trict, as he had been instructed to do previously by both companies. Small states that while on the train, in his berth, about 12 o'clock that night, he awakened and felt that all was not well and that there was something wrong but he did not know just what it was that was troubling him. He then opened his brief case and examined the papers and found the first quitclaim deed in order, but discovered, in the second instrument, that his name had been misspelled "Cavill" instead of "Cavil" and that he had been referred to by his initials "C. B." Small instead of "Cavil" B. Small and that the word "Attest" appeared above the signature of the secretary of the American. He worried about the matter until about 5 o'clock the next morning (November 16, 1939) and, because one of his employers, who had been a lawyer before going into the oil business, was very technical and as he was afraid he would be criticized for bringing back the instrument as it was, he decided to get off the train and did so, at Des Moines, New Mexico. There he engaged an automobile and drove back to Denver, some 200 miles, in order to have his name correctly spelled and to have the word "Attest" eliminated from the second quitclaim deed. He arrived in Denver at noon and had the same young lady, who had written the letter which he signed on November 15, 1939, in connection with the settlement of the slander of title action in St. Charles Parish by the Sunset against the American, during her lunch hour, recopy the second quitclaim deed and the minutes in connection therewith so as to eliminate the word "Attest" and correctly

spell his name. He met Link and Chase in the afternoon and explained the purpose of his visit, assuring them that the changes made in the documents were only those above described, and that in all other respects the documents were the same as the originals. They hastened over to the bank and acknowledged the rewritten documents before the same notary on November 16, 1939, although the deed itself is dated November 15, 1939. Chase appears to have glanced at the papers but Link did not read them. Small admits that he was unable to produce the second quitclaim deed and minutes dated November 15, 1939, and the copies thereof, because he had torn them up and Link had thrown them into the wastepaper basket on November 16, 1939. Several days after November 16, 1939, Link examined the rewritten quitclaim deed, dated November 16, 1939, and discovered the omnibus clause therein covering the remainder of the property (431.70 acres) which the American had acquired from Sorrells in 1921. He expressed his surprise and disappointment to his son, C. Gordon Link, E. L. Williams, an attorney and a member of the Board of Directors, and later to the attorney for the American, Mr. Brady. He stated that he did not notify Small of his discovery because he still believed, as Small told him, that the Sunset had the valid title and the property had only speculative mineral value. He never returned the money which had been paid as a consideration for the deeds. On Small's written suggestion, Link, on November 30, 1939, mailed him a proposed or form of letter to be written to the Texas

in an effort to have it promptly develop the property but this letter was never sent to the Texas. He also permitted the secretary of the American to send out certified copies of the alleged fraudulent documents to the Delaware Registration Corporation and on December 11, 1939, the Delaware furnished Small its written approval of validity thereof. On December 18, 1939, Link wired Small that an attorney in New Orleans had telephoned him and submitted a proposition concerning the balance of the American's acreage in the Sunset Drainage District. Small on the same day in the afternoon wired Link that he desired to see the contract before Link signed it to be sure that it did not conflict with his trade. Later that day, Small also telephoned Link about the matter. On December 19, 1939, or the next day, Small transferred all of the interest he had acquired from the American to the Sunset and subjected the property to the Texas' mineral lease and the Hibernia Bank's $100,000 mortgage against the Sunset and the Sunset's pledge of mineral interest and rents to the Bank. On February 3, 1940, he also executed an instrument setting forth the respective mineral interests of the other defendants named in the second suit. He retained one-half of the one-eighth royalty from the Sunset as a consideration for his services in securing the first quitclaim deed. He was also reimbursed his expenses and paid $500 by Texas and $1500 by Sunset.

Funk, who formerly resided at Paradis, in St. Charles Parish, La., and had lost a fortune there, heard the report in 1937 that oil had been discovered at Black Prince Island in St. Charles Parish, and returned to Louisiana after an absence of fifteen years. He told some of his friends that he was confident he still had some rights and titles to certain properties in the Drainage District and if any one was interested in the matter to refer them to him. L. L. & E. No. 2 well, which was begun on September 4, 1939, and cored on October 15, 1939, was brought in as a crude oil well on November 26, 1939, and in the early part of December 1939, Tom L. Sessions, a Texas lawyer, also engaged in the oil business, appeared in Paradis in search of leases. He called on his friend, Robert Todd, a New Orleans lawyer, who was handling some legal matter for a man by the name of Cadow, who referred Sessions and Todd to Funk. Sessions contacted Funk who at once came to New Orleans. Todd telephoned Link at Denver. Sessions, Funk, and Todd then went to Fort Worth, Texas, where they were joined by Bond, who is Sessions' partner in the oil business, and saw Sorrells. Sessions and Bond agreed to look into the matter and finance any necessary lawsuits. They also, at an expense of $5,000, had an abstract of the titles prepared and on the advice of their attorneys undertook to secure a quitclaim deed from the American. Funk, in the latter part of December, 1939, or the early part of January, 1940, went by plane to Denver and saw Link, giving him the information that he had obtained and stating that he considered the American had been defrauded. After some negotiations, Link and his attorney, Brady, met Sessions and his attorney in Tulsa,

Oklahoma. Link and Sessions reached an agreement by which Sessions was to advance the American $10,000 cash. On March 6, 1940, three documents were executed and were recorded in St. Charles Parish on April 15, 1940. They were (1) an oil, gas, and mineral lease from the American to Sessions covering the lands in controversy and providing for a ¼th royalty therein in favor of the lessor; (2) a mineral deed from the American to Sessions covering a conveyance of minerals to secure $10,000 paid the American by Sessions (who shortly thereafter waived the return of the $10,000); and (3) a collateral agreement to which the American, Sessions, and Brady and Ellis, attorneys, were parties under which the American obligated itself to file suits in its name for the benefit of Sessions to cancel the two quitclaim deeds to Small, provided that the rights assigned the attorneys as compensation for their services should not have the effect of reducing the mineral interest of the American. On April 18, 1940, the present proceedings were instituted.

We shall now reconsider whether the evidence in the record shows that the trial court is manifestly in error in holding that the omnibus clause was not surreptitiously placed in the purported second quitclaim deed of November 16, 1939.

The several directors of the American testified that the omnibus clause was neither in the minutes passed nor the second quitclaim deed authorized by the Board on November 15, 1939; and that the consideration of $2,000 and ½00th royalty was solely for the conveyance of Lots 34 through 52 and Lots 530 to 533, both inclusive, containing 459.78 acres, and the proposition submitted and transaction entered into in no way directly or indirectly included the remainder of the lands acquired from Sorrells by the American in 1921 or the 431.70 acres embraced in the fraudulent omnibus clause, and for which lands no consideration whatsoever was paid. Link, the President, and Chase, the Secretary, of the American, testified that they were deceived and misled by Small's misrepresentations and assurances that the only purpose of rewriting the second quitclaim deed and the minutes in connection therewith was to correct the spelling of his name and to eliminate the word "Attest" appearing by the Secretary's signature, and, in relying on these false statements, they were induced to hurriedly sign the instrument of November 16, 1939, without checking it or discovering the omnibus clause.

Small testified that the omnibus clause was in the second quitclaim deed of November 15, 1939, which, together with the minutes authorizing it, he destroyed, and that both Link and Chase read the document of November 16, 1939, before signing it.

Yates Land, General Counsel for the Texas Company at Denver, stated that he drafted a proposed quitclaim deed and the minutes of the Board pertaining to it during his lunch hour on November 15, 1939, for Mr. Small and he produced a copy of the deed and minutes from his file. As he was not present at the Board of Directors' meeting, he was unable to say

whether or not Small presented the originals of these copies or some other documents to the Board of the plaintiff or whether Link and Chase signed the original quitclaim deed of the copy which he presented. A comparison of the minutes prepared by Land with the purported minutes annexed to and made a part of the alleged second quitclaim deed of November 16, 1939, reveals that the latter contains an additional paragraph (copied in full in our original opinion), which is not in the former, granting a most general authorization to the president and the secretary of the plaintiff company under which they could have conveyed any land that the company might have owned, because no property is described or referred to therein, except by the words "said tract".

Small testified that he presented the originals of the copies prepared by Land to the Board of Directors without reading them and that they were the same ones approved by the directors and the approved deed was signed by the officers of the plaintiff company.

The young lady stenographer, who testified that she copied certain documents with signatures on them for Small during her lunch hour on November 16, 1939, identified the purported second quitclaim deed of November 16, 1939, and the minutes annexed thereto as the instruments she had copied because of certain errors peculiar to her typing. Neither she nor Small were able to account for the appearance of the additional paragraph in the minutes annexed to the second quitclaim deed of November 16, 1939, which was not in the copy produced by Yates Land.

Small stated that one of the purposes of having the second quitclaim deed and minutes of November 15, 1939, retyped was to correctly spell his name "Cavil" instead of "Cavill" and to eliminate the word "Attest" appearing by the secretary's signature. On cross-examination, his attention was called to the fact that this word "Attest" was also written on the purported second quitclaim deed of November 16, 1939, and had been erased from the face of the document but that it clearly appeared on the reverse side of the page by the impressions of the keys of the typewriter in, and the ink from the typewriter ribbon on, the paper. In explanation, he stated that he was unaware of the fact that this word "Attest" had been recopied on the retyped document and had been erased therefrom. However, the young lady stenographer who retyped the document for him stated that she had erased the word "Attest" upon Small's instructions after she copied it. The evidence also shows that, when Small was informed that the plaintiff was seeking to have the quitclaim deeds set aside on the grounds of fraud, he went to Denver, Colorado, and interviewed this young lady and later had her come to New Orleans and appear as a defense witness in the trial at Hahnville, St. Charles Parish. She remained in New Orleans one month during which time Small paid all of her expenses and also sent her to Panama City, Florida, on a pleasure trip, at his expense. This conduct on his part was not conducive to fair, impartial and

unbiased or truthful testimony of the witness, particularly when the record shows that there were other equally important witnesses whose testimony was taken by depositions.

It is also significant that, in the letter of November 15, 1939, with reference to the slander of title suit pending in St. Charles Parish, covering Lots 34 through 52 and Lots 530 to 533, both inclusive, no mention was made of the remainder of the property acquired by the American from Sorrells and contained in the omnibus clause of the purported deed of November 16, 1939. Obviously, if this land had been placed in the quitclaim deed of November 15, 1939 as a part of the consideration by the American for the $2,000 cash and 1/200th royalty, some reference to it would have been made. The latter is strangely silent on this subject and corroborates the testimony of the officers and directors of the plaintiff that the second deal and second quitclaim deed of November 15, 1939, in no way covered or included the remainder of the Sorrells property acquired by the plaintiff in 1921. In fact, they said there was no discussion or negotiations whatsoever with reference to this 431.70 acre tract.

The telegram of the Texas to Small at Denver on November 15, 1939, 8:40 a.m., in reply to Small's long distance telephone message the night before for authority to raise the offer from $1500 to $2,000 and a 1/200th royalty for Lots 34 to 52 and 530 to 533, both inclusive, involved in the Sunset's jactitation action against the American, corroborates the testimony of Link, Weaver, and Link's son, members

of the Board of Directors of the American, who stated that on the evening of November 14, 1939, Small never mentioned including the 431.70 acres in the deal but made the offer exclusively with reference to the above specifically described lots. The telegram reads: "Texas Company will pay five hundred dollars cash and royalty of one-two hundredths in order to clear title to acreage covered by Sunset suit. If this can be worked out suggest that contract be drawn so that Denver people quitclaim all interest they might have in any of Sunset acreage." If Small had obtained Link's consent to an offer not only embracing the specifically described lots covered by the Sunset's suit against the American, but also the remainder of the property acquired from Sorrells and had so informed the Texas in his telephone communication, there would have been no occasion for the Texas to suggest that, if it could be worked out, Small should endeavor to secure a quitclaim from the American to all interest it might have in the Sunset's acreage.

We also observe that while Small testified that the plaintiff's representatives were trading for everything they could get for the land, the purported deed of November 16, 1939, shows on its face that the 431.70 acre tract was conveyed for the same consideration as Lots 34 to 52, inclusive, and 530 to 533, inclusive. Surely, if the plaintiff's representatives were endeavoring to obtain as much as possible for the lands or their claims thereto and, with reference to both the first and the second purported quitclaim deeds, had Small increased

the amount of the consideration to be paid therefor, they would not have suddenly assumed a generous attitude and gratuitously convey an additional 431.70 acres. It is also to be noted that the alleged omnibus clause, covering the remainder of the Sorrells property is contained in a paragraph in double space typing, in no way connected with, or near, the description of the lots. If the transfer of the two tracts of land—the one covered by the specific description of the lots in single space type, and the one covered by the general description in double space type as to the remainder of the property acquired from Sorrells—had been contemplated, the descriptions would have been given as is customary, one after the other, as shown by Small's deeds from the Sunset, instead of separating them by four distinct paragraphs, which contain a number of clauses. So that, if Link or Chase, at the time they signed the second purported quitclaim deed of November 16, 1939, had referred to the place therein where the lots were described in single space typing, they would have seen only the description of Lots 34 to 52 and Lots 530 to 533, both inclusive.

Small testified that, from the time Yates Land prepared the papers during his lunch hour on November 15, 1939, until late that night when he examined the documents on the train while enroute to Shreveport; he had not read them, although he had delivered the papers to the Directors of the American for their approval, and later signed the deed. He gave this statement as an explanation of why he had not previously discovered the alleged error in the spelling of his first name "Cavill" instead of "Cavil" and the word "Attest" in the quitclaim deed. On the other hand, he admits that he wired both the representatives of The Texas and the Sunset Companies and the Hibernia Bank on the night of November 15, 1939, that he had gotten a quitclaim not only to all of the lots specifically described, but also to all other property acquired by the American Guaranty Company from C. J. Sorrells. Since he had not read the minutes nor the deed prepared by Land and, as the deeds previously drafted by his counsel on two occasions, according to his statements, erroneously or inadvertently omitted the omnibus clause covering the remainder of the Sorrells property acquired by the American, it is difficult to understand how he sent such a wire not knowing whether the balance of the Sorrells property had been included in the deed. It will be remembered that the two quitclaim deeds prepared by his two attorneys did not contain the omnibus clause, although Small states they were written for that purpose. These two attorneys never took the stand to corroborate him.

When the New Orleans attorney contacted Link about the American's property in St. Charles Parish, Link wired Small on December 18, 1939, at 11:53 a.m., from Denver, Colorado, as follows: "New Orleans attorneys called me Saturday and Sunday made proposition on balance ten hundred forty acres sending contract. Do you want to see it before we sign it?" Small answered by wire at 1:45 p.m. the same day, stating: "Would like to see contract be-

fore you sign. Be sure there is no conflict in my trade with you. Be sure our interest is protected." If Small at that time considered that he had purchased the balance of the 1040 acres in controversy, it is clear that he would have wired Link calling his attention to the fact that the American had no further property to convey because he had already bought the remainder or balance of its lands. In this reply telegram, Small in effect acknowledges that the American had other property in the 1040 acre tract which had not been conveyed to him.

Moreover, Small admits that he knew that the slight discrepancy in the spelling of his given name and the appearance of the word "Attest" above the signature of the Secretary of the American Company would not in any way affect the legality of the deed and that these were immaterial circumstances, except, he stated they might displease his employer who was very exacting. He did not show the documents to Attorney Land after they were executed, and never read them, although he remained in Denver from 3 o'clock in the afternoon until 8 p.m. that night before entraining. He did not wire or telephone Land when he became apprehensive that these slight errors might have some possible effect on the transaction and his employer nor did he wire or telephone his attorney in Shreveport to obtain his advice. In fact, when he returned by taxicab to Denver at noon on November 16, 1939, he admits he did not attempt to see Attorney Land, but that he had the young lady stenographer, employed by a patent attorney, during

her lunch hour, recopy the second quitclaim deed with the slight corrections. This is most unusual to say the least. Small's fantastic story that, through some psychophenomenon, at midnight, while asleep in his berth on the train, he was awakened and warned that there was something wrong and this caused him to read for the first time the second quitclaim deed of November 15, 1939, and he worried and pondered over the matter until morning, then he got off the train and went back to Denver, 200 miles away, certainly taxes one's credulity to the breaking point. Able counsel for the defendants had no better explanation of his extraordinary conduct than to say he was drunk.

Small, in his testimony, assigns as one of the reasons why he went back to Denver to have the deed rewritten was because in the minutes prepared by Land, he was referred to by his initials as "C. B." Small and that he wanted to have this corrected so as to give his first name "Cavil." A comparison of the minutes annexed to the rewritten second quitclaim deed of November 16, 1939, with the office copy produced by Land of the originals which had been prepared by him, shows that in both purported sets of minutes Small is referred to as "C. B." Small. Small's reason for his unusual and extraordinary conduct in returning to Denver and having the documents rewritten to correct concededly immaterial and inconsequential matters is made more incredible by reference to the three drafts and the rewritten quitclaim deed, all of which he signed as "C. B." Small and "C. B." Small, Jr. It is likewise

difficult to reconcile his asserted dislike for erasures on documents because the erasures of the "Jr." after his name on the first quitclaim deed and the word "Attest" on the second one are plainly seen.

The defendants stress the fact that, when Link, several days after the execution of the purported deed of November 16, 1939, discovered that the omnibus clause had been added and so informed his attorney and certain members of the Board of Directors of the plaintiff, he, notwithstanding this circumstance, wrote Small friendly letters dated November 22, 1939, November 30, 1939, and December 7, 1939, addressing him "My dear C. B." In the first letter, Link states that he had located his guaranty stock certificates and in the second, he replies to Small's letter of November 26, 1939, wherein he (Small) stated: "You remember in our conversation while I was in Denver I mentioned that if we could dispose of the litigation between American Guaranty Company and Sunset Realty and Planting Co., Inc., that we might get The Texas Company to drill a well on some part of the Sunset Realty and Planting Company's property. Well, I have been working on this and using all the influence that I have to get a well drilled on or near the property you have the 1/200th override, or the $47,000.00 oil payment on. * * * I believe it might be of some help if the American Guaranty Company would write The Texas Company asking for development. I am sure it would do no harm." As a matter of fact, Link prepared the form letter but it was never sent to The Texas Company. In passing, we might say that Small apparently had sufficient influence with The Texas Company to have a well drilled because Sunset No. 1 was drilled on Lot 74, included in the omnibus clause and which lot was subsequently, on December 19, 1939, together with the other property, transferred to the Sunset by Small. It will be recalled that Small had previously purchased from the Sunset one-half of one-eighth royalty in the lands covered by the omnibus clause, or 431.70 acres. The last letter merely asked Small to meet Link in the Majestic Hotel in St. Louis on December 11, 1939.

The defendants also rely upon the fact that Chase and Link forwarded a certified copy of the deed of November 16, 1939, and the minutes annexed to it to the Delaware Registration Corporation at Small's request after Link discovered the fraudulent insertion of the omnibus clause.

Link's explanation of the friendly letters, the Christmas card, and the certification of the minutes was that while he was very disappointed in having discovered that Small had deceived him, he was still under the definite impression and belief created by Small's misstatements and concealments that the plaintiff had no title to the property and that it had purely a speculative mineral value.

Small had been informed by his attorneys that, in order for the American (which had the adverse title or claim to the title of the property) to bind itself, the stockholders and directors must authorize the sale of the property and fix the price therefor, and empower its officers to act

for it. With reference to the first quit-claim deed, a stockholders' and board of directors' meeting was required, but, as to the second quitclaim deed of November 15, 1939, due to haste on Small's part, the stockholders' meeting was dispensed with by him. He knew on November 16, 1939, that Link and Chase could not waive any of the corporation's rights and that before they took any further action it was neces-sary for the Board of Directors to au-thorize them to make any changes or al-terations in the second quitclaim deed, ap-proved by them on November 15, 1939. In spite of this information, Small destroyed the second quitclaim deed of November 15, 1939 (and the minutes in connection therewith and all known copies of both), the authorized act of the plaintiff, and made it impossible for the plaintiff or the defendants to show by documentary evi-dence the provisions these documents actually contained. If the omnibus clause was in the second quitclaim deed of Novem-ber 15, 1939, it is clear that Small, an experienced man in abstracting titles and purchasing mineral rights, would not have destroyed the document and the copies thereof and minutes because there was no necessity for doing so. Clearly, ordinary precaution would suggest that they be retained by him. The only reasonable explanation that can be given for Small's actions in destroying this authorized deed (the copies thereof and the minutes) is that it did not contain the omnibus clause. Neither the negligent nor the intentional acts of Link and Chase subsequent to November 15, 1939, could enlarge the limited authority conferred upon them by the directors by carelessly signing the deed of November 16, 1939, and certifying to erroneous minutes. These unauthorized acts do not have the legal effect of giving or donating 431.70 acres of the plaintiff's land to Small. Under the law the directors could not give away the corporation's property. Certainly, the friendly letters of Link to Small and the unauthorized acts of Link and Chase can-not be construed as an enlargement of the limited power conferred upon them by the Board of Directors.

Great reliance is placed by the defend-ants upon Small's draft of November 15, 1939, for the sum of $2,000 to the order of the American, drawn on Fred H. Ryan, one of the defendants, in care of the First Na-tional Bank at Shreveport. There appears on the face of this draft, in the upper left hand corner, the notation, in Small's hand-writing in ink, "Payment Quit Claim deed. Lots 34 to 52 incl. Lots 530 to 533 inc. Other property." The draft was endorsed by the American, through Link as Presi-dent and Chase as Secretary, and was de-posited to its account. This draft and the one for the sum of $4,113.50, the balance due on the purchase price of the first quit-claim deed and dated the same day, payable to the order of the same party, drawn upon the same drawee at the same bank by Small, was likewise endorsed by Link and Chase for the American, and deposited to its ac-count. The notation on this draft was "Payments of Lots 104 to 119 St. Chas. Parish Lands—Sunset Drainage Dist." The draft for $250, drawn to the order of

·the Central Savings Bank & Trust Company by Small on Ryan at the Shreveport Bank, was cashed by him, after Link endorsed it as an accommodation endorser. The proceeds of this draft were turned over to Small for expenses. The purpose ·of introducing these three drafts in evidence was to show that the notations were ·placed on them by Small on November 15, 1939, while at the Denver Bank, before they were endorsed, thus showing that all of the remaining property acquired by the American from Sorrells was included in the second quitclaim deed of November 15, 1939. On the original hearing, these drafts were not before us, the record merely containing photostatic copies of them. At that time the question was raised as to whether ·or not the notations on the drafts, identifying them with the first and second quitclaim deeds, were placed on them before the Shreveport National Bank's ink stamps were placed on the face of the drafts on November 21, 1939. On rehearing, the plaintiff's attorneys argued that the drafts show that the notations were placed on them after the bank's mail and collection ink stamps were put thereon on November 21, 1939, at Shreveport, Louisiana. There is no expert testimony on this issue. A visual examination of the drafts indicates to us that the writing is over the ink stamps. The most favorable view of the notations, insofar as defendants are con-· cerned, is that it is difficult in some respects ·to say whether or not they were placed on the drafts by Small before the Shreveport Bank stamped them. However, if we are in error in these impressions and it be con-·

ceded that the words "Other property" were placed on the face of the $2,000 draft on November 15, 1939, there is nothing to show that this notation in itself refers to the 431.70 acres of land included in the omnibus clause without consideration. It will be noted that it does not refer expressly to the property acquired from Sorrells. It must also be remembered that Small admitted that due to the fact that the deal with reference to the property included in the second quitclaim deed was not proposed by him until 9 p.m., November 14, 1939, there was haste in the preparation of it and the minutes during the lunch hour and the papers had to be placed before the directors' meeting and because the closing time of the bank was near, the matter was rushed through there, before the Notary Public. In fact, the matter was handled so quickly in the bank, Small even forgot to sign the first quitclaim deed covering Lots 104 through 119, inclusive, and Lot 53. So that, even if this notation were on the draft at the time Link and Chase endorsed it, the evidence establishes that it was not called to their attention and that the purpose of placing it there was to show that it covered the remainder of the American's property purchased from Sorrells in 1921.

As the drafts were made out and given by Small to Link at the bank just before closing time about 3 o'clock p.m., in the afternoon of November 15, 1939, the Board of Directors never saw them and they and the corporation they represented cannot be bound by any notations placed on them by Small. These directors testified

that the deed read to them and which was fully incorporated in their minutes and received their approval covered only the specifically described Lots 34 to 52, inclusive, and Lots 530 and 533, inclusive, and no other property. Small admits Link and Chase never read the drafts, but simply endorsed and deposited them.

Finally it is said that Small would have no motive in fraudulently inserting the omnibus clause in the rewritten quitclaim deed of November 16, 1939, and the general authorization paragraph in the minutes of the Board of Directors in connection therewith, because he was to receive one-half of he one-eighth of the Sunset's royalty interest under the mineral lease with The Texas in the lots covered only by the first quitclaim deed, Lots 104 through 119, inclusive, and Lot 53, and, therefore, he would not take any chance to deceitfully include the additional 431.70 acres, without any consideration.

The record shows that Small's attorney had approved the title of the Sunset Company to the lands included in the omnibus clause and that Small had purchased and paid for one-half of the Sunset's one-eighth mineral interest therein. It was, therefore, to his, the Sunset and the Texas Companies' interest and advantage to obtain a quitclaim from the American to this acreage and in doing so, he was also carrying out the previous written instructions of the Sunset and the Texas Companies to endeavor to get a quitclaim to all of the American's interest.

■ It is our conclusion that the evidence overwhelmingly and beyond any reasonable doubt shows that the omnibus clause was surreptitiously inserted in the second quitclaim deed of November 16, 1939, and that the judgment of the trial court holding to the contrary is manifestly erroneous, as we decided originally.

■ The Texas and the Sunset Companies and the Hibernia Bank contend that the action of Link and Chase in connection with the above referred to letters to Small and the certification of the minutes containing the general authorization which would fit any description of property, was a ratification of the fraudulent deed of November 16, 1939. It must be remembered that Link and Chase were acting as officers of the corporation under the authority of its Board of Directors, upon the insistence of Small and those he represented and, since they did not have the right or authority to extend the Board of Director's authorization so as to, in effect, donate or give away the American's property, there could not be a ratification, even though Link was the majority stockholder of the corporation. It is incorrect for defendants to say that the American was a one man corporation and, therefore, Link's acts bound it. If this were true, the defendants and their attorneys would not have instructed Small to require a stockholders' meeting and a Board of Directors' meeting and expend, as they state, some $4,000 to have the corporation's franchise reinstated, and a Board of Directors named, in order that the contemplated quitclaim deeds could be regularly and legally executed. Even the holder of the majority of shares of

stock cannot legally give away the corporation's property.

■ The Texas and the Sunset Companies and the Hibernia Bank pleaded laches and estoppel by silence and inaction on the part of the plaintiff in not promptly repudiating the fraudulent deed with the result that The Texas Company, at an expense of $130,000, proved the mineral value of the land in controversy by drilling a well on Lot 74, included in the omnibus clause. The well was begun on March 30, 1940. The instruments covering the transactions between the American, Sessions, Bond, Brady and Ellis were dated March 6, 1940, and recorded on April 15, 1940. These two suits were filed on April 18, 1940 (with recorded notice of lis pendens), at which time the well had been drilled to a depth of 5,830 feet and the Texas had expended $24,243.95 and had incurred additional contract obligations. The well was completed on July 21, 1940, as a well producing distillate and gas. There is nothing in the evidence to show that Link or the Board of Directors of the American knew when the Texas Company commenced drilling the well on Lot 74. It is clear that the proceedings were instituted nineteen days after the Texas Company started its drilling operations.

In Emerson v. Shirley, 191 La. 741, 186 So. 88, 92, with reference to the duty and obligation of a party, who was contemplating suing for the annulment of a deed on the ground of fraud, to notify the opposing party, the Court said:

" * * * The evidence shows that his lawyer informed him that he could not

bring suit at that time on account of being engaged in two important cases, Gulf Refining Co. of Louisiana v. Glassell et al., 186 La. 190, 171 So. 846, and Miami Corporation v. State, 186 La. 784, 785, 173 So. 315, but that he would bring the suit just as quick as he could, which his counsel did. The suit was entered on December 21, 1936, practically two months from the date the deed was passed. There is evidence to the effect that the draft given in payment of the deed was deposited by Mrs. Emerson to the account of S. A. Emerson, that S. A. Emerson transferred it to the account of Emerson Oil Corporation and that some checks were subsequently issued against the account. This in itself would not be sufficient to show that Emerson intended to ratify the transaction. International Accountants Society v. Santana, 166 La. 671, 117 So. 768, 59 A.L.R. 276. In fact if he had prior to the institution of the suit let out information that he intended to sue to have the deed declared void, it would have been possible for the property to be transferred into the hands of a third party. The testimony shows that his counsel advised him not to let out any information as to what he intended to do for that very reason."

In this case, it is interesting to note that Small received Link's wire of December 18, 1939, informing him that a New Orleans lawyer had made a proposition to the American on the balance of the 1040 acres. In his reply telegram on the same day, Small requested that he be permitted to see the contract before it was signed and asked Link to protect his interest. He did

not state that the American had no further land in the 1040 acre tract to sell. On December 19, 1939, or the next day, Small transferred all the property he acquired from the American to the Sunset and subordinated the title thus conveyed to the Hibernia Bank's mortgage and the Texas Company's lease and had the Sunset transfer to him the mineral interest in consideration of his services rendered and the mineral rights purchased under the escrow agreement. Based upon this transfer by Small, the Texas and Sunset Companies and the Hibernia Bank have pleaded and are urging that they are bona fide purchasers under just title, upon the faith of the public records and, therefore, not subject to any rights and equities existing between Small and the American. Small, on February 3, 1940, also conveyed to his other co-defendants their respective mineral interests, which he acknowledged he had acquired as their agent. The Sunset's representative, on November 17, 1939, in reply to Small's telegram of November 15, 1939, wherein he informed his principal that he had acquired a quitclaim to the remainder of the American's property, congratulated him by wire and stated: "I shall eagerly await the details of your trade." If Small failed to apprise those whom he represented of all the facts and circumstances in connection with obtaining the quitclaim deed of November 16, 1939, he might be held accountable to them, but not the American, which acted as promptly as it could in a complicated and involved matter after its officers and directors were informed of the extent of the imposition.

This will be further shown later herein. We find no merit in the plea of laches and estoppel.

The plaintiff contends, if this Court adheres to its original view that the omnibus clause was surreptitiously placed in the second quitclaim deed, then the whole deed must be annulled because the plaintiff's officers' consent thereto was unauthorized and fraudulently obtained and, therefore, there was no meeting of the minds of the parties, and that this is especially true where the deed originally authorized was completely destroyed and made nonexistent by Small, the transferee. It is pointed out that the plaintiff in its petition prayed for the annulment and rescission of the deed in toto and that the defendants affirmatively averred the genuineness of the deed and prayed for the upholding of it in its entirety, but did not, in the alternative, ask that any part of it be maintained.

In Marshall v. Sims, Billups & Co., 1880, 1 McGloin 293, at page 294, where a partial rescission of a contract was sought on the grounds of fraud, the Court declared:

"If the contract was secured by fraudulent misrepresentations, or was entered into by defendants under an error of fact, material in its nature, the resultant nullity necessarily affected the whole contract. The defendants' remedy, upon discovering the fraud, or mistake, was to repudiate the agreement entirely and refuse to act farther thereunder. This, however, they are not attempting, in this case, to do. They expressly declare that they abide by the same so far as the fifty cents per bale is

concerned, except as to the particular consignments which they claim did not come from responsible parties. It is well settled that parties cannot demand the partial rescission of a contract, and that by approving a portion of a vicious contract they approve the whole."

■ In 3 C.J.S., Alteration of Instruments, § 5, pages 907, 908, the rule is expressed:

"As a general rule, which is sometimes made the subject of express statutory declaration, any material alteration of a written instrument made after its execution by a party claiming thereunder or with his privity without the authority or consent of the other party or parties to the instrument invalidates the instrument in the hands of the party responsible for the alteration and his assignees as to all non-consenting parties. Two principal grounds have been advanced by the courts as fundamental bases for this doctrine. First, and that which is said to be the true foundation thereof, public policy does not permit a man to take the chance of committing a fraud without running any risk of loss by the event when it is discovered. Second, the identity of the contract as evidenced by the instrument is destroyed; the nonconsenting party cannot be bound by such contract since he never agreed to it. Other statements of the basis of the rule have been sometimes given and are collected in the appended note."

Again at page 913, § 7, it is said:

"The general rule is that, when a right of action depends upon the instrument,

any material unauthorized alteration of it works its destruction to such an extent that no rights can be asserted under, or approved by, it on behalf of the responsible party. In other words, except as the rule may be altered by statute, in the hands of the party responsible the instrument is so far vitiated that no recovery can be had on it either in its altered or original form."

At page 908, § 5, Footnote 28, we find:

" 'The law proceeds on the idea, that the identity of the contract has been destroyed —that the contract made is not the contract before the court—that the party did not make the contract which is before the court; and so adjudging, it can not go further and hold him bound by it, on speculations, however probable and plausible, that he would or ought to have entered into the altered agreement, because it involved less liability than the original and only paper executed by him.' Montgomery v. Crossthwait, 90 Ala. 553, 570, 8 So. 498, 12 L.R.A. 140, 24 Am.St.Rep. 832; Keller v. State Bank of Rock Island, 292 Ill. 553, 127 N.E. 94, 96, 9 A.L.R. 1082."

See also Decennial Digests, Alteration of Instruments, ☞13–24, and Footnotes, 3 C.J.S., Alteration of Instruments, §§ 1–7, pages 904–913.

The above principle was applied to a negotiable instrument by the Court of Appeal for the Second Circuit in Simmons v. Green et al., 18 La.App. 492, 138 So. 679.

In the instant case, it is conceded that the minutes and the document dated November 16, 1939, relied upon by the defendants were never seen by the members of the

Board of Directors of the American, as they had disbanded the previous day and had gone to their respective homes in other cities. Furthermore, it is admitted that Small, the transferee, destroyed the original authorized second quitclaim deed and the minutes of November 15, 1939, and the copies thereof, after fraudulently obtaining Link's and Chase's consent to the deed dated November 16, 1939. It is obvious that the authorization of the American's Board of Directors to the redrafted minutes and its consent to the execution of the re-written deed of November 16, 1939, were not obtained and, consequently, neither the minutes nor the quitclaim deed are legally binding upon the corporation whose officers signed the deed through deception and without authority. The identity of the authorized deed as well as the minutes annexed thereto was made impossible because of their physical destruction by Small, the grantee. The wisdom of the law in providing that under such circumstances the identity of the contract as evidenced by the instrument is destroyed and that fraud vitiates the entire contract is illustrated by this very case. Small and the young lady stenographer who retyped the minutes and the deed of November 16, 1939, both declared, under oath, that the second quitclaim deed of November 15, 1939, and the minutes annexed thereto were simply recopied and no changes were made except to correct the spelling of Small's name and to omit the word "Attest." We have already demonstrated how faulty their memories were and that there was a material and substantial alteration and change

in the minutes by the addition of a whole paragraph.

Counsel for the defendants rely upon Munn v. Hoyt, 150 La. 729, 91 So. 169, and McGinty v. McGinty, 195 La. 328, 196 So. 548, in support of their position that the omnibus clause only should be rescinded and the remainder of the rewritten deed given legal effect. Those cases are not in point here because they involve a fraudulent alteration of the original deed itself after it was executed. The originals in these cases were not physically destroyed by the transferee or grantee as in the instant case where he wilfully and intentionally did so, with the result that the authorized or genuine unrecorded deed was physically and legally put out of existence as far as the transferee or grantee was concerned. Emery v. Dana, 76 N.H. 483, 84 A. 976; Repass v. Jones, 102 N.C. 5, 8 S.E. 770; and Fortune v. Watkins, 94 N.C. 304. Furthermore, the point was not raised in those cases that the entire deed or transfer was null because of the fraudulent alteration.

█ It is our opinion that the transferee or the grantee is not permitted under the law to fraudulently prepare a new deed and new set of minutes for the transferrer corporation, adding 431.70 acres, without consideration and without the authority of the grantor's board of directors, to have its officers sign the fraudulent deed, to destroy and surrender the unrecorded muniment of title, to plead the validity of the fraudulently obtained and unauthorized rewritten document, and then, when apprehended, attempt to assert title under the

original unrecorded deed, without even praying, in the alternative, for such relief.

█ The Sunset, the Texas and the Hibernia Bank & Trust Company, in Liquidation, contend that Small was not their agent or joint adventurer but that he was an independent contractor and that they acquired their interests in the lands from him as third persons upon the faith of the public records, and, consequently, they are not subject to any rights and equities existing between the original parties, the American and Small. When Small obtained information that there was activity in the Paradis field by the Texas Company, he investigated the matter thoroughly and then contacted the Sunset Company and made a deal on March 29, 1939, to purchase certain mineral rights in its one-eighth royalty under the Texas Company's lease, subject to approval of the title by his attorney. On April 11 and 28, 1939, the attorney wrote two letters refusing to approve the title to certain of the lots, pointing out a cloud upon, or defect in, the title with reference to others, and approving the balance of them. The Sunset and Texas Companies were anxious to have these matters cleared and employed Small, who was an experienced abstractor and royalty or mineral purchaser to undertake the work by seeking out the American for the purpose of obtaining its "right, title and interest" to Lots 104 to 119, inclusive, and Lot 53. The authorization by these companies is contained in letters written in July, August and September 1939, whereby Small was authorized to make his investigation and to offer the American

$5,000 cash and a one-twenty-fourth overriding royalty for its claim to title of the above lots, of which the Texas was to bear three-fourths of the cash consideration and the entire overriding royalty. Small's Shreveport associates were to pay one-fourth of the above $5,000 cash consideration. The Sunset Company agreed that it would grant Small one-half of its one-eighth royalty under the Texas Company's lease in consideration of his services in successfully obtaining a deed from the American to the lots, otherwise he was to stand his own expenses for which he was to be reimbursed in the event he was successful. Small made reports to his principals and specifically obtained their written authority whenever he considered it was necessary to do so. For instance, raising the offer from $2,000 to $5,000 on the above lots and the cash from $1,500 to $2,000 and an overriding royalty of 1/200th interest in Lots 34 to 52 and Lots 530 to 533, both inclusive. Small, in his testimony, refers to the parties he represented as his "principals." In the instrument, dated December 19, 1939, wherein Small transferred to Sunset all of the right, title, and interest he had acquired in the property under the two alleged quitclaim deeds from the American on November 15 and 16, 1939, to which the Texas and the Hibernia Bank were parties and in which the newly acquired title rights of Small and the Sunset were made subject to the mineral lease of the Texas and the Hibernia Bank's mortgage and pledge, it is expressly stated that "* * * the said Small (by agreement between the parties hereto) acting for himself, Sunset and Texas, * * * ac-

quired * * * all of the rights, title and interest of the American Guaranty Company in and to the hereinabove described property. * * *" In the negotiations with the representatives and directors of the American, Small, when urged to better his offers, conferred with those whom he represented as his principals and asked for authority to increase the offers.

Stewart, the Division Manager of the Texas Company, admitted that he felt insecure as to the Sunset's title to the lands as the Sunset was claiming through a tax sale and, therefore, was interested in acquiring the American Company's rights, title, and interest. The conduct of these parties and the manner in which the negotiations and transactions were handled show that the Sunset and the Texas Companies maintained supervision and direction of Small's actions. Whenever Small wanted to act, he required specific authority from the companies and he obtained their written permission to proceed. He also made telephone and telegraphic reports on the progress he was making and consulted with his principals, who advised him what to do, leaving the details to him to handle. Small, in accordance with his agreement of employment, was reimbursed his expenses by the Texas and Sunset Companies, and also received $500 from the former and $1500 from the latter.

In Moreland v. Mason, 45 Idaho 143, 260 P. 1035, it was held that where stock buyers were employed to buy cattle for another, the authority being limited to the price they could pay for them, the party they represented being liable for the pay-

ment of the purchase price, they were his agents, because the functions they performed were purely of a business character and their labor in bringing the stock to the shipping point did not make them independent contractors. See, also, 2 C. J. S., Agency, § 2, page 1028.

In Re De Haven's Estate, 248 Pa. 271, 93 A. 1013, the Court held that where one contracting party acquired land and conveyed it to the other that the former was the agent and not the partner of the latter.

In Lockney State Bank v. Damron, Tex. Civ.App., 179 S.W. 552, the Court held that a corporation cannot retain an advantage obtained by fraud of one of its agents and accept the benefit of his acts without also adopting the means through which the advantage was procured, although the principal may have been without any knowledge at the time what those means were.

In Brigham v. T. D. Judy Inv. Co., Mo. App., 186 S.W. 15, at page 22, it was decided that a principal cannot reap the benefit of his agent's frauds and then escape by stating that he (principal) was not personally cognizant of any fraud.

In the instant case, it must be borne in mind that this is not a matter where a principal is repudiating the unauthorized and fraudulent act of his agent as beyond the scope of his authority and, therefore, not legally binding on him, but here the principals are contending that there was no fraud committed but if there was, then the wrongdoer was not their agent but an independent contractor. It is our opinion that the evidence in this case unmistakably

shows that Small was the agent of the Sunset and the Texas Companies. Consequently, they cannot retain the benefits and advantages of his wrongful acts.

It is also argued that the Hibernia Bank, in Liquidation, and the State Bank Commissioner, did not employ Small and he was, therefore, not their agent. If Small was not their agent, then his actions in their behalf are unauthorized and repudiated. This would mean that whatever title Small obtained from the American did not redound to the Hibernia Bank and the Bank Commissioner's benefit and advantage because he was not their agent authorized to bind them. But these two parties defendant are claiming herein the benefits and advantages obtained by Small from the American Company and, consequently, they thereby ratified his acts in obtaining the American's right, title and interest in the property, even though they were at that time unaware of his fraudulent conduct. Thus, the Hibernia Bank and the Bank Commissioner are in no better position than their debtor and mortgagor, the Sunset Company, which is shown to be a subsidiary of the Bank, because the ratification likewise made Small the agent of the Bank and the Bank Commissioner, and the plaintiff is legally entitled to have the quitclaim deed annulled and rescinded on the grounds of fraud. Certainly, the ratification by the innocent principals does not have the legal effect of changing Small's status as an agent and making him an independent contractor with reference to these two parties. Great American Indemnity Co. v. First National Bank, 10 Cir., 100 F.2d 763; Lock-ney State Bank v. Damron, Tex.Civ.App., 179 S.W. 552.

This conclusion confirms the views expressed in our original opinion wherein we stated that Small was either the agent or a joint adventurer of his co-defendants.

We shall next consider the alleged charges of fraud in misrepresenting the value of and title to the property involved herein.

Article 1847 of the Revised Civil Code, under the heading of "Conventional Obligations," paragraph VIII, dealing with the nullity resulting from fraud, provides:

"Fraud, as applied to contracts, is the cause of an error bearing on a material part of the contract, created or continued by artifice, with design to obtain some unjust advantages to the one party, or to cause an inconvenience or loss to the other. From which definition are drawn the following rules:

"1. Error is an essential part of the definition; an article [artifice] that can not deceive can have no effect in influencing the consent, and can not injure the validity of the contract.

"2. The error must be on a material part of the contract, that is to say, such part as may reasonably be presumed to have influenced the party in making it; but it need[s] not be the principal cause of the contract, as it must be in the case of simple error without artifice. (Brackets ours.)

"3. A false assertion as to the value of that which is the object of the contract, is not such an artifice as will invalidate the agreement, provided the object is of such

a nature and is in such a situation that he, who is induced to contract by means of the assertion, might with ordinary attention have detected the falsehood; he shall then be supposed to have been influenced more by his own judgment than the assertion of the other.

"4. But a false assertion of the value or cost, or quality of the object, will constitute such artifice, if the object be one that requires particular skill or habit, or any difficult or inconvenient operation to discover the truth or falsity of the assertion. Sales of articles falsely asserted to be composed of precious metals, sales of merchandise by a false invoice, of any article by a false sample, of goods in packages or bales, which can not without inconvenience be unpacked or inspected, or where the party making the sale avoids the inspection with intent to deceive, of goods at sea or at a distance, are, with others of a like nature, referable to this rule.

"5. It must be caused or continued by artifice, by which is meant either an assertion of what is false, or a suppression of what is true, in relation to such part of the contract as is stated in the second rule.

"6. The assertion and suppression, mentioned in the last preceding rule, mean not only an affirmation or negation by words either written or spoken, but any other means calculated to produce a belief of what is false, or an ignorance or disbelief of what is true.

"7. The artifice must be designed to obtain either an unjust advantage to the party for whose benefit the artifice is carried on, or a loss or inconvenience to him against whom it is practiced, although attended with advantage to no one.

"8. It is not necessary that either of the effects mentioned in the last preceding rule should have actually been produced; it is sufficient to constitute the fraud, that such would be the effect of the contract, if it were actually performed.

"9. If the artifice be practiced by a party to the contract, or by another with his knowledge or by his procurement, it vitiates the contract; but if the artifice be practiced by a third person, without the knowledge of the party who benefits by it, the contract is not vitiated by the fraud, although it may be void on account of error, if that error be of such a nature as to invalidate it; in this case the party injured may recover his damages against the person practicing the fraud.

"10. In the words 'loss or inconvenience' which may be suffered by the party, is included the preventing him from obtaining any gain or advantage, which, without the artifice, he might have obtained.

"11. If the advantage to be gained by the party, in favor of whom the artifice is practiced, gives him no unjust advantage, that is to say, no advantage at the expense of the other party, and this latter would neither suffer inconvenience nor loss in consequence of the deception, if the contract were performed, the artifice does not vitiate it.

"12. Combinations with respect to sales to enhance the price by false bids or offers, or to depress it by false assertions,

are artifices, which invalidate the contract, when practiced by those who are parties to it, or give rise to an action for damages where they are not." (Brackets ours.)

Articles 1843, 1844, and 1845 of the Revised Civil Code read, respectively, as follows:

"1843. There is error as to the substance, when the object is of a totally different nature from that which is intended. Thus, if the object of the stipulation be supposed by one or both the parties to be an ingot of silver, and it really is a mass of some other metal that resembles silver, there is an error bearing on the substance of the object.

"1844. The error bears on the substantial quality of the object, when such quality is that which gives it its greatest value. A contract relative to a vase, supposed to be of gold, is void, if it be only plated with that metal. (As amended, Acts 1871, No. 87.)

"1845. Error as to the other qualities of the object of the contract, only invalidates it, when those qualities are such as were the principal cause of making the contract."

 The parties to contracts or deeds are not obliged by law to make any statement with reference to the title, the condition, or the value of the subject matter thereof. But, if any one of them undertakes to speak with reference thereto, he is legally obligated to tell the whole truth and neither conceal nor suppress any material facts or information bearing upon and affecting the title, the condition, and the value of the object of the transaction.

In the event the speaker is guilty of material misrepresentation or concealment, the contract or deed is vitiated by his fraud, because he deceitfully obtained the consent of the other party to the transaction. An invitation by the offender to inspect or to investigate will not excuse him from his misconduct as it is not a defense of his wrongdoing to stand before the court and plead that the defrauded party unwisely or carelessly trusted him and placed too much confidence in his honesty and truthfulness. While a purchaser is under no obligation to inform a prospective vendor as to the value, the title or the condition of the property involved, he, individually, or as agent for his principal, having made representations and statements as to the value, the title or the condition of the property, knowing them to be false or reckless or without knowledge of their truth or falsity, is under the solemn obligation to make correct representations and tell the whole truth, without concealment or suppression of any material facts, especially if there exists an inequality of knowledge, as where the seller does not reside near the land and the purchaser does and is familiar with it. Morgan v. Dinges, 23 Neb. 271, 36 N.W. 544, 8 Am.St.Rep. 121; Stackpole et al. v. Hancock et al., 40 Fla. 362, 24 So. 914, 45 L.R.A. 814; Berry et ux. v. Stevens et al., 168 Okl. 124, 31 P.2d 950; Roby Motors Co., Inc., v. Price et al., La.App., 173 So. 793; Markey v. Hibernia Homestead Ass'n, et al., La.App., 186 So. 757; Winzey v. Louisiana Industrial Life Ins. Co., La.App., 195 So. 67; Moses Loeb & Co. v. Godchaux & Silbernagel; 2 McGloin

140; Mendelsohn v. Dodson, 95 Fla. 144, 116 So. 474; Penn Mut. Life Ins. Co. v. Taggart, 38 Ga.App. 509, 144 S.E. 400; McGuire v. Gunn, 133 Kan. 422, 300 P. 654; McGuffin v. Smith, 215 Ky. 606, 286 S.W. 884; Nunn v. Howard, 216 Ky. 685, 288 S.W. 678; Osborne v. Simmons, Mo. App. 23 S.W.2d 1102; Cooper v. Weissblatt, 154 Misc. 522, 277 N.Y.S. 709; Costello v. Costello, 155 Misc. 28, 279 N.Y.S. 303; Brooks v. Greenville Banking & Trust Co., 206 N.C. 436, 174 S.E. 292; Trosper v. McKee, 153 Okl. 12, 4 P.2d 755; Bevan v. Templeman, 145 Or. 279, 26 P.2d 775.

Whenever a person states a matter which might otherwise be only an opinion, not as a mere expression of his own opinion, but as an existing fact, material to the transaction, the statement clearly becomes a statement of fact and not an expression of opinion. Fidelity & C. Co. of New York v. J. D. Pittman T. Co., 244 Ala. 354, 13 So.2d 669, at page 672; Coleman v. Night Commander Lighting Co., 218 Ala. 196, 118 So. 377; Tillis v. Smith Sons Lumber Co., 188 Ala. 122, 65 So. 1015; Tabor v. Peters, 74 Ala. 90, 49 Am. Rep. 804; Tanner v. Clark, 13 Ky. Law Rep. 922; Sacramento Suburban Fruit Lands Co. v. Nelson, 9 Cir., 36 F.2d 929; Sacramento Suburban Fruit Lands Co. v. Hanson, 9 Cir., 36 F.2d 946; Sacramento Suburban Fruit Lands Co. v. Nepstad, 9 Cir., 36 F.2d 947; Milliken-Tomlinson Co. v. American Sugar Refining Co., 1 Cir., 9 F.2d 809, rehearing denied 1 Cir. 10 F.2d 973; Neff v. Engler, 205 Cal. 484, 271 P. 744; J. B. Colt Co. v. Freitas, 76 Cal.App. 278, 244 P. 916; California Stearns Co. v.

Treadwell, 83 Cal.App. 69, 256 P. 594; Dvorak v. Latimer, 91 Cal.App. 664, 267 P. 578; Roloff v. Hundeby, 105 Cal.App. 645, 288 P. 702; Russell v. Roscoe, 106 Cal.App. 293, 289 P. 185; Cahill v. Readon, 85 Colo. 9, 273 P. 653; Commercial Sav. Bank of Carroll, Iowa, v. Kietges, 206 Iowa 90, 219 N.W. 44; Madison Trust Co. v. Helleckson, 216 Wis. 443, 257 N.W. 691, 96 A.L.R. 992; Held v. Mansur, 181 Ark. 876, 28 S.W.2d 704; Gammon v. Ealey & Thompson, 97 Cal.App. 452, 275 P. 1005; Connor v. Butler, 113 Cal.App. 502, 298 P. 546; Lesser v. Porter, 94 Colo. 348, 30 P.2d 318; Security Trust Co. v. O'Hair, 103 Ind.App. 56, 197 N.E. 694, rehearing denied 199 N.E. 602; McGuffin v. Smith, 215 Ky. 606, 286 S.W. 884; Gugel v. Neitzel, 248 Mich. 312, 226 N.W. 869; Poloms v. Peterson, 249 Mich. 306, 228 N.W. 711; Voss v. Scott, 180 Minn. 88, 230 N.W. 262; Marantz v. Weisberg, Tex.Civ. App., 33 S.W.2d 505; La. Law Review, Vol. IV, Page 145; Crompton v. Beedle et al., 83 Vt. 287, 75 A. 331, 30 L.R.A., N.S. 748, Ann.Cas.1912A, 399; Formento v. Robert, 27 La.Ann. 489; Stackpole et al. v. Hancock et al; Morgan v. Dinges; and Berry **v.** Stevens, supra.

The above rule is particularly applicable where:

The hearer could not with ordinary attention have detected the falsehood, and the object of the false assertion is one that required particular skill or habit, as well as inconvenient operation to discover the truth or falsity of the assertion, C. C. art. 1847, Sec. 4; Williams v. Miller, 9 La.

129, 134, 135; 37 C.J.S., Fraud, § 34, pp. 279–281;

It was possible to ascertain the facts, but an investigation would have been difficult, De Swarte v. First Nat. Bank, 188 Wis. 455, 206 N.W. 887;

There was intentional fraud, Griffiths v. Thrasher, 95 Mont. 210, 26 P.2d 995;

The hearer lacks equal facilities for ascertaining the truth, Falter v. United States, 2 Cir., 23 F.2d 420, certiorari denied 277 U.S. 590, 48 S.Ct. 528, 72 L.Ed. 1003;

The facts are peculiarly within the knowledge of the speaker, Hull-Tex Oil Ass'n v. Pipes, Tex.Civ.App., 240 S.W. 994; .

The facts are difficult for the hearer to ascertain, Bankers Bond Co. v. Cox, 263 Ky. 481, 92 S.W.2d 790; Bunch v. Bertram, 219 Ky. 848, 294 S.W. 805;

It would be necessary for the hearer to employ a third person to make an examination in order to learn the truth, Payne v. Clow, 114 Cal.App. 597, 300 P. 138; 26 C.J., p. 1154, note 94; 37 C.J.S., Fraud, § 34, note 80;

Employment of an expert would be required in order to ascertain the truth, Chase v. Wolgamot, 137 Iowa 128, 114 N.W. 614; McGibbons v. Wilder, 78 Iowa 531, 43 N. W. 520;

The speaker is an expert with respect to the transaction involved and hearer is not, Kost v. Bender, 25 Mich. 515;

The subject matter of the representations is at such a distance that the hearer could not reasonably be called upon to investigate the matter, Nolan v. Fitzpatrick, 186 Iowa 1226, 173 N.W. 255;

The party making representations possesses or assumes to possess a superior knowledge or special information, the representations so made are not mere expressions of opinion, Russell v. Roscoe, 106 Cal.App. 293, 289 P. 185;

■ An action for deceit will lie, although misstatements of fact and opinion were both relied on, Gillespie v. Hunt, 276 Pa. 119, 119 A. 815; certiorari denied Hunt v. Gillespie, 261 U.S. 622, 43 S.Ct. 519, 67 L.Ed. 832;

■ When a party sees fit to make representations as to the condition or quality of property it is obligatory that the whole truth be told without suppression of or concealment of any material facts known to the agent or his principal, C. C. Art. 1832; Markey v. Hibernia Homestead Ass'n et al., La.App., 186 So. 757; Winzey v. Louisiana Industrial Life Ins. Co., La.App., 195 So. 67; and

■ A sale will be set aside even where the agent made misrepresentations or suppressed facts innocently as a result of the failure of principal to divulge the true facts to him, American Jurisprudence, Vol. 2, Agency, Sec. 363, page 283. See also Guerin Theatre Seating System, Inc., v. Guerin, 163 La. 426, 112 So. 34.

■ An innocent principal cannot retain the benefits and advantages secured by his agent's fraud without also adopting the means through which the advantage was obtained. Lockney State Bank v. Damron, Tex.Civ.App., 179 S.W. 552.

In 37 C.J.S., Fraud, § 56, it is stated:

" * * * False and positive statements as to title and encumbrances are usually regarded as actionable misrepresentations of fact, which may be relied upon without investigation where there exists a relation of confidence or inequality of knowledge, and for which redress can be had, notwithstanding the hearer failed to exercise prudence in preliminary investigation, and had means of ascertaining the truth, as by reference to public records."

In Crompton v. Beedle et al., 83 Vt. 287, 75 A. 331, 335, 30 L.R.A.,N.S., 748, Ann. Cas.1912A, 399, we find:

"Pollock in his work on Contracts, after treating of misrepresentation and fraud in ordinary cases of sales adds: 'All this proceeds on the supposition that the vendor's property and title are best known to himself, as almost always is the case. But the position of the parties may be reversed. A person who becomes the owner of a property he knows very little about may sell it to a person well acquainted with it, and in that case a material misrepresentation by the purchaser makes the contract, and even an executed conveyance pursuant to it, voidable at the vendor's option.'

* * * * *

"So Sir Frederick Pollock says: 'In the case of active misrepresentation it is no answer, in proceedings either for damages or for setting aside a contract, to say that the party complaining of the misrepresentation had the means of making inquiries'—and he quotes the principle that 'No man can complain that another has too implicitly relied on the truth of what he himself has stated.' Williston's Wald's Pollock on Contracts, 693, 694. In a House of Lords case this principle was thus declared by Lord Chancellor Chelmsford: 'When once it is established that there has been any fraudulent misrepresentation or willful concealment, by which a person has been induced to enter into a contract, it is no answer to his claim to be relieved from it to tell him that he might have known the truth by proper inquiry. He has a right to retort upon his objector, "You at least, who have stated what is untrue, or have concealed the truth for the purpose of drawing me into a contract, cannot accuse me of want of caution because I relied implicitly upon your fairness and honesty."' Central Ry. Co. of Venezuela v. Kisch, L.R. 2 H.L. 99, 120. This is the expression of no obscurantist. The bare statement proves itself. It expresses a doctrine the soundness of which the sages and votaries of the common law perceived, not always altogether clearly, but with a vision which sufficed. Any different doctrine, carried to its logical conclusion, would facilitate transactions in gold bricks, salted mines, bogus diamonds as real, facsimiles as originals, and would permit a variety of things destructive of commercial integrity. The maxim which requires a party to a trade to look out for himself has a wise and broad application. We would not traduce it or deny to it the legitimate application to which it is entitled. But it cannot be permitted that that maxim should be so construed as to portray the law in caricature,

and to render it an instrument of craft, a tool of fraud, a talisman of injustice, a key by the use of which one man may plunder another. For the commerce of the world is promoted, not by cunning, but by such wisdom as is consistent with that good faith which underlies everything in the social order that has stability."

An innocent principal cannot be exonerated from the fraud of his agent acting within the scope of his employment. Henderson et al. v. Western Marine & Fire Insurance Co., 10 Rob. 164, 43 Am.Dec. 176.

■ Where an agent acts beyond the scope of his authority but the principal accepts and insists on retaining the benefits and advantages of the fraudulent transaction, this constitutes a ratification. The Federal Court in Great American Indemnity Co. v. First National Bank, 10 Cir., 100 F.2d 763, 765, in discussing the foregoing subject, stated:

"In such a case the principal is impaled on the horns of a dilemma. If he disclaims the agent's act as unauthorized, he has no grounds to retain the fruits thereof; on the other hand, if he retains the fruits of the agent's act, after knowledge of the facts, he must in fairness be charged with the agent's knowledge. Maryland Casualty Co. v. Queenan, 10 Cir., 89 F.2d 155, 156, 157."

In American Jurisprudence, Vol. 2, Agency, Sec. 363, page 283, it is stated:

"The principle laid down by the American Law Institute is that a principal who authorizes an agent to conduct a transac-

tion for him intending that the agent shall make representations to another in the course of it which the principal knows to be untrue is as liable for such misrepresentations as if he had made them intentionally; if he does not intend that the agent shall make representations but should know that the agent will do so, he is as liable as if he had made them negligently. Moreover, although the principal may not have actually authorized the particular fraudulent act, yet he is responsible for the fraud of the agent if he has intrusted to the agent a matter which puts the agent in a position to perpetrate the fraud complained of while the agent is executing the agency transaction within the scope of his employment. Even though the agent is committing a fraud for his own benefit, the principal is liable therefor if it is within the actual or apparent scope of the agent's employment."

See, also, Guerin Theater Seating System, Inc., v. Guerin, 163 La. 426, 112 So. 34.

An invitation to the victim to investigate for himself, when coupled with false representations and concealment, aggravates rather than mitigates the fraud committed.

In Hossier Realty Co. v. Caddo Cotton Oil Co., 136 La. 328, 67 So. 20, 22, the plaintiff sued the defendant for loss said to have been sustained as a result of its illegal rejection of three car loads of cotton seed. The defense was justifiable rejection of the seed because it was represented as sound but to plaintiff's knowledge at the time, it was fifty percent rotten. The plain-

tiff contended that the defendant's agent, who was on the plantation where the seed was stored, was invited to inspect it and if he had done so, he could have determined the defective condition by simple inspection, and that failure to do so was his own fault. The district court first rendered judgment for the plaintiff, but on a new trial, in favor of the defendant. The Court of Appeal decided for the plaintiff and this Court granted the defendant a writ of review, and held that the plaintiff's manager had made misrepresentations as to the condition or value of the seed to the defendant's agent and while he might have inspected the seed and did not do so, he was entitled to rely on the plaintiff's manager's statement because the seed could not be conveniently examined or inspected. The Court rejected the theory that the invitation to inspect the seed relieved the plaintiff of his agent's misrepresentations as to the condition or value thereof. The Court, in deciding the case in favor of defendant, stated:

"In Millaudon v. Price, 3 La.Ann. 4, the purchaser, after making a partial inspection of 2,400 sacks of salt, was influenced to accept the same on the representation of the vendor that they had not been on storage for more than five or six months. As a matter of fact, the salt had been in storage for 16 or 17 months, and in consequence had deteriorated in quality. The court released the purchaser from his bargain."

In Corpus Juris, Vol. 26, at pages 1154 and 1155, we find:

"The hearer may rely upon representations if the subject matter thereof is at such a distance that he could not reasonably be called upon to investigate it, and his right of reliance will not necessarily be precluded by the fact that the speaker advised him to investigate before acting, that the speaker himself had never seen the property and so informed the hearer, or that the hearer had previously been in the immediate vicinity of the property misrepresented."

"There is authority holding that representations as to the value, quality, and character of distant property are mere expressions of opinion upon which there is no right to rely. But the weight of authority holds that there is a right to rely upon representations as to distant property even when the representations relate to its value, quality, and condition, and where such representations are made positively they are generally regarded as actionable representations of fact." See, also, 37 C.J.S., Fraud, § 34.

See, also, American Law Institute's Restatement of the Law of Torts, Section 540.

In Morgan v. Dinges, 1888, 23 Neb. 271, 36 N.W. 544, 547, 8 Am.St.Rep. 121, the action was to set aside the deed to real estate by the plaintiff to the defendant on the grounds of fraud in its procurement. The defendant admitted the execution of the deed, denied making any misrepresentations, averred that the property had no market value, and claimed by adverse possession under a tax deed for more than ten years. There was judgment in favor of the plaintiff and the defendant appealed. It appears that the

plaintiff, a resident of Denver, Colorado, had been absent from Lincoln, Nebraska, for about fourteen years; that in 1874, she owned a lot in Lincoln valued between $6,000 and $8,000; that, in 1888, the defendant called at her home in Denver, with his attorney, and represented that the value of the lot, exclusive of the house, was not more than $200 or $300, concealing from her the true value thereof; that he stated that her title had been extinguished by a tax deed, but, in order to clear a flaw, he wanted her signature to a deed as a simple formality; that the defendant's attorney, at the defendant's instigation, informed the plaintiff that the title to the property had been extinguished by the tax deed; that the defendant threatened to bring a suit and cause her trouble unless she sold the lot to him for $100; that because of illness and lack of money, she did not have an opportunity to consult with an attorney as to her rights and was ignorant of them; that she had heard nothing as to the value of the lot for many years and had no knowledge of its value; and that she relied wholly and implicitly upon the statements of the defendant and his attorney in executing the sale for $100.

It also appears that a tax purchaser was in possession of the lot in question under a tax deed of 1887, but the evidence failed to show that the tax purchaser had been in possession a sufficient period of time to give him title by adverse possession. The defendant applied to the tax purchaser to buy the lot and was informed by him as to the state of the title and it was verbally agreed that he would sell his interest for $2,000 to the defendant, it being understood that the record title was in the plaintiff, and, at that time, the lot was worth $5,000. After the defendant located the plaintiff in Denver, he employed an attorney and called upon him and had the deed executed. The plaintiff, because of her lack of means, had not paid the taxes on the property amounting to $300. In affirming the judgment of the district court, in favor of the plaintiff, the Supreme Court declared:

" * * * the defendant and his attorney, when asked by the plaintiff as to the value of the lot, concealed the fact as to its true value, and by indirection and innuendo, in effect, stated that her interest had passed by the tax sale, and was of little or no value whatever. These statements, so far as this record shows, were false. * * *"

In the syllabus it is stated:

"Where a vendor and purchaser stand on equal footing, the expressions of opinions as to the value of property will not usually be considered so material that misstatements will constitute fraud. Where, however, the purchaser resides near the property and has knowledge of its value, and the owner is a resident of another state, and has no knowledge on that subject, statements of the purchaser representing the property to be greatly beneath its true value, and that the vendor's title has been conveyed by sale for taxes, will be sufficient to avoid the deed given to such purchaser.

"Where a person, desiring to purchase real estate, knows its value, and when asked by the vendor, a resident of another state, and who has no knowledge as to such value, as to the worth of such property, designates a sum greatly beneath its worth, as he well knows, and such statement is relied upon by the vendor, and a sale effected, it may be sufficient to authorize a cancellation of the deed at the suit of the vendor.

"If the purchaser does any act or makes any declaration with the intention of misleading the seller, and preventing him from ascertaining the real situation of the property, and at the same time conceals from him a fact or facts which he knows to be material, he is guilty of a fraudulent deception."

In Stackpole et al. v. Hancock et al., 1898, 40 Fla. 362, 24 So. 914, 918, 45 L.R.A. 814, Stackpole and Connor purchased jointly wild forest lands in the State of Florida in 1882. They resided on it for about six months and then moved to Connecticut and never returned. The property was sold in 1889 for nonpayment of taxes due to a defective assessment. The defendants, Hancock, Hale, Keathley and Taylor, obtained a quitclaim deed to the land from the tax purchaser. On June 2, 1890, Hancock purchased the interest of Stackpole in the land. In September 1890, Connor died and Hancock bought the respective interests of Connor's heirs in the land. Hancock, in 1891, then executed a quitclaim deed to the defendants, Hale, Taylor and Keathley for an undivided ¾ths interest. The purchases by Hancock from the vendors were made by him while they were residing in the State of Connecticut. Phosphate had been discovered on the land a short time before Hancock made the purchase from Stackpole and the latter knew nothing of it when he sold his interest. Hancock had resided in Florida near the land and he knew of a valuable deposit of phosphate thereon. He represented to Stackpole, as an inducement for him to sell, that the land was valuable only for the timber on it and that he desired to buy it to augment a body of his own land that was necessary to complete a sale to an English syndicate. He told Stackpole the land had been sold for taxes, showing him two tax deeds. It was shown that when Hancock purchased the Connor heirs' interest, he was acting for and representing Hale, Taylor and Keathley, as agent, and they were held bound by his acts. In purchasing from three of the Connors, he also stated that the land did not have any phosphate deposit and that the vendors might lose the land on account of the tax sales. Stackpole and the Connor heirs relied upon Hancock's statements in selling the property.

In affirming the finding of the lower court that Hancock had made fraudulent representations to Stackpole when he purchased his interest in the land, and cancelling the quitclaim deed, the Court stated:

"The testimony is of a character to warrant the chancellor's conclusion, and to forbid a disturbance of it, that Hancock represented to Stackpole, as an inducement for him to sell, that the land was valuable only for the timber that was on it, and

also that the special reason of the former in desiring to buy it was to augment a body of his own land that was necessary to complete a sale to an English syndicate. * * * According to the rule of the common law, a vendee who has information of a mine on the land of another, of which he is ignorant, is under no legal obligation to disclose such fact in making a purchase. Under such circumstances, the vendee may remain silent as to the real facts, and purchase, but such situation places him under legal obligation to do no act or make any representation calculated to mislead the owner into the belief that there was no mine on the land. If the vendee undertakes to speak under such circumstances, he must utter the truth. * * * The authorities sustain the view that while a purchaser, situated as Hancock was, is not bound to disclose facts in his knowledge, or to answer inquiries as to such facts, yet, if he undertakes to do so, he must disclose the whole truth, without concealment of material facts, and without doing anything calculated to prevent an investigation on the part of the seller, especially if he does not reside near the land, and the purchaser does. * * * The statement made by Hancock, that the land was valuable only for the timber that was on it, would ordinarily be regarded as an expression of an opinion; but under all the circumstances of this transaction, as disclosed by the testimony, it was calculated to mislead Stackpole, and to prevent him from making any inquiry in reference to the land, and constituted a part of the scheme to conceal the real facts as to the discovery of phosphate on the land, and which, if known to Stackpole, would have prevented the sale at the price accepted. The conclusion is reached by the chancellor that the sale by Stackpole to Hancock, so far as he is concerned, is sustained by testimony of such a character as to preclude, under the established rule on the subject, a reversal. * * * "

The Court also found, with reference to the purchase from the three Connor heirs:

" * * * that they relied upon the statement that there was no phosphate on the land as being true, and it cannot be safely affirmed, on the evidence, that it did not operate to some extent in inducing the sale. If so, complainants can avail themselves of it in having a cancellation of the sale. The decree is erroneous as to James, Eugene and Rosanna Connor, but as to W. J. Connor it must be affirmed, on the ground of an entire absence of proof showing any improper representations whatever made to him in obtaining the conveyance of his interest in the land. * * *

"It appears that the decree made no provision for a refunding of the purchase money and interest by the succeeding complainant, W. P. Stackpole. The cancellation should be conditioned upon the refunding of the proper amount of purchase money and interest by those of the complainants in whose favor the decree is made."

In Berry et ux. v. Stevens et al., 1934, 168 Okl. 124, 31 P.2d 950, 954, suit was

filed for the rescission and cancellation of a deed to property, based on the grounds of fraud. The defendant Stevens denied making false representations, and his co-defendants denied that he was their agent, claiming they were innocent purchasers without notice of fraud and that while the deed conveyed the land to all three of them jointly, they paid for their interest therein to the defendant Stevens a day or two after the execution of the deed, when he returned home. The defendants demurred to the evidence, contending that it was insufficient to justify holding them guilty of fraud. The lower court overruled the demurrer insofar as Stevens was concerned and sustained it as to the other defendants. Judgment was rendered for the defendants and a motion for a new trial was overruled. The plaintiffs appealed.

The plaintiffs had resided for a number of years in Caddo county, Oklahoma, where the land was situated. They were personally acquainted with Stevens, who was a real estate agent in that county. About twenty-two months before the execution of the controversial deed, the plaintiffs moved from Caddo county to Craig county, Oklahoma, where they thereafter resided. Stevens knew the plaintiffs owned the tract of land in the proportion of an undivided ⅖ths. Before the deed was executed, Stevens wrote the plaintiffs about the property and they were in communication both by written correspondence and by telephone. Stevens reported that he might find a buyer for the land and the plaintiffs communicated to him their willingness to sell it, being under the impression that Stevens was acting as his agent. Stevens visited the plaintiffs in Craig county pretending that he was interested mainly in having the plaintiffs assist him in showing other property to prospective purchasers of Craig county lands. His real purpose in visiting the plaintiffs, however, was to purchase their interest in the land in Caddo county. The land involved was in an oil bearing territory and there were a number of small producing wells in the vicinity. Immediately prior to this time, various operators for oil and gas in the vicinity of the plaintiffs' land had discovered new and deeper oil-bearing sand than the oil bearing-strata (stratum) that had theretofore been the source of the oil and gas. The Magnolia Company drilled a well within one or two miles of plaintiff's lands that had an initial daily producton of 1,000 barrels. The plaintiffs had been acquainted with the older production in the field, but knew nothing of the discovery of the new large producing well. They did not know the real purchaser of their land until the deed conveying the same was written out and presented to them for signature. The plaintiffs sold their interest in the land for $2,000 to the three defendants. Stevens then returned to his home in Caddo county. When the plaintiffs learned of the existence of the large new oil well, they filed this action in the District Court against the three defendants for the cancellation of the deed. The Court stated:

"If Stevens made false representations and practiced fraud upon the Berrys in obtaining the land of the plaintiffs, and the

defendants Wamsley and Pruett benefited thereby, or still retained the lands, they cannot be heard to say that they are innocent of such fraud or misrepresentations. That a person cannot enjoy the benefits of a transaction and evade the burdens thereof is a leading principle from 'the manner of the Romans' and of their successors, the Normans; and the Romans and the Normans are the races that conceived and developed cosmopolitan law.

 * * * * *

"In the case we are now considering, all the three defendants were purchasing the Berry land jointly, and no one of the defendants was making a profit off either of the others. According to Stevens' testimony, they were to own the land equally and jointly, each owning an undivided one-third interest. * * *

" 'The gist of a fraudulent "misrepresentation" is the producing of a false impression upon the mind of the other party, and, if this result is actually accomplished, the means of accomplishing it are immaterial.' Wilson v. Rentie, 124 Okl. 37, 254 P. 64. * * *

" 'When fraud is alleged great latitude of proof is allowed, and every fact or circumstance from which a legal inference of fraud may be drawn is admissible.' Copper Process Co. v. Chicago Bonding & Ins. Co., 3 Cir., 262 F. 66, 8 A.L.R. 1477. * * *

" 'Fraud may be committed by suppression of truth as well as by the suggestion of falsehood.' 12 R.C.L. 305; Copper Process Co. v. Chicago Bonding & Ins. Co., 3 Cir., 262 F. 66, 8 A.L.R. 1477.

"In this case, the most potent contention made by the plaintiffs is that Stevens, while giving plaintiffs information as to the oil field in the vicinity of the lands involved in the action, gave them only such information as they already had, at least in part, but that he did not disclose to them the existence of the large well that had come in from the new and deeper sand just a day or two prior to the purchase of their lands, and, on this point, the record discloses that Stevens testified * * *" that he had never mentioned it.

" 'Although a party may keep absolute silence and violate no rule of law or equity, yet, if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to discover [disclose] the whole truth. A partial statement, then, becomes a fraudulent concealment, and even amounts to a false and fraudulent misrepresentation.' Gidney v. Chappell, 26 Okl. 737, 110 P. 1099." (Brackets ours.)

" 'A duty to speak may arise from partial disclosure, the speaker being under a duty to say nothing or to tell the whole truth. One conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud, even though his statement is true as far as it goes, since such concealment is in effect a false representation that what is disclosed is the whole truth.' 26 C.J. 1074, par. 17.

 * * * * *

"This court is of the opinion and so holds that the plaintiffs in this case are entitled to a new trial, and the judgment

and decree of the trial court is reversed, and the cause is remanded to that court, with directions that a new trial be granted."

With the foregoing principles of law in view, we shall proceed to a discussion of the evidence as to misrepresentation and concealment of the value of the lands.

The several directors and officers of the American testified that Small stated to them verbally that he was making a purely speculative investment in purchasing mineral rights in the property located in the Sunset Drainage District, St. Charles Parish, La.; that he desired to purchase the technical but unfounded claim of the American to Lots 53 and 104 to 119, inclusive, totalling 180 acres; that the Texas Company had drilled for oil and gas on the land of the Louisiana Land and Exploration Company lying to the west of the southern Pacific railway tracks; that the well was designated as L.L. & E. No. 1 and was drilled to a depth in excess of 11,000 feet but plugged back and completed as a gas well producing some distillate or condensate; that the well was 6,000 feet from the lots on which he was seeking a quitclaim deed; that the land had speculative prospects as a gas field with a doubtful market and no facilities to convey the gas to market; that the prospects for discovering oil were purely speculative; and that they did not make any investigation to determine the value of the property and relied upon Small's statements and representations as being true, in authorizing and entering into the sales of the property. The evidence shows that Small did not reveal to the officers and directors of the

American, but suppressed and concealed from them, the fact that well L.L. & E. No. 1, which was brought in by the Texas Company on the Louisiana Land & Exploration Company's property, practically adjoined the American's property and was only a distance of 839 feet from it and that, therefore, the American's land was practically offset property; that well, L.L. & E. No. 1, had been brought in by the Texas Company on the 25th day of June, 1939, and had, through a quarter inch choke or an opening the size of an ordinary lead pencil, produced 120 barrels of distillate, or condensate, or "white oil" per day at the wellhead or surface of the ground under normal production methods without the aid of any manufacturing process whatsoever, and that the well was capable of producing the same high grade of natural gasoline, or distillate, or condensate, or "white oil" in excess of 245 barrels per day by simply opening the choke wider; that the Conservation Department, on the 23rd day of August, 1939, had classified this well as an oil well and granted it an allowable of "50 barrels of oil per day"; that the Texas Company had collected the condensate, or distillate in a pipeline and tanks provided for the purpose of storing it for sale; that this distillate or condensate was worth $1.25 a barrel; and that the Texas Company also drilled a second well on the Louisiana Land & Exploration Company's property about one and a quarter miles to the north of L.L. & E. No. 1 well, beginning the drilling on this L.L. & E. No. 2 well on the 4th day of September, 1939, coring it on October 15, 1939, and finding about a two-

hundred foot thick rich oil sand. The L.L. & E. No. 2 well was brought in as an "oil well" on November 28, 1939, producing 1710 barrels of crude or brown oil per day through a ⅜ inch choke.

The testimony of the plaintiff's and defendants' experts and other witnesses establishes the fact that it is well known among those familiar with the production of oil in the Gulf Coast area, within which the property in question is located, there are deep seated salt dome oil reservoirs, the apex of which is formed by large pillars of salt rising above the outside edges of the sand formations or reservoirs; that these oil reservoirs are generally and roughly circular or oval in shape; that if a well such as L.L. & E. No. 1 is drilled about the center or apex of the reservoir or salt dome structure and another well such as L.L. & E. No. 2 is successfully completed as an oil producer at a certain distance from the initial successful well, or as in this case, one and one-quarter of a mile, that by describing a circle with a line bisecting the second well and using the first one as the center of the circle, the oil reservoir is determined to be under the area of the circle thus made, subject only to reservoir "faultings" and "segmentations," which would seal off all or a portion of the oil from the other or main part of the reservoir; that the chances of successfully producing oil in the area thus determined is estimated by the defendants' expert as "50-50" and the plaintiff's expert at 85 per cent; and that the lots in controversy are within the circular or oval reservoir area thus established and even though they are to the south of the initial well, the favorability for successful production of oil of the same grade and quantity therefrom would be nearly or practically equal to the favorability of the part of that area of the circle north of the initial well or in this case where L.L. & E. No. 2 is located.

It is admitted by the defendants' witnesses that the Texas Company conducted on the lands it leased seismograph tests, that is tests made by exploding dynamite in the earth and having the vibrations electrically recorded to determine the possibilities of successfully producing oil in pay quantities in that area; that electric logs were made which tended to confirm the accuracy of these tests and that the coring of the well by removing the oil bearing sand therefrom before bringing it in and finding the sand saturated with oil positively establishes that oil, in commercial quantities, will be produced from the well; and that the defendants' experts admitted that such favorable geological and geophysical information would greatly enhance the value of the land for mineral purposes. It was further shown that the information obtained through the two successful wells, L.L. & E. No. 1 and the cored L.L. & E. No. 2, established the presence of a rich oil field covering many acres of land, including the property in question.

William C. Spooner, one of the defendants herein, a geologist, appearing as a witness for the defendants, testified that the information and data that the Texas Company had as a result of its tests and

operations before November 15, 1939, would establish the mineral value of the lots in question. As the property in question lay within the productive area around No. 1 well, on cross-examination, Spooner testified that this property had at least a "fifty-fifty" chance of being as good as the forty acres on which the No. 2 well had been drilled to the north and that any local faulting which might condemn part of the property would not affect as much as one-half thereof and, consequently, that at least one-half of the property in controversy would be as good as the forty acres on which the No. 2 well had been drilled. Mr. Spooner, after making some calculations, estimated the value of the forty acres on which the No. 2 well was located, by stating that it would produce 750 barrels of oil per acre foot or 75,000 barrels per acre or 3,000,000 barrels of oil worth $1.00 per barrel. On this basis, five hundred acres of the 1041.70 acre tract obtained by Small from the American would produce 37,500,000 barrels of oil worth $1.00 per barrel. These figures were computed by Spooner upon information and data possessed by the Texas Company on or before November 15, 1939, the date of the quitclaim.

On or before November 15, 1939, it was clear from the data and the structural positions of L.L. & E. Well No. 1 and L.L. & E. Well No. 2 that the No. 1 well had been drilled on the high part or center or apex of the dome or circular or oval structure and, therefore, the oil field would extend in a circular pattern around No. 1 well, at least as far out as the No. 2 well or one mile and a quarter and, hence, enhance the value of the property involved in these two suits, and that the oil reservoir was an exceptionally rich one.

The plaintiff's expert, Charles V. Decker, figured and estimated it at $500 an acre. George M. Clement, geologist, who was in charge of L.L. & E. No. 2 well for the Texas, admitted that he knew before November 15, 1939 that the well would be a very or "awfully good oil well."

The evidence also shows that Small paid $300 an acre to another party for lots situated less favorably for oil production as the lands in question.

Small testified that on November 4, 1939, or before the quitclaim deeds in question were executed, he purchased one half of the Angelo Paretti one-eighth royalty in 15 acres of land, in which the Sunset had no interest, Lots 17 and 18 thereof being located a mile from the discovery well, L.L. & E. No. 1, and about two miles from the L.L. & E. No. 2 well, which it will be remembered had been cored on October 15, 1939, but not yet completed, for a price of $300 per acre, or a total of $4,500.

The bulk of the American's property was adjacent to the discovery well and, therefore, very much closer to the initial production than the Paretti property. The American's representatives were unaware of these facts, being two thousand miles away, and Small concealed them from them.

The above investment and the three made with the Sunset for one-half of one-eighth of its royalty representing a total investment by Small and his Shreveport principals of $104,561.51 during March, April

and May, 1939, certainly show that Small and his principals were informed of the enhanced mineral value of the property; and that he knew his statements to the American's representatives that the property had purely a speculative mineral value as a gas field were false.

Small selected other lots with accuracy within the circular or oval reservoir area, selecting a part of some lots and rejecting the remainder, apparently because he considered them outside of the productive area.

Small admitted that he did not tell the American's representatives that L.L. & E. No. 1 well had produced 120 barrels of distillate per day and had been classified as an "oil" well, with an allowable of 50 barrels per day, by the Conservation Commission and was capable of producing 245 barrels of condensate or distillate per day by further opening the choke, and that this commercial product of the well had a value of $1.25 per barrel as distinguished from crude oil, which had a value of $1 per barrel; and that he did not tell plaintiff's representatives about the very favorable tests and invaluable information that the Texas Company had obtained by its explorations, coring and drilling operations on the adjacent lands. He does not disclaim knowledge of the data with reference to L.L. & E. No. 1 well, but denies that he knew about the successful coring of L.L. & E. No. 2 on October 15, 1939. He admitted that he and his Shreveport principals were experienced in the oil business and interested themselves in the Paradis lands because of the information they had about oil production activities by the Texas Company there.

Due to the fact that Small alone negotiated with the American's representatives for the sale of its claim to the lands, the sole contradiction to the testimony of the plaintiff's officers and directors as to his verbal misrepresentations and concealment of the above referred to invaluable information and data is Small's partial denial. As we have already concluded with reference to the rewritten quitclaim deed of November 16, 1939, and the minutes in connection therewith, that Small was guilty of a gross fraud, it necessarily follows that his credibility as a witness is completely destroyed and we cannot place any credence in his testimony. This result leaves this part of the case in the position where there is no countervailing testimony to that given by the several directors and officers of the American as to the verbal statements made by Small with reference to the value of the land to them as a means of inducing them to quitclaim the lots to him.

After Small was employed by the defendants to negotiate with the American and purchase its rights, title and interest in the land, he first personally contacted Link at Denver on August 12, 1939, and August 14, 1939. On August 22, 1939, from Shreveport, La., he wrote Link that he had been doing some work on the title to the property and had some information, which he would forward to him within the next few days, expressing the hope that he had taken advantage of the time elapsed since his visit to get information both as to the value and title to the land discussed. On

August 24, 1939, Link replied that he would co-operate with Small to achieve his purpose, and informed him that the American had spent $23,471.51 on the property. On August 31, 1939, Small then wrote a letter offering to purchase the property included in the first quitclaim deed or 180 acres for $2,000 and the payment of $47,000 out of a 1/48th royalty from any oil produced from the lands. In this letter he described L.L. & E. No. 1 well as a "gas well producing some condensate or distillate" located a distance of approximately 6,000 feet from the lots. On September 2, 1939, Link wrote Small that he would co-operate with him on the terms of his letter if he would raise the cash consideration to $5,000 which Small immediately did and on September 25, 1939, the parties placed the understanding in writing in the form of a letter. Small, on October 30, 1939, or fifteen days after L.L. & E. No. 2 had been cored and the rich oil sand was found, addressed a letter to Max S. Goldsmith, then a director of the American, and was still talking about the lands' "speculative mineral value" but artfully concealed the facts about wells L.L. & E. No. 1 and L.L. & E. No. 2. Small and his principals were insisting that the American's franchise be reinstated and a stockholders' meeting and a Board of Directors' meeting be held to authorize the proposed quitclaim, because he had made an investigation of the affairs of the American and found that it was a dormant corporation. He, therefore, knew that the American did not have the facilities nor finances to investigate the matter and obtain the kind of information and data pos-sessed by Small and his principals. He also knew that American's representatives and directors had not informed themselves and his trade with Link was practically closed between August 31, 1939, and September 2, 1939.

The record shows that James P. Vial, attorney residing at Hahnville, St. Charles Parish, La., who was appointed as curator for the defendant absentee, in the slander of title suit by the Sunset against the American, on June 13, 1939, wrote the American a letter notifying it of the suit and his appointment and that he had filed an answer converting the action from a jactitation one into a petitory action. The information that the American was located at Denver, no street address being given, was obtained by Vial from the Sunset. The letter was returned, marked "Unknown." Sunset, on November 10, 1939, gave Vial Link's office address in Denver and Vial mailed a copy of the petition to him, which was received on November 14, 1939. Vial states that he received no reply to this letter. It must be remembered in the meantime that Small, the Sunset's agent, had personally visited Link in his office in Denver on August 12 and 14, 1939, and had written him several letters during the months of September, October and November, 1939. If the American's or Link's correct address had been given to Vial in June when the suit was filed, or even in August, 1939, the American would have had an opportunity to communicate with Vial and might have obtained valuable information from him, but, due to Sunset's and the other defendants' action, this was made impossible.

. It is a singular circumstance to say the least that the information as to Link's or the American's correct address was furnished Vial by Sunset at the time that Small had arranged to be in Denver and the letter with the enclosed copy of the petition, furnished by Sunset, arrived there on November 14, 1939, when Small, Sunset and the other defendants knew that the American's Board of Directors' and stockholders' meetings were to be held the next morning, or November 15, 1939. Obviously, the purpose of appointing a curator ad hoc to represent an absentee, particularly one that resides 2,000 miles from the court-house (as in this case), was to inform it of its rights in the litigation and to have the curator defend those rights with the assistance and co-operation of the absentee, which the curator represented.

Small was under no legal obligation whatsoever to the American to make any statement with reference to the value or the title to the property. However, if he did make any statements or representations with reference to the value of the land for mineral purposes, it was his duty, under all of the authorities, to tell the whole truth and to reveal all of the information that he had, especially as it was apparent that the representatives of the American were relying upon his statements and had not made and could not, without great difficulty and expense, make an investigation to determine the value of the land. Small's letter of August 31, 1939, wherein he describes L.L. & E. No. 1 well as a "gas well producing some condensate or distillate," and the letter agreement of September 25, 1939,

were read to the stockholders and the members of the Board of Directors of the American at their meetings in Denver on November 15, 1939, and were written into the directors' resolution authorizing the sale of the property on the terms and conditions of the letter, dated September 25, 1939, copied in full in our first opinion. It must be borne in mind that this representation was made to the stockholders and directors thirty days after the Texas Company had determined to its own satisfaction by coring the 200 feet of rich oil sand from L.L. & E. No. 2 well that it would positively produce oil in great quantities. We are convinced that Small and his other principals also had the same invaluable information at that time.

As to whether or not Small's description of the well, L.L. & E. No. 1, was misleading and deceptive, we shall let the defendants' own experts answer.

In reply to questions, on cross-examination, propounded to William C. Spooner, one of the defendants and a geologist, who testified for the defendants, that if he had the information which the operators of the well had at the time that Small wrote the letter of August 31, 1939, would he have written such a letter, we find:

"Now, suppose that he asked your authority to send that letter, and he was a close friend, and it was of great importance to him to send it if he could in good conscience do so, would you let him do it? A. If he was a close friend, he would never ask me to do that, because he would know better.

"Q. What would he know about it? A. Well, he would know that, if he quoted me at all, he would have to quote whatever facts I had in the matter, as otherwise he would not have my permission to do it.

"Q. And you would not give your permission to send such a letter as that, would you? A. No.

"Q. Because you would know that that letter was false, isn't that right? A. What do you mean by 'false'?

"Q. I mean not true and deceptive from a value standpoint. A. If I knew as much about that well at that time as I know now,—that's what you mean?

"Q. No, sir. I mean if you had all the information which was then available to the operators on that well, which you now have examined, by that electric log, core records and flow tests. A. Well, I will again say that I would have presented, as far as I am personally concerned, whatever facts that I had. Now, if he were doing it on my advice, after making an investigation, he would quote all the facts. Now, what somebody else would do that didn't have the knowledge of the thing that I had, is something that I am not going to attempt to answer.

"Q. But if he pleaded with you for your authority to send out that letter, you would refuse it; is that right? A. If I had those facts, yes."

Mr. Clement, witness for the defendants and an employee of the Texas Company, testified as follows:

"Q. Suppose some agent of The Texas Company, though, in a weak moment, de-

sired to acquire property without that explanation, and told you that he wanted to acquire the property adjoining that well, and that it was very expedient to The Texas Company to acquire it, and that he did not believe they could acquire it unless they made the statement that it was a gas well producing some condensate or distillate, do I understand you to say that you still would not authorize them to make that representation on your opinion? A. Well, I wouldn't make any recommendation that I thought was going to lead to fraud.

"Q. And you figure that would be fraud? A. Yes, if it was a freak well and it was described as an ordinary well."

These were Small's exact words, "a gas well, producing some condensate or distillate," and defendants' expert, Mr. Flaitz stated in referring specifically to L. L. & E. No. 1, "* * * you should use an expression to describe the well that would let him know that the material had some economic value that came out of the well other than natural gas."

If Small's letter was an accurate, or a fair, or a truthful statement with reference to this well, then these witnesses would have no reason to say that they would not write such a letter and the only reason why they would not do so is because the letter was deceptive and misleading. These and other witnesses explained that from shallow gas wells there is a colorless fluid, or drip, or condensate, or distillate, or white oil in such infinitesimal quantities as to be practically valueless and it was drained off by operators as a nuisance. Later, or since about 1935 or 1936,

when deep seated salt dome reservoirs were tapped, due to the fact that there was an apex in the dome reservoir and the lighter hydrocarbon, or distillate, or condensate, or white oil, or natural gasoline, all meaning the same thing, found its way to the upper or higher part of the reservoir and due to the tremendous pressure and temperature, at that depth, by some strange physical phenomenon referred to as "retrograde condensation," this material was in a vapor form there but upon reaching the surface of the earth, at normal or surface temperature and pressure, immediately turned into a colorless or white fluid, or condensate, or "white oil," under normal production methods, this fluid or "white oil" was produced in paying quantities. This product or "white oil" has a greater commercial value than crude or brown oil, which is found in the lower sides or edges of the reservoir, being heavier hydrocarbons or materials. Such a well as L. L. & E. No. 1 capable of producing in excess of 245 barrels of distillate, or condensate, or "white oil," per day, and, according to the defendants' own experts, would produce on a twenty acre tract 258,620 barrels of condensate or distillate worth $1.25 per barrel, certainly cannot in any way be likened to or classified with a "gas well producing some condensate or distillate" as described in Small's letter of August 31, 1939. This letter was unquestionably misleading and deceptive.

There was conflict in the plaintiff's and defendants' experts' testimony as to whether the well should be classified as. a gas or an oil well. The plaintiff's expert's statement that the well should be classified as an oil well was predicated on the fact that the predominate valuable commercial product from it was a high grade natural oil called condensate, distillate, or "white oil" but, nevertheless, oil, and that this designation was in accordance with the statutory definition contained in Act 157 of 1940.

It is conceded that both gas and oil are made up of hydrocarbons, the difference in them being in the density of the molecules of which they are composed.

One of the defendants' witnesses, a former Conservation Commissioner, stated that the condition of the hydrocarbon in the ' earth determined whether the well should be called a gas or an oil well. If it was in a vapor state in the reservoir and upon reaching the surface of the earth at the wellhead under normal production methods turned into a fluid, it was a gas well regardless of the tremendous amount or great number of barrels of condensate or distillate it produced daily and ultimately. Apparently, it was on this theory that the change in the classification of the Well L. L. & E. No. 1 from an oil well to a gas well was subsequently made.

The defendants' other experts did not share this view, that is, vapor theory, but thought that the designation should be based upon the ratio of the gas produced to the distillate or condensate produced by the well. In short, that if one barrel of distillate, or condensate, or "white oil" was produced to every 1700 cubic feet of gas, it should be called an "oil. well," and that was the reason why the Texas well, Broussard No. 2, at Erath, Vermillion Parish, La., completed November 29, 1941, pro-

ducing 335 barrels of "white oil" or distillate per day, was so classified. It was also explained that L. L. & E. No. 1 well would not come under the same ruling as Broussard Well No. 2 because the ratio was about 34,000 cubic feet of gas to one barrel of distillate, or condensate, or "white oil". However, it was shown that by gas recycling, which is a relatively inexpensive method of increasing production, the L. L. & E. No. 1 well would produce even more "white oil" than 245 barrels per day. We do not consider it necessary to determine whether the well should be technically classified as an oil or a gas well. It is indisputable that describing the well as a "gas well producing some condensate or distillate" without either in the letter or verbally revealing the quantity and commercial value of this fluid which was actually produced by the well and which it was capable of producing and the ultimate amount which would be produced from a 20 acre tract was a material misrepresentation and concealment concerning and affecting the value of the lots in question.

The record shows that the night before Small presented the second proposition to the American's Board of Directors, and after his conversation with Link at his home, he talked over long distance telephone with the Production Manager of the Texas Company, at Shreveport, La., and received final instructions from him on the proposed trade with the American. The defendants admit that at that time (November 14, 1939) the second well, L. L. & E. No. 2, had been completely drilled and the casing cemented in it after a complete survey of the hole had been made by modern methods from which the Production Manager of the Texas knew definitely that the well would produce over 3,000,000 barrels of oil worth $1 per barrel from the 40 acre tract.

Spooner, a defendant and an expert witness for the defendants, valued the well as of November 15, 1939, the day that the deal was consummated, at $3,000,000, the well being capable of producing 3,000,000 barrels of oil worth $1 per barrel from the 40 acre tract. At that time it is shown that all that had to be done was to perforate the casing and turn the oil into tanks.

The plaintiff's directors and representatives testified that they did not make any investigation but relied upon Small's representations and statements as being true and that he thereby induced them to part with the company's property for an insignificant or a very small part of its real value. It is clear that if the above outlined information and data, which Small and his principals had, had been conveyed to the American's representatives, they would not have parted with these valuable lands for a consideration representing only a fraction of their value.

The above discussed evidence and finding is as equally applicable to the charge of fraud as to the value of the lots described in the second quitclaim deed of November 16, 1939.

It is argued that Link, having read in the early part of December, 1939, an item in the Denver newspaper that oil had been discovered in the Paradis field in St. Charles Parish, La., and having failed to take immediate action to repudiate the quit-

claim deeds, shows that he was not deceived and that he ratified the transaction by his silence and inaction after obtaining this information. Link voluntarily mentioned reading the news item and produced the clipping and explained that he did not become alarmed because he did not consider that one oil well a mile from the American's property would mean an oil field and that he was unfamiliar with the deep seated salt dome oil wells in the Gulf Coast area, or in Louisiana. When Funk apprised him of the real facts and produced parties who had the financial ability to help him, he took action as quickly as possible under the circumstances.

It is stated by defendants' counsel that more than $50,000 had been expended by each side in these lawsuits up until about a year ago. It was shown that Sessions and Bond spent $5,000 for the abstract of the titles to the property and an opinion of the attorneys as to the validity of the American's title. Considering the involved nature of the transactions, the highly controversial and complex issues as to title, the technical and scientific information which the plaintiff's representatives would have to secure and study before realizing and understanding the extent of the imposition, it cannot be said that they unduly delayed recording the instruments in favor of Sessions and Bond on April 15, 1940, and filing these suits on April 18, 1940.

The defendants rely on the case of Roy v. Arkansas-Louisiana Gas Co., 200 La. 233, 7 So.2d 895. There the plaintiff sued to set aside a mineral lease on the ground that the lessee had failed to pay the royalties in accordance with the oil royalty clause and also sought to recover the difference between the amount paid under the gas royalty clause and the amount said to be due under the oil royalty clause. It was held that under the wording of the royalty provisions in question and the construction placed by the parties themselves upon them for several years, the lessee paying and the lessor receiving, without protest, the royalty payments under the gas and not the oil royalty clause, the plaintiff, lessor, was not entitled to relief. The case has no application here.

Defendants cite a number of cases which hold that where the parties are equally informed or are in a position, and through ordinary attention, to observe the condition and value of the object or property sought to be sold or purchased and the facts and circumstances surrounding the matter, the party, who claimed that he was defrauded, will be held to have exercised his own judgment rather than have relied upon any statements made by the other party to the transaction.

The defendants also rely upon other authorities which are not apposite here, because it appears that the party selling or buying knew that there were mineral deposits in the land sold or purchased, and neither party had determined the extent of the deposit or its value. Therefore, it was held that the party who was seeking relief had relied upon his own judgment and opinion, as he was equally apprised of the facts as the other party with whom he was dealing.

The several directors and officers of the American who testified in its behalf stated that Small told them that the Sunset had the valid title to the lands and the American did not have any title to the property involved in both quitclaim deeds, because it had been sold for taxes, which were unpaid as shown by the records that he personally checked, but due to some slight irregularity with reference to the title to Lots 104 through 119, inclusive, and Lot 53, his attorney was insisting that this error be remedied; that Sunset had. the valid title and the purpose of the quitclaim was to avoid the cost and inconvenience of a lawsuit; that on November 14, 1939, Link, the President of the American, received for the first time the petition in the jactitation action filed by the Sunset against the American covering Lots 34 to 52 and Lots 530 to 533, both inclusive; and that Small explained the purpose of the suit was only to remove a cloud on the title, due to some slight defect, but that the American did not have title to the property and had lost it through a valid tax sale. This petition. alleged that American was slandering Sunset's title by claiming an interest in the property.

Small admits that he stated that the American did not have any title to any of the property and that the Sunset had a valid title to it, with the exception of Lots 104 through 119, inclusive, and Lot 53, and as to those lots, he informed the American's representatives that it had "a serious claim" thereto.

We reiterate that Small, having been found guilty of a palpable fraud in surreptitiously inserting the omnibus clause and the authorization of it in the rewritten quitclaim deed of November 16, 1939, and the minutes in connection with it, we can not believe him. Therefore, the statement of the American's witnesses that Small told them that the Sunset had the valid title and the American had no title because it had lost the property through a legal tax sale for unpaid taxes is uncontradicted.

Under cross-examination, Small was asked, "What else did you tell Mr. Link about the tax sale, other than what you have just stated?", and replied, "Mr. Todd, if I remember correctly, the only thing that I told Mr. Link with regard to the sale—the sheriff's sale for taxes, was that we had examined the title, checked all of the records carefully, and, as far as we could find out and were able to learn, it was a good and valid tax sale." And, with reference to all of the lots embraced in the rewritten quitclaim deed of November 16, 1939, he was asked: "Then, you didn't tell him anything further about it than that?" and replied, "I told him that we had examined the title, and that we considered he had no interest in the property."

Small admits that he had personally examined the records involving the title to this land; that he had an abstract of it in his possession; that he had received two letters, dated April 11 and April 28, 1939, respectively, from his attorney making a report and giving his opinion as to the validity of the title; and that he had inspected the State and Parish tax rolls and assessments for 1920, under which the tax sale was made and saw the pencil notation

under the heading "Taxes Paid," "8/27/21." Due to the fact that there was this record of prior payment of State and Parish taxes on the property, which was subsequently sold to A. V. Smith in 1922, for unpaid State and Parish taxes of 1920, the Lawyer's Abstract Company, Inc., employed by Small and his principals, made a report on April 23, 1939, to him, his principals and his attorney, who was examining the title, calling their attention to this record. Small, who had undertaken to do certain curative work with reference to this report, testified, as follows:

"A. We didn't know exactly what property—where it says, 'date paid, written in pencil and erased, still can be read', we didn't know exactly what property that covered, and we called Mr. ——— I have forgotten his name, the man that made the report, and we discussed it at the time, and he said that it had been erased and he didn't know whether the taxes were paid or not; that the erasure was there, but it still could be read. Now, we talked to him, and I made a trip to Hahnville—

"Q. Why did you come to Hahnville? A. I wanted to see it myself, so I could tell you the exact condition of it and what it was.

"Q. All right, what did you do? A. Well, I made a copy of that particular item, and the way it was assessed and everything, and brought it back and gave it to you [his attorney] for the curative work; that was among the curative work." (Brackets ours.)

In the two letters, dated April 11 and 28, 1939, respectively, with reference to the title, Small's attorney informed him "We have examined the * * * abstract in five volumes * * * covering the title to * * * property, * * * but are unable to approve, at this time, title as good in said [Sunset] company"; that " * * * the property was sold many times at tax sale, and the title depends entirely on the validity of these sales"; that " * * * we are unable to find where the Sunset Realty Company, Inc., ever acquired any title to Lots 104 to 110, inclusive, these seven lots comprising seventy [70] acres"; that "The Sunset Realty & Planting Company is of the impression that it acquired by this deed [Smith's tax deed of February 25, 1922] Lots 104 to 110, Inc., of Section 38. However, we cannot find these lots described therein"; that a reference to the map showed the lots in Sub-District No. 4, designated by the letter "R" but the description places Lots 101–R to 119–R, inclusive, in Sub-District No. 5; that Lots 109 through 119, inclusive, in Section 41, had been assessed in the name of J. F. Funk in 1916 and 1919 and sold for taxes, which sales were valid if there were not prior payments of taxes and no dual assessments on these lots for those years; that "A. V. Smith [the tax purchaser in 1922] purported to acquire title at a foreclosure sale [by him] against the American Guaranty Company in 1923 to Lots 34 to 48, inclusive, and Lots 104 to 110, inclusive [these latter lots, as we above notice, were not described in the tax deed to Smith, dated February 25, 1922], Lots 49, 50, 51 * * *"; that "The foreclosure proceedings show that Smith [the tax purchaser] sued the American Guaran-

ty Company, as the then owner of this property [1923], and secured a judgment recognizing that he held a special mortgage thereon"; that " * * * lots 105, 106, 107, 108, 109, 110 * * * were sold by A. V. Smith to the Sunset Realty & Planting Company, Inc., in 1924, but Smith had no title thereto"; that they were " * * * unable to find where Smith ever acquired them. They were included in the proceedings entitled 'A. V. Smith versus the American Guaranty Company,' No. 1172, St. Charles Parish, but those proceedings never culminated in a sheriff's sale"; that they were "unable to approve at this time Lots 104 to 110 * * * unless additional curative work is submitted by the Sunset Realty & Planting Company, Inc., clearing up the defects above mentioned, we will have to disapprove the title to these lots"; that " * * * reference to the judgment confirming his title [A. V. Smith's] shows that these lots were not included therein; that is, the judgment Smith secured confirming the tax title did not include lots 34 to 51, inclusive, because Smith in his petition to secure such judgment construed his tax title as not including these lots"; that there should be research to determine whether there was any dual assessment or prior payment of taxes on the property; that " * * * the lands under examination are traversed by numerous highways and canals"; that there are a great number of deeds shown in the abstract, but it is uncertain whether these deeds convey a fee title or merely a servitude of right-of-way, and the location of the property is not given with sufficient clarity to say whether or not these deeds affect the property under examination; that " * * * if the fee be conveyed, a third party might secure a lease from the proper officials and drill the canals or the roadbed and thereby drain the adjoining lands, which are covered by your royalty interests"; and that "if this be a fee title, the area embraced by canals, bayous and roadway should be deducted from your purchase." (Brackets ours.)

The attorney, in his letter of April 28, 1939, after stating that he considered the additional information furnished by the Sunset and Small and approved the title to a number of lots, did not approve the title to Lots 104 to 119, inclusive, and Lot 53, and Lots 34 to 52, inclusive, and Lots 530 to 533, inclusive, included in the two quitclaim deeds. He concludes, as follows:

"From our investigation, we are of the opinion that Smith and his attorneys were in error when they construed his tax title as not including Lots 34 to 51, inclusive, because the deed itself and the assessment and all the history in connection therewith indicate that it did. However, we are of the opinion that as long as the adverse title is in the American Guaranty Company, which Company brought the suit to enjoin the Sheriff from making a sale of these particular lots, that this erroneous allegation can be withdrawn because of error, but we doubt that this would be possible if the American Guaranty Company should sell their title to the lots to a third party.

"Consequently, we are unwilling to disapprove the title to the McCullough lots at

this time, but suggest that an arrangement be worked out, if possible, with the Sunset Realty & Planting Company, Inc., by which an appropriate action would be brought to clear up the title, while the adverse claim is still in the American Guaranty Company.

"Until this has been done, it is our view that the Sunset Realty & Planting Company, Inc. has a very questionable title to the lots that Smith, while the holder of the properties he bought at the Sheriff's sale, judicially alleged that he had not so acquired these lots, for he secured a judgment against the American Guaranty Company as the owner of these lots, but failed to follow up this judgment with a foreclosure sale.

"We have considered the question as to whether or not the deed from Smith in 1924 to the Sunset Realty & Planting Company, Inc. could serve as the basis for ten years prescription, but in view of the fact that Smith was connected with the latter Company as one of the principal owners thereof and one of the directing officers, we do not believe that that Company could perfect its title which it acquired from Smith by prescription of ten years."

As Small admitted that he had examined the record as an abstractor, he knew that Lots 104 to 119, inclusive, and Lot 53 were not mentioned in the tax sale made under the assessment in the name of McCullough to Smith for the State and Parish taxes of 1920; that Smith in his proceedings to quiet the tax title, did not include Lots 104 to 119, inclusive, and Lot 53, nor Lots 35 to 51, inclusive; that Smith, in the foreclosure proceeding against the American had alleged that Lots 35 to 51, inclusive, were owned by the American and that there was a prior recorded sale by Sorrells to the American before the deed by Sorrells to Smith was executed; and that Smith had foreclosed on the $35,000 American mortgage note obtained from Sorrells in this latter transaction, and obtained a $35,000 judgment against the American.

In the letter of Sunset to Small, dated August 9, 1939, employing Small "* * * to secure any adverse claim which the American Guaranty Company" had to lots 104 through 119, inclusive, and lot 53, included in the first quitclaim deed, it is stated: "* * * Should you be successful in acquiring the adverse claim of the American Guaranty Company, its successors or assigns, *you are to transfer the fee title so acquired to Sunset Realty & Planting Company, Inc.,* * * *" subject to the mineral lease in favor of the Texas, if it elected to participate in the deal and to take the benefits derived therefrom. The letter also states "* * * *Simultaneously with the conveyance of the fee title by you to Sunset,* Sunset is to convey to you an undivided one-half (1/2) mineral interest in the said property." (Italics ours.) In connection with this document, it will be remembered that Small's attorney, in his letters of April 11 and 28, 1939, had pointed out that the Sunset was not the owner of the property but that the record title was in the American Guaranty Company. In spite of this information and data in his possession, Small continued to represent to the officers and directors of

the American that the Sunset had a valid title to the property and that the American did not have any title and the only purpose of the quitclaim deeds was to merely clarify a slight . irregularity which gave the American a claim or interest.

Both plaintiff and defendants in the present suits introduced documentary evidence and testimony tending to show their respective titles to the property, in connection with the issue of misrepresentation of title by Small. The American is claiming as record owner under the deed from Sorrells to itself in 1921. It is attacking the validity of the tax sale to A. V. Smith on February 25, 1922, for the State and Parish taxes of 1920 assessed against Mc-Cullough, on the ground that these taxes had been previously paid. It supports its position in this respect with the 1920 assessment rolls showing the notation in pencil when the taxes were paid and the testimony of Julius Funk and the two deputies, Hubert Keller and Layous Gassen, who were employed in the Sheriff's and Tax Collector's office continuously from 1916 until the trial ·of this case, and they all state that the 1920 State and Parish taxes assessed against the whole property in question were paid by Funk.

In order to show that the taxes were not paid, the defendants introduced in evidence the tax deed to Smith and the letter addressed by Sheriff Vial (since deceased) to the State Auditor and the unpaid or unhonored draft of Funk drawn on the American to the order of the Sheriff as tax collector for the payment of the State, Parish, and Drainage District taxes. Defend-

ants also refer to certain letters by Funk to Smith and the American's injunction suit against the tax collector. The American also attacks the validity of the tax sale to Smith on the ground that the assessment under which it was made and the tax deed itself do not include the hereinabove referred to and designated lots and as to the remainder of the property purported to be included, the description is so vague, general, and incomprehensible that the property is insusceptible of identification, for several assigned reasons. The defendants denied these statements and both parties introduced evidence tending to support their respective positions. The Sunset and . those claiming through it also plead prescription of ten years under just title based upon the transfer by Smith to Sunset in 1924. The American meets' this issue by offering evidence tending to prove that Smith was apprised by Deputy Sheriff Gassen and the records of his office that the State and Parish taxes for 1920 had been paid prior to the sale of the property to him and he refused to accept the regular tax receipt with that notation on it, insisting upon being given one without this notation upon it when he paid the drainage and other taxes that he claimed were · due and owing. Smith's and the Sunset's good faith is challenged because of this knowledge and because they (Smith, a salaried bank employee, and the Sunset) were both interposed parties for the Hibernia Bank, of which the Sunset is a subsidiary. ` The American .also denies that Smith and the Sunset had possession of all of the property for ten years and showed that the lands were adjudicated to the State for the un-

paid taxes of 1933 and redeemed by the Sunset in 1938, just prior to leasing them to The Texas for mineral purposes. The American also introduced evidence tending to show that the widow of A. V. Smith leased the surface rights of the lands for farming purposes from the State and she and her tenants were in possession thereof from 1934 to 1938 and, consequently, it is said the Sunset was out of possession and could not successfully urge prescription of ten years under just title.

There are other involved complex and complicated issues of fact and law with reference to the title presented by the respective parties. We reiterate the questions pertaining to title to the lands cannot be determined in these proceedings but must be decided in the petitory actions. We intentionally refrain from expressing herein any opinion whatsoever as to whether the American or the Sunset has the paramount or superior title to the property. It is sufficient to say in the light of the information, data, facts and the written opinions of his attorney that Small had in his possession, he made material misstatements to the American's representatives that it had no title whatsoever to the property but that the Sunset had the valid and good title, subject only to slight curative work.

Small, as a prospective buyer, under the law, did not have to reveal anything he knew about the American's title. He could have remained silent, but he elected to speak and was then required by law to tell the whole truth and conceal nothing that had a material bearing upon the title to the property. He knew that the American had not made an investigation of the title because it was a dormant corporation without funds to do so and that the property was located two thousand miles from Denver, and that the representatives of the corporation were relying upon his statements.

This ground for recission of the deeds is also common to both the first and second quitclaim deed and the lots included therein.

It is our opinion that the plaintiff, in both cases, proved overwhelmingly or beyond any reasonable doubt the charges of fraud and, therefore, the opinions of the trial court are manifestly erroneous.

The Texas Company, as lessee, claims $130,000 reimbursement for the expense and cost of drilling Sunset No. 1 well on Lot 74 of the property included in the omnibus clause and, in the alternative, reserves the right to make this claim in a proper proceeding. As the Texas is the mineral lessee of the Sunset, in the event Sunset is successful in the petitory action pending in the district court, this issue will pass out of the case. Therefore, at this time we shall refrain from passing upon the question and reserve the Texas Company's right.

While previous tender is not indispensable before a suit for recission on the grounds of fraud is instituted, the Court will require the complaining party to restore the consideration or price received as a condition in the decree of annulment. State v. Hackley, Hume & Joyce, 124 La. 854 (860 on rehearing), 50 So. 772, 774, and State v. Cross Lake Shooting & Fishing Club, 123 La. 208, 48 So. 891.

For the reasons assigned, it is ordered, adjudged and decreed that both judgments of the district court are annulled and set aside;

It is further ordered, adjudged and decreed that there be judgment herein in favor of the American Guaranty Company, plaintiff, and against the defendants, Cavil B. Small, the Sunset Realty & Planting Company, Inc., the Texas Company, the Hibernia Bank & Trust Company, in Liquidation, and Wilfred G. Begnaud, State Bank Commissioner of Louisiana, annulling and rescinding the quitclaim deed by the American Guaranty Company to Cavil B. Small dated November 15, 1939, and registered in C.O.B. "OO," Folio 453, Parish of St. Charles, Louisiana, covering Lot 53 and Lots 104 to 119, inclusive, located in the Sunset Drainage District, St. Charles Parish, Louisiana, upon the payment by the American Guaranty Company to these defendants of the sum of Five Thousand ($5,000.00) Dollars, in the proportions that the respective defendants contributed to this amount, representing the purchase price, with legal interest thereon from the date this judgment becomes final until paid, or, upon depositing this sum to their credit in the registry of the district court;

It is further ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, the American Guaranty Company, and against the defendants, Cavil B. Small, the Sunset Realty & Planting Company, the Texas Company, the Hibernia Bank & Trust Company, in Liquidation, Wilfred G. Begnaud, State Bank Commissioner of Louisiana, Nemours Corporation, Fred Hall Ryan, W. C. Spooner, J. W. Koonce, C. W. Sharp, R. J. O'Brien, P. F. O'Brien, H. A. O'Brien and J. C. O'Brien, annulling and rescinding the quitclaim deed by the American Guaranty Company to Cavil B. Small, dated November 15, 1939, and acknowledged on November 16, 1939, registered in C.O.B. "OO", Folio 453, et seq., Parish of St. Charles, Louisiana, covering Lots 34 to 52 and Lots 530 to 533, both inclusive, located in the Sunset Drainage District, St. Charles Parish, La., and all of the property acquired by the American Guaranty Company from S. J. Sorrells on August 8, 1921, in the Sunset Drainage District, St. Charles Parish, Louisiana, covered by the omnibus clause of this quitclaim deed, upon the payment by the American Guaranty Company to the defendants of the sum of Two Thousand ($2,000) Dollars, in the proportions the respective defendants contributed to the purchase price of $2,000, with legal interest thereon from the date that this judgment becomes final until paid, or, upon depositing this sum to their joint account in the registry of the district court;

It is further ordered, adjudged and decreed that there be judgment in favor of the plaintiff, the American Guaranty Company, and against the defendants, Cavil B. Small, the Sunset Realty & Planting Company, Inc., the Texas Company, the Hibernia Bank & Trust Company, in Liquidation, Wilfred G. Begnaud, State Bank Commissioner of Louisiana, Nemours Corporation, Fred Hall Ryan, W. C. Spooner, J. W. Koonce, C. W. Sharp, R. J. O'Brien, P. F. O'Brien, H. A. O'Brien and J. C. O'-

Brien, annulling and rescinding the instruments executed by Cavil B. Small in favor of the above co-defendants, two of which are dated December 19, 1939, the others December 21, 1939, and February 3, 1940, respectively, and recorded in C.O.B. "PP," Folios 86, 90, 94 and 255, St. Charles Parish, Louisiana, covering and embracing the lands hereinabove specifically referred to and also described in the purported quitclaim deeds of November 15th and 16th, 1939, only insofar as these instruments affect any rights, title and interest that Cavil B. Small sought to acquire from the American Guaranty Company by said quitclaim deeds of November 15 and 16, 1939, and the respective rights, title and interest which Cavil B. Small and his co-defendants attempted to acquire therein by and through the two instruments of December 19, 1939, and the other instruments dated December 21, 1939 and February 3, 1940, upon the condition that the $5,000 and $2,000 hereinabove referred to is paid by the plaintiff to the defendants entitled to receive the same, or upon the plaintiff depositing these amounts in the registry of the district court for their joint account;

It is further ordered, adjudged and decreed that the Clerk of Court and Ex-officio Register of Conveyances and Recorder of Mortgages, in and for the Parish of St. Charles, Louisiana, is authorized to cancel and erase the above and foregoing referred to quitclaim deeds and instruments, upon presentation of receipts showing the prior payment of the above sums of $5,000 and $2,000, respectively, to the defendants, or upon the plaintiff depositing the same in the registry of the district court for their joint account;

It is further ordered, adjudged and decreed that the Texas Company's alleged right to claim reimbursement for the expenses and costs of drilling Sunset Well No. 1 on Lot 74 from the American Guaranty Company is reserved;

It is further ordered, adjudged and decreed that the plaintiff's and the defendants' rights to apply for a rehearing are reserved on all questions herein decided except those with reference to the surreptitious insertion of the omnibus clause in the quitclaim deed of November 16, 1939, and Small being the agent of the defendants in obtaining the quitclaim deeds.

The defendants to pay all costs of court.

O'NIELL, C. J., recused.

HAMITER, J., dissents in each case.

### On Second Applications for Rehearings.

PER CURIAM.

The respondents in their applications for rehearings complain that the Court committed manifest and grievous error on each and every one of the multiple legal and factual issues presented in these cases. The applications and the lengthy briefs in support thereof are merely a rehash of the questions and discussions contained in the voluminous briefs heretofore filed. Our opinion on rehearing is complete and decides all of the points properly raised by the litigants and especially the respondents and

all parties concerned certainly had their day in court and due process of law in full measure. Counsel for the respondents are so insistent that we erred in certain respects, we have decided to answer these particular contentions:

■ The defendants request that we remand the case to the district court, in order that they may produce certain testimony and evidence with reference to the questions of whether the notations were placed on the drafts at the time they were written by Small or subsequent thereto. It appears from the defendants' own statements that the proposed testimony and evidence was available to them during the course of the trial in the district court. Furthermore, our opinion in that respect was not based upon the fact that the notations were placed . upon the drafts after they were deposited. This will be demonstrated by a mere reading of the opinion on that score.

■ The request to remand the case to take certain testimony and secure certain evidence comes entirely too late because it is well-settled that where a party presents his case on the record as made up and loses and then, for the first time, on rehearing, asks for a remand, he is not entitled to that consideration. Esmele v. Violet Trapping Co., 184 La. 491, 166 So. 477. In the instant case, the remand is sought for the first time in the second applications for rehearings.

■ Complaint is made that we failed to make a reservation in favor of Small to claim the alleged sum of $4,000 said to have been expended for expenses in connection with the reinstatement of the charter of the plaintiff corporation to properly execute the quit claim deeds. To start with, there was no prayer in the defendant's answer and no reconventional demand for that sum. Moreover, there was not any specific or convincing evidence in the record which would justify the Court in awarding that amount, the defendant Small not having placed his claim at issue. The evidence shows that Small insisted on handling the alleged expense money himself and that he was to receive reimbursement for it from the other defendants. There is nothing in the record to indicate that Small was not reimbursed and the amounts which the respective parties paid to him as their pro rata share of this item. It may be observed that the Texas Company, on the other hand, made reservation to claim $130,-000 for drilling a well on Lot No. 74, and as it had prayed for this relief, in the alternative, we entered the proper decree.

■ The Court is said to have erred in failing to re-establish the status quo between the parties by restoring the slander of title action to the docket. of the 24th Judicial District Court in and for the Parish of St. Charles. We again observe that no relief to that effect was prayed for by the defendants. The slander of title action was dismissed by the respondents before the suit was filed and if there were any intervening rights obtained by third persons purchasing on the faith of the public record, they are not before the Court and any decree we would render in these proceedings could not affect or bind them. The

Court should not be required to do a useless and vain thing. The issue, of course, would come up in the petitory actions which are now pending in the trial court and any expression of opinion by us at this time on the subject would be prejudging that part of the pending case.

Finally, it is said that the defendants have not been granted due process of law in certain respects with reference to certain testimony and evidence. All we need say in reply to this contention is that the defendants had every opportunity to introduce in evidence in the trial court all of the testimony and documentary evidence they considered pertinent and necessary to refute the plaintiff's demands and establish their position in the case. We gave due consideration to all of the evidence in the record.

In passing, it is interesting to note that in the respondent's brief, in support of the applications for rehearings, it is now admitted that the defendant Small, without authority, incorporated a whole paragraph in the rewritten minutes of the second director's meeting held on November 15, 1939. On page 142 of the brief, it is stated: "It is a fact that Mr. Small caused Miss Hoppens to rewrite the minutes of the second director's meeting held on November 15, 1939, and to incorporate therein a paragraph which Mr. Land had not inserted in the original draft of the minutes which was presented to and approved by the board. * * *"

It will be recalled that this case took nearly a year to be tried in the district court.

We granted the parties an entire day to argue the case in this Court on the first hearing and the same amount of time on the second rehearing and thirty days within which to file briefs in support of the applications for rehearings. We have carefully reviewed the voluminous records and briefs which have confirmed us in our convictions that the opinion on rehearing is sound and correct.

The applications for rehearings are denied.